IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**MARK ERIC LAWLOR,**

      **PETITIONER,**

v.                                  **CIVIL ACTION NO. 2:15-cv-113**

**DAVID W. ZOOK,**
**Warden, Sussex I State Prison,**

      **RESPONDENT.**

## REPORT AND RECOMMENDATION

    Mark Eric Lawlor, a Virginia state prisoner, filed a Petition for a Writ of Habeas Corpus on June 8, 2015 pursuant to 28 U.S.C. § 2254 ("Petition"), ECF No. 20, after having been appointed counsel by the Court on March 27, 2015, ECF No. 9. Respondent filed a Motion to Dismiss, ECF No. 28, and an accompanying memorandum, ECF No. 29, on July 23, 2015. On November 12, 2015, Lawlor filed a Motion to Defer Ruling on the Petition, ECF No. 36, as well as a Motion to Supplement the Record, ECF No. 38. Respondent filed oppositions to both motions on November 23, 2015, ECF Nos. 40-41, and Lawlor filed replies to Respondent's oppositions on November 26, 2015, ECF Nos. 42-43. On December 22, 2015, the Court denied Lawlor's Motion to Defer Ruling on the Petition. ECF No. 44. The remaining matters were referred for a recommended disposition to the undersigned United States Magistrate Judge ("undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to United States Magistrate Judges. For the reasons set forth in Part II(A) of this Report

1

and Recommendation, Lawlor's Motion to Supplement the Record, ECF No. 38, is **DENIED** and **DISMISSED WITH PREJUDICE**. Furthermore, the undersigned finds that Lawlor's claims are without merit, and therefore, **RECOMMENDS** that the Respondent's Motion to Dismiss, ECF No. 28, be **GRANTED**, and that the Petition, ECF No. 20, be **DENIED** and **DISMISSED WITH PREJUDICE**.

## I. FACTUAL AND PROCEDURAL BACKROUND

On February 11, 2011, Lawlor was convicted by a jury of premeditated murder of Genevieve Orange in the commission of abduction with the intent to defile, in violation of Va. Code § 18.2-31(1), and premeditated murder of Genevieve Orange in the commission of rape or attempted rape, in violation of Va. Code § 18.2-31(5). Set forth are the relevant facts leading to Lawlor's conviction as recited by the Supreme Court of Virginia:

> The victim, Genevieve Orange, was found on the floor of the living area of her studio apartment. She was naked from the waist down, her bra and t-shirt had been pushed up over her breasts, and semen was smeared on her abdomen and right thigh. Her soiled and bloodied shorts and underpants had been flung to the floor nearby. She had been struck 47 times with one or more blunt objects.
>
> A bent metal pot was found near Orange's body. Its wooden handle had broken off and was found in the kitchen sink, near a bloody metal frying pan that had been battered out of its original shape. Some of Orange's wounds were consistent with having been struck with the frying pan. Subsequent medical examination established that she had aspirated blood and sustained defensive wounds, together indicating that she had been alive and conscious during some part of the beating.
> Lawlor resided in Orange's apartment building. He also worked there as a leasing consultant and had access to keys to each apartment. On the eve of trial, Lawlor admitted "participation" in the murder.
>
> A blood sample from Orange's body and a buccal swab from Lawlor resulted in the compilation of a polymerase chain reaction ("PCR") DNA profile for each person, consisting of type characteristics or alleles from 16 genetic regions on their respective DNA strands. Police and medical personnel also collected forensic evidence from Orange's body. This forensic material, the wooden pot handle, and the frying pan were subjected to DNA analysis resulting in the

> compilation of a PCR DNA profile for each sample. A comparison of the PCR DNA profiles revealed that every allele at each of the 16 genetic regions from the forensic material and the frying pan was consistent with either Orange or Lawlor, with one exception: DNA from a non-sperm sample recovered from Orange's abdomen included a fractional amount of a single allele that was not consistent with either person's DNA profile. However, each of the alleles at the 15 other genetic regions in the sample was attributable to either Orange or Lawlor, as was each of the alleles at all 16 genetic regions from the other forensic material and the frying pan. The statistical probability that an unrelated person other than Lawlor contributed the DNA foreign to Orange was 1 in more than 6.5 billion.

*Lawlor v. Com.*, 285 Va. 187, 209-10, 738 S.E.2d 847, 859 (2013). At sentencing, the jury returned unanimous verdicts of death for each of the capital murder convictions, finding both of Virginia's aggravating factors: that Lawlor's conduct in committing the murder was outrageously wantonly vile, horrible, or inhuman, and that there was a probability that Lawlor would commit criminal acts of violence that would constitute a continuing serious threat to society. On July 2, 2011, following a post-verdict hearing, the trial court imposed the jury's death sentences. Lawlor appealed to the Supreme Court of Virginia, which affirmed his convictions and death sentences on January 10, 2013. *Id.* at 187, 738 S.E.2d at 847. Lawlor petitioned the Supreme Court of the United States for a writ of certiorari, which the Court denied on October 15, 2013. *Lawlor v. Virginia*, 134 S. Ct. 427, 187 L. Ed. 2d 282 (2013). On December 16, 2013, Lawlor filed a petition for a writ of habeas corpus to the Supreme Court of Virginia ("state habeas petition"). The Supreme Court of Virginia, in a published opinion dated October 31, 2014, dismissed the petition and denied Lawlor's request for relief. *Lawlor v. Davis*, 288 Va. 223, 764 S.E.2d 265 (2014). Lawlor's execution was scheduled for March 26, 2015, pursuant to Va. Code § 53.1-232.1. This Court entered a stay of execution on March 20, 2015, ECF No. 7, and further extended that stay on June 11, 2015, ECF No. 22.

Lawler, through appointed counsel, filed the instant Petition on June 11, 2015, raising the following claims:

I.      The trial court improperly prevented trial counsel from identifying substantially impaired jurors and improperly seated jurors without first determining substantial impairment, in violation of the Sixth, Eighth, and Fourteenth Amendments

II.     Lawlor's due process rights were violated by the trial court's contradictory rulings and hostile treatment of trial counsel during voir dire.

III.    Lawlor was convicted and sentenced by a jury assembled in a discriminatory manner and without enforcement of *Batson v. Kentucky*, in violation of the Sixth, Eighth, and Fourteenth Amendments; and trial counsel were ineffective in failing to object and litigate this issue.

IV.     Trial counsel rendered ineffective assistance of counsel under the Sixth and Fourteenth Amendments by failing to understand rudimentary law governing the charges (the elements of first and second degree murder) against Lawlor.

V.      Trial counsel were ineffective where they unreasonably failed to utilize and examine a psychopharmacologic expert in the guilt phase.

VI.     The jury instructions were unconstitutional with respect to the *mens rea* for murder; and trial counsel unreasonably failed to ensure that the jury was properly instructed.

VII.    The Commonwealth violated due process by knowingly presenting false testimony from Detective John Tuller.

VIII.   The Commonwealth violated due process by failing to disclose favorable, material evidence regarding Detective Tuller's expert credentials and testimony.

IX.     Lawlor was denied his Sixth and Fourteenth Amendment rights to plead guilty and be sentenced by a jury.

X.      Trial counsel rendered ineffective assistance under the Sixth and Fourteenth Amendments by failing to present available psychological testimony from an evaluating expert in the penalty phase.

XI.     The trial court improperly excluded testimony from Dr. Mark Cunningham of Lawlor's risk of violence in prison and his future adaptability to prison.

XII.    The trial court's exclusion of relevant mitigating evidence deprived the jury of critical sentencing evidence in violation of Lawlor's right to due process and a reliable sentencing determination under the Eighth and Fourteenth Amendments.

XIII.   Trial counsel rendered ineffective assistance under the Sixth and Fourteenth Amendments by unreasonably opening the door to damaging testimony from Amanda Godlove during cross-examination at the sentencing phase.

XIV.    Lawlor was denied his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments when the Commonwealth misled the sentencing jury by wrongly asserting, during penalty phase, that Lawlor raped Genevieve Orange; and trial counsel was ineffective for failing to object.

XV.     The vileness aggravating factor violated the Fifth, Sixth, Eighth, and Fourteenth Amendments.

XVI.    The penalty phase instructions unconstitutionally biased jurors toward a sentence of death and appellate counsel was ineffective in failing to properly present this claim on direct appeal.

XVII.   The trial counsel violated Lawlor's Fifth Amendment privilege against self-incrimination and Sixth Amendment right to counsel during his sentencing proceeding.

XVIII.  The cumulative impact of the constitutional errors in this case requires that Lawlor's convictions and death sentence be vacated.

ECF No. 20.  On July 23, 2015, the Attorney General of Virginia, on behalf of the Respondent, filed a Motion to Dismiss, a Rule 5 Answer, a brief in support, and a *Roseboro* notice.  ECF Nos. 27-29.  Lawlor filed a brief in opposition to the Motion to Dismiss on August 24, 2015.  ECF No. 35.  Therefore, the Motion to Dismiss is ripe for a recommended disposition.


## II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.  Motion to Supplement the Record

On November 12, 2015, Lawlor filed a Motion to Supplement the Record ("Motion to Supplement"), with an accompanying memorandum.  ECF Nos. 38-39.  In the Motion to Supplement, Lawlor asked for leave from the Court to supplement the record with two expert declarations and an expert report.  ECF No. 39 at 2 (referring to three attachments—the supplemental documents—to the memorandum).  Lawlor explained that the three supplemental documents would be used to support Claims V, X, and XII in the present Petition:

i.   Declaration of Dr. Alexander Morton:  The first piece of supplemental evidence is a declaration from Dr. Alexander Morton ("Dr. Morton"), the

5

psychopharmacological expert for Lawlor's trial. ECF No. 39 attach. 1. In his declaration, Dr. Morton explained that trial counsel contacted him in November of 2010 to provide a psychopharmacological clinical evaluation of Lawlor. *Id.* ¶¶ 4-5. Apparently on the day Dr. Morton was supposed to conduct the pretrial clinical interview, a snowstorm hit and the interview did not take place. *Id.* attach. 1 ¶ 5,6. Trial counsel still had Dr. Morton testify but only as a "teaching expert" on the effects of drugs and alcohol that night as he did not interview Lawlor first-hand. *Id.* ¶ 17 ("At trial, because I was not given the opportunity to examine Mr. Lawlor, I could testify only to generalities and as a teaching expert."). Dr. Morton stated in his declaration that if he had been given the opportunity to interview Lawlor before the trial, he "would have informed trial counsel that a hypothetical person who consumed at least seven grams of crack cocaine and at least twelve beers would not be able to premeditate or deliberate. . . . [And] that the evidence of repeated blows that were apparent on [the victim's] body may not have been the product of intent, but instead an unintentional product of Mr. Lawlor's drug use that night." *Id.* ¶¶ 14-15. Lawlor sought to use Dr. Morton's declaration to supplement Claim V, wherein he argued that trial counsel were deficient for failing to prepare Dr. Morton. ECF No. 39 at 3.

ii.    Psychological Report of Trauma: The second piece of supplemental evidence is a psychological report of trauma prepared by clinical psychologist Victoria Reynolds ("Dr. Reynolds") on November 10, 2015. ECF No. 39 attach. 2. Reynold's report discussed a brief psychosocial history of Lawlor, including information about his biological parents. *Id.* at 5-8. It then discussed Lawlor's lifetime exposure to traumatic experiences (domestic violence, emotional neglect, verbal and physical abuse, promiscuity, sexual boundary violations, sexual victimization, etc.). *Id.* at 8-15. Dr. Reynold's then provided an overview of the immediate and long-term impacts of repeated childhood abuse and neglect on brain and neural development, as well as masculinity and adult relationships. *Id.* at 15-27. Lawlor sought to introduce this report to supplement Claim X, wherein he argued that trial counsel were deficient for failing "to present available psychological testimony that would have explained how his mental illnesses and traumatic upbringing impacted his character, led to his substance abuse problems, and mitigated his capital crime." ECF No. 39 at 5. Lawlor also sought to introduce this report to supplement Claim XII, arguing that the trial court violated the Eighth and Fourteenth Amendments by applying hearsay rules prohibiting him from presenting reliable evidence of his sexual abuse unless he testified. *Id.* at 9-10.

iii.   Declaration of Dr. Joette James: The third piece of supplemental evidence is a declaration from Dr. Joette James, Ph.D., ABPP-CN ("Dr. James"), a licensed psychologist and a board-certified clinical neuropsychologist. ECF No. 39 attach. 3 ¶ 1. Dr. James completed a pretrial evaluation of Lawlor by compiling his psychosocial history and administering a number of in-person neuropsychological tests. *Id.* ¶ 4. Trial counsel did not call Dr. James as an expert to testify, but she stated in her declaration that if she had been called as a witness, she would have

been able to testify regarding her test results and could have described Lawlor's traumatic experiences as a child, ultimately explaining how those experiences negatively affected his psychological and neuropsychological development. *Id.* ¶ 5. She then concluded that this evidence would have established that Lawlor was likely to behave well in a highly structured environment like prison. *Id.* Dr. James also added that trial counsel did not ask for her opinions regarding the prosecution's expert Dr. Leigh D. Hagan's ("Dr. Hagan") report. *Id.* ¶ 8. If they had, Dr. James stated that she would have explained and testified to the errors in Dr. Hagan's report. *Id.* Similar to Dr. Reynold's report, Lawlor sought to introduce Dr. James's declaration to supplement both Claim X and Claim XII. ECF No. 39 at 9-12.

Respondent filed an Opposition to the Motion to Supplement on November 23, 2015. ECF No. 41. Lawlor filed a Reply on November 26, 2015. ECF No. 43. On January 7, 2016, Lawlor filed a request for a hearing on the matter. ECF No. 46. After reviewing the briefs, the undersigned disposes of the Motion to Supplement on the papers without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J).

When considering a Motion to Supplement, the threshold question is whether the claims the petitioner seeks to supplement were "adjudicated on the merits" in state court proceedings consistent with § 2254(d). *See Waters v. Clarke*, No. 2:11CV630, 2012 WL 4498914, at *8 (E.D. Va. Sept. 28, 2012) *aff'd*, 560 F. App'x 197 (4th Cir. 2014); *Winston v. Pearson*, 683 F.3d 489, 501-02 (4th Cir. 2012) (*Winston II*). The reason for this barrier is to limit the federal court's analysis, keeping with the "AEDPA's goal of promoting comity, finality, and federalism by giving state courts the first opportunity to review a claim, and to correct any constitutional violation in the first instance." *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011) (citing *Jimenez v. Quarterman*, 555 U.S. 113, 121 (2009)). 28 U.S.C. § 2254(d) does not permit a federal court to grant a habeas petition when the petitioner is in custody pursuant to a state court judgment and the state court adjudicated the merits of any habeas claim now before the federal court, unless the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2). Further, when the petitioner's claims were adjudicated on the merits before the state court, the petitioner generally cannot introduce new evidence on federal habeas review. *Cullen*, 563 U.S. at 171 (explaining that "the record under review is also limited to the record in existence at that same time—*i.e.,* the state-court record"). Consequently, the federal court can only consider evidence that was before the state court. *Id.* (noting that this backward-looking analysis is consistent with Congress' intent to channel a petitioner's claims first to state court).

However, there are some nuances to note with this initial § 2254(d) evidentiary barrier. A federal court may encounter a situation where the petitioner requested discovery or an evidentiary hearing in state court but had his request denied and was unable to present the evidence before the state court, thereby also unable to develop the factual basis of his claim. The petitioner's argument essentially becomes that he was unable to exhaust his claims in state court because the state foreclosed further development of the factual record. *See Winston v. Kelly*, 592 F.3d 535, 555 (4th Cir. 2010) (*Winston I*) ("[W]hen a state court forecloses further development of the factual record, it passes up the opportunity that exhaustion ensures."). If this situation arises, the federal court must keep to the § 2254(d) analysis and only ask whether the state court's decision to deny the petitioner's ability to develop the factual record (denying a discovery or an evidentiary hearing request) was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented before the state court. 28 U.S.C. §

8

2254(d); *see also Powell v. Kelly*, 531 F. Supp. 2d 695, 713-14 (E.D. Va. Jan. 11, 2008) *aff'd*, 562 F.3d 656 (4th Cir. 2009) (citing *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000) ("A decision to admit evidence under state law is not reviewable by a federal habeas court 'unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding.'")).

One way a federal court can make a determination as to whether the denial of discovery was reasonable is to consider whether the petitioner's "*properly advanced* evidence failed to demonstrate the need for discovery." *Waters*, 2012 WL 4498914, at *8 (emphasis in original). In another case decided by this Court, *Davis v. Mathena*, the petitioner, Davis, argued in his federal habeas petition that "[t]rial counsel was ineffective because he failed to object to Davis wearing leg shackles that were visible to the jury during all phases of the trial." No. 2:12CV92, 2014 WL 1308694, at *3 (E.D. Va. Mar. 27, 2014). Davis sought to expand the record on federal habeas review with additional evidence that he was in fact shackled during his trial to support this claim. *Id.* This Court ordered the Respondent to provide declarations from individuals with personal knowledge in response to Davis' allegation, but none of Respondent's provided declarations affirmatively stated whether Davis was or was not shackled in view of the jury. *Id.* Davis had tried to raise this issue on review in his state habeas petition by requesting an evidentiary hearing but was denied the opportunity by the state court. *Id.* at *5. This Court granted Davis' request for an evidentiary hearing in federal court, finding "that the Supreme Court of Virginia unreasonably denied Davis' request for an evidentiary hearing, when material evidence supporting his shackling claim would have been presented had a hearing been granted." *Id.* Because the evidence Davis did present demonstrated the need for further development of the record, and he attempted to present the evidence before the state court but was denied the

opportunity, this Court found the state court's decision unreasonable and permitted Davis to expand the record with the new evidence at the federal habeas level. *See Waters*, 2012 WL 4498914, at *8 (explaining that the supplemental evidence must be sufficient enough to demonstrate the material nature of the evidence that the petitioner would have presented to the state court if the state court had permitted discovery). When the federal court makes such a determination—that the state court's decision denying petitioner's opportunity to develop the factual basis of his claim was unreasonable—the federal court is to interpret the state court's decision as having not been adjudicated on the merits. *Winston II*, 683 F.3d at 496. It is key that the petitioner diligently tried to develop the factual foundation before the state, otherwise the petitioner could circumvent the AEDPA's § 2254(b) exhaustion requirement, and the petitioner could "overcome an adverse state-court decision with new evidence introduced in a federal habeas court and [have the evidence] reviewed by that court in the first instance effectively *de novo*." *Pinholster*, 563 U.S. at 182. Thus, the mere act of requesting an evidentiary hearing from the state court might not always suffice to satisfy AEDPA's diligence requirement. *Winston II*, 683 F.3d at 497.

To sum, the general rule states, consistent with the AEDPA's § 2254(b) exhaustion requirement, the petitioner cannot present new evidence on federal habeas review if that evidence has not been presented to a state court that adjudicated the merits of petitioner's claims. One exception comes into play when the petitioner tries to supplement the record on federal review with evidence that the petitioner *diligently* tried to present to the state court but the state court *unreasonably* denied the petitioner said opportunity. It could be found, in some instances, that the state court unreasonably denied the petitioner the opportunity to present evidence when the evidence the petitioner did successfully provide to the court (*i.e.* his "properly advanced

evidence") demonstrated the need for further discovery, including but not limited to an evidentiary hearing. If so found, the claims the petitioner was unable to factually support will be considered as not having been adjudicated on the merits. At that point, the federal court can consider the supplemental evidence when reviewing the petitioner's claims *de novo*.[1]

The Court finds that consideration of Lawlor's Motion to Supplement stops at the initial barrier. The Supreme Court of Virginia fully adjudicated Lawlor's claims on the merits. Claims V and X were adjudicated before the Supreme Court of Virginia in Lawlor's state habeas proceeding, *Lawlor*, 288 Va. at 223, 764 S.E.2d at 274-75, 282-83 (state habeas claims VI and XII, respectively); and Claim XII was adjudicated on direct appeal to the Supreme Court of Virginia, *Lawlor,* 285 Va. at 242, 738 S.E.2d at 878 *cert. denied sub nom. Lawlor*, 134 S. Ct. 427. Because of this finding, this Court is limited to the record that was before the state court. And the exception does not come into play here because though the Supreme Court of Virginia denied Lawlor's request for expert assistance, discovery, and an evidentiary hearing, ECF No. 42

---

[1] There is a further caveat at this stage in the analysis that is unnecessary to consider in this case because the Court finds the state court fully adjudicated Lawlor's claims on the merits and the state court did not unreasonably deny him an opportunity to present the pending supplemental evidence during state proceedings. However, the Court will briefly address the standard since Lawlor raised the issue in his accompanying memorandum. ECF No. 39 at 2. If a federal court does consider the petitioner's claims *de novo*, there are three hurdles that each piece of new evidence must clear before the new evidence can be considered on federal habeas review: First, the petitioner must have exhausted the claim for which he is trying to introduce the new evidence on federal habeas review by demonstrating that he raised the same claim at the state level of review. *See Powell*, 492 F. Supp. 2d at 559-60. Second, a court must then consider whether the new evidence merely supplements or fundamentally alters the previous claim raised at the state level (as to render a new claim that would be unexhausted). *See id.* at 560 (citing *Morris v. Dretke,* 413 F.3d 484, 491 (5th Cir. 2005) ("While the question whether additional evidence 'supplements' or 'fundamentally alters' a state petition can only be answered by reference to the facts and circumstances of each case, new evidence that places a claim in a 'significantly different legal posture' must first be presented to and exhausted in the state courts."); *Winston*, 592 F. 3d at 550 ("The key is whether [the petitioner] offered some evidence in state court to support the factual claim that he possesses significantly sub-average intellectual functioning as measured by a standardized test."); *Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000) ("Although both the State and [the petitioner] argue this issue as one of 'factual development' under § 2254(d) and (e), it is more accurately analyzed under the 'exhaustion' rubric of § 2254(b)."). And third, if the new evidence merely supplements, the court must consider whether the new evidence is *relevant* to the *Strickland* analysis (*e.g.* would it be material to demonstrate the petitioner was prejudiced as a result of ineffective assistance of counsel?). *See Richmond v. Polk*, 375 F.3d 309, 328 (4th Cir. 2004); *Dowthitt*, 230 F.3d at 745 (finding that the petitioner's new evidence supplemented and did not fundamentally alter petitioner's ineffective assistance claim—demonstrating deficient performance—but that in any event the petitioner was not prejudiced by counsel's performance on this matter); *cf. Buxton v. Lynaugh*, 879 F.2d 140, 142 (5th Cir. 1989) ("*Strickland* allows the habeas court to look at either prong first; if either one is found dispositive, it is not necessary to address the other.").

at 1, the denial was not unreasonable. The evidence Lawlor presented as supplemental is not evidence he attempted to present before the state court. By denying his request for expert assistance, discovery, and an evidentiary hearing, the Supreme Court of Virginia did not prevent Lawlor from producing the expert declarations, nor did the court prevent Lawlor from presenting the expert report. Further, there is no indication that the evidence Lawlor properly advanced in state court demonstrated the need for further development of the factual record at that time. In fact, the supplemental evidence is merely *better* evidence that could theoretically support his claims, and not necessarily new evidence so that but for the Supreme Court of Virginia's actions Lawlor was prevented a fair opportunity to develop the factual record before the state court. Accordingly, Lawlor's Motion to Supplement, ECF No. 38, is **DENIED WITH PREJUDICE**.

## B. Timeliness

Section 2254 petitions are subject to a one-year statute of limitations and must be dismissed if they are filed later than one year after the conclusion of direct review of the conviction or the expiration of the time to seek direct review. 28 U.S.C. § 2244(d)(1)(A). Generally, the limitation period for filing a § 2254 petition is statutorily tolled during the time in "which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim" is pending. *Id.* § 2244(d)(2). To be properly filed, the petition must comply with the state's procedural rules imposed on post-conviction petitions, *Pace v. DiGuglielmo*, 544 U.S. 408, 413-17 (2005) (denying statutory tolling to an improperly filed petition when the state court rejected the petition as untimely), and violation of those rules, including "time limits, place for filing and filing second or successive petitions," will render that petition improperly filed and ineligible for statutory tolling, *Rodgers v. Angelone*, 113 F. Supp.

2d 922, 929 (E.D. Va. Sept. 12, 2000). Moreover, the time in which a habeas petition is pending in federal court does not toll the one-year statute of limitations. *Duncan v. Walker*, 533 U.S. 167, 172 (2001).

The Supreme Court of Virginia considered Lawlor's direct appeal on January 10, 2013, and affirmed the trial court's decision. *Lawlor*, 285 Va. at 187, 738 S.E.2d at 847. The Supreme Court of the United States denied Lawlor's petition for a writ of certiorari on October 15, 2013, concluding the time for seeking direct review of his state-court conviction. *Lawlor*, 134 S. Ct. at 427. *See* Sup. Ct. R. 13.1; *Harris v. Hutchinson*, 209 F.3d 325, 328 & n.1 (4th Cir. 2000) ("[T]he time for seeking direct review of [the] state-court conviction was concluded . . . when the period for filing a petition for a writ of certiorari in the United States Supreme Court expired."). Under § 2244(d)(1), Lawlor had until October 15, 2014, to file his habeas petition in this Court. However this period was statutorily tolled from December 16, 2013, when Lawlor filed his state habeas petition in the Supreme Court of Virginia until October 31, 2014, when the Supreme Court of Virginia dismissed his petition, or for three hundred and nineteen (319) days. *Cf. Lawrence v. Florida*, 549 U.S. 327, 334-36 (2007) (holding the petitioner is not entitled to tolling for the additional ninety days to file a petition for writ of certiorari to the United States Supreme Court following state collateral review, even if the petition for certiorari is actually filed). Due to this tolling period, Lawlor was left with three hundred and three (303) days to file his habeas petition in this Court, which expired on August 30, 2015. The instant Petition was filed on June 8, 2015, and therefore complies with the § 2244(d)(1) one-year statute of limitations. Therefore, the undersigned **FINDS** that Lawlor's Petition is timely.

**C. Exhaustion and Analysis of Petition Claims**

Before addressing the merits of a federal habeas petition, the preliminary inquiry must be whether the petitioner appropriately exhausted his claims and whether the petitioner's claims are barred by procedural default. Section 2254 allows a prisoner held in state custody to challenge his detention on the ground that his custody violates the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A state prisoner, however, must exhaust his available state remedies or demonstrate the absence or ineffectiveness of such remedies before petitioning for federal habeas relief in order to give "state courts the first opportunity to consider alleged constitutional errors occurring in a state prisoner's trial and sentencing." *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). Importantly, "[t]he burden of proving that a claim is exhausted lies with the habeas petitioner." *Id.* at 618. The exhaustion requirement is satisfied if the prisoner seeks review of his claim in the highest state court with jurisdiction to consider it through either direct appeal or post-conviction proceedings, *see O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999), and the "essential legal theories and factual allegations advanced in the federal court [are] the same as those advanced at least once to the highest state court," *Pruett v. Thompson*, 771 F. Supp. 1428, 1436 (E.D. Va. Aug. 19, 1991), *aff'd*, 996 F.2d 1560 (4th Cir. 1993). The Court will discuss exhaustion as it arises throughout this Report and Recommendation.

Claim I.

In Claim I, Lawlor argued that the trial court improperly prevented trial counsel from identifying substantially impaired jurors and improperly seated jurors without first determining

substantial impairment, in violation of the Sixth, Eighth, and Fourteenth Amendments.  ECF No. 20 at 5.  Lawlor further separated Claim I into two parts, Claim I(A) and Claim I(B):

Claim I(A): Lawlor argued that voir dire was insufficient to identify jurors substantially impaired from considering a life sentence.  *Id.* at 6.  Essentially, Lawlor stated that the trial court improperly prevented defense counsel from directly inquiring about the prospective jurors' ability to consider a life sentence, but permitted the Commonwealth to ask, "Are you opposed to the death penalty?"  *Id.* at 8.  The Supreme Court of Virginia considered the merits of this argument and rejected it on direct appeal.  *See Lawlor*, 285 Va. at 215, 738 S.E.2d at 862-63 (discussing the claim under section header "Views on Capital Punishment").  Respondent argued that the Supreme Court of Virginia's decision was not unreasonable because "Lawlor had the opportunity to determine whether the jurors could perform their duties in accordance with their instructions and their oath."  ECF No. 29 at 20.  Lawlor argued to this Court that the Supreme Court of Virginia's holding regarding the trial court's preclusion of questions about jurors' feelings regarding the death penalty was contrary to *Morgan v. Illinois*, 504 U.S. 719 (1992), and was unreasonable because the court "failed to consider the inequity of the Commonwealth being permitted to ask the types of questions the defense was prohibited from asking."  ECF No. 20 at 10-11.

The Supreme Court's holding in *Morgan* specifically dealt with a juror's ability to be impartial: "A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do," and based on "the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views."  *Id.* at 729.  Thus, where *Wainwright v. Witt* held that the state may exclude for

cause jurors that would never impose a sentence of death, 469 U.S. 412 (1985), *Morgan* extended the same right to a defendant, permitting a defendant to exclude, for cause, jurors that would always impose a sentence of death in certain circumstances, 504 U.S. at 733-34. Essentially, "[i]n a capital murder trial, potential jurors are questioned to assure that those who would invariably impose capital punishment be removed from the panel. If this purpose is satisfied, 'it is not reversible error for the trial court to deny defense counsel additional questions on this subject.'" *Beavers v. Com.*, 245 Va. 268, 277-78, 427 S.E.2d 411, 418 (1993) (citing *Mueller v. Commonwealth*, 244 Va. 386, 401, 422 S.E.2d 380, 390 (1992)). The Supreme Court of Virginia, citing *Burns v. Commonwealth*, 261 Va. 307, 329, 541 S.E.2d 872, 887, *cert. denied*, 534 U.S. 1043 (2001), held that neither party is entitled to ask potential jurors their views on the death penalty, and that the relevant inquiry instead is to ask "whether the juror would adhere to [his/her personal views] in disregard of the jury instructions and in violation of his or her oath." *Lawlor*, 285 Va. at 215, 738 S.E.2d at 863; *see Beavers*, 245 Va. at 278, 427 S.E.2d at 418 ("A review of the record in this case shows that the trial court posed questions to prospective jurors that were sufficient to provide Beavers with a basis upon which he could challenge prospective jurors for cause, based on a potential juror's position concerning imposition of capital punishment."). Thus, the Supreme Court of Virginia's holding on the matter was in conformity with *Morgan* in that it held that the relevant inquiry is whether the juror is impartial, or in other terms, could set aside his or her personal views.

Claim I(B): Lawlor argued that voir dire was insufficient to identify jurors substantially impaired from considering mitigating evidence. ECF No. 20 at 8. Lawlor's trial counsel sought to ask the jurors about their ability to consider mitigating evidence but was precluded by the trial court. *Id.* at 9. The trial court only allowed counsel to ask "the broadest questions about

mitigation," such as whether the jurors could "consider any and all issues of mitigation that we present and based on that rule for life," and whether there were "any issues of mitigation that you would not consider?" *Id.* For instance, trial counsel sought to ask the jurors "whether there were any issues of mitigation that [the jurors] would not consider;" and to ask them about "their ability to consider childhood evidence, including evidence of abuse and neglect; the defendant's full life history, including the circumstances of his childhood through the present; lack of a violent criminal record prior to the charged crime; and drug or alcohol abuse." *Id.* at 9-10. On direct appeal, Lawlor argued to the Supreme Court of Virginia that based on the Supreme Court's opinion in *Abdul–Kabir v. Quarterman*, 550 U.S. 233 (2007), "denying him the opportunity to ask about specific types of mitigating evidence . . . prevented him from determining whether the jurors could give meaningful consideration to all mitigating evidence." *Lawlor*, 285 Va. at 215-16, 738 S.E.2d at 863. The Supreme Court of Virginia also rejected this claim on direct appeal. *Id.* at 216, 738 S.E.2d at 863 (discussing the claim under section header "Mitigating Evidence" and stating, "Lawlor argues that the court erred by preventing him from asking whether specific members of the venire would consider a life sentence in the absence of any mitigating evidence"). The Supreme Court of Virginia determined that the focus of voir dire is on a juror's particular bias or prejudice and *Abdul-Kabir* "does not require courts to permit defendants to ask jurors how they would weigh every species of mitigating evidence." *Id.* The Supreme Court of Virginia noted that even though Lawlor was prevented from asking certain questions,

> each of the specified members of the venire was instructed during voir dire that a sentence of death is never mandatory and that the jury could return a sentence of life imprisonment without parole even if the Commonwealth proved both aggravating factors and Lawlor presented no mitigating evidence. The court thereafter asked each member whether he or she understood that the defense was not required to present mitigating evidence. Counsel also asked whether the members of the venire understood and received affirmative responses.

17

*Id.* The court further noted that counsel are not entitled to ask members of the venire their questions in their preferred manner. *Id.*

Lawlor argued to this Court that the state court's decision was unreasonable or contrary to clearly established Supreme Court law, citing *Abdul–Kabir,* 550 U.S. 233 (2007), *Hitchcock v. Dugger,* 481 U.S. 393 (1987), and *Eddings v. Oklahoma,* 455 U.S. 104 (1982). The Supreme Court's holdings in *Abdul-Kabir*, *Hitchcock*, and *Eddings*, were all limited to the jury's ability to consider mitigating evidence when imposing a death sentence:

> Our line of cases in this area has long recognized that before a jury can undertake the grave task of imposing a death sentence, it must be allowed to consider a defendant's moral culpability and decide whether death is an appropriate punishment for that individual in light of his personal history and characteristics and the circumstances of the offense.

*Abdul-Kabir*, 550 U.S. at 263-64; *see also Hitchcock*, 481 U.S. at 398-99 (holding that a sentencing jury must be instructed to consider non-statutory mitigating circumstances, and not just statutory mitigating evidence); *Eddings*, 455 U.S. at 117 (holding that "state courts must consider all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances"). In *Goins v. Angelone*, the court addressed a Fourth Circuit case regarding what questions on voir dire are sufficient to determine whether jurors would consider mitigating circumstances:

> In *Yeatts v. Angelone,* 166 F.3d 255, 262-66 (4th Cir. 1999), *cert. denied,* 526 U.S. 1095 (1999), as here, a habeas petitioner sought relief on the ground that trial counsel provided ineffective assistance when he failed to conduct voir dire sufficient to determine whether jurors would consider mitigating circumstances in determining the sentence of a capital defendant. The panel rejected this claim, holding that voir dire regarding jurors' willingness and ability to impose the death penalty is sufficient to protect a capital defendant's Sixth and Fourteenth Amendment rights when jurors are asked (i) whether they have any opinion that would prevent them from convicting anyone of an offense punishable with death; (ii) whether, if they found the defendant guilty of capital murder, they could never vote to impose the death penalty or even consider its imposition; and (iii) whether,

if they found the defendant guilty of capital murder, they would be able to consider voting for a sentence less than death.

52 F. Supp. 2d 638, 657-58 (E.D. Va. June 10, 1999). This standard—what the jurors can be asked in a capital case—was well recognized in this case and properly executed.[2] "No further questions are constitutionally required to 'death qualify' a jury, and counsel cannot be constitutionally ineffective for failing to ask further questions regarding the jurors' opinions on possible mitigating and aggravating circumstances." *Id.* Because the scope of the Supreme

---

[2] For an example of the proper execution of this standard, see JA 8420-22:

[THE COMMONWEALTH or] MR. MORROGH: Ms. Alvarex, do you think based on all the evidence in a case – if you felt the case was appropriate, could you ever vote for the death penalty in a case?
MS. ALVAREZ: No.
MR. MORROGH: No?
MS. ALVAREZ: No.
MR. MORROGH: Okay. Can you tell us why you couldn't do that?
MS. ALVAREZ: Because a life is something that should be preserved. That's why we have different punishments for people.
MR. MORROGH: So you could never vote for the death penalty? That's okay. Thank you. Ms. Belayneh, if you felt the evidence called for it in a case, would you ever vote for the death penalty?
MS. BELAYNEH: Yes.
MR. MORROGH: By the same token, even though this is a capital case, if you felt the evidence and everything you've heard did not call for the death penalty, could you still vote for life?
MS. BELAYNEH: Yes.
MR. MORROGH: You could?
Ms. BELAYNEH: Yes.
MR. MORROGH: Mr. Evinger, the same questions. If you felt the evidence called for and was appropriate in this case, and the Commonwealth had met all its burdens, could you ever vote for the death penalty?
MR. EVINGER: Yes, I could.
MR. MORROGH: On the other hand, if after listening to all the evidence and giving it your mature consideration, could you ever vote for a life sentence, assuming the Defendant is guilty?
MR. EVINGER: Possibly.
MR. MORROGH: Can you expand on that a little bit? It's okay to just talk out loud.
MR. EVINGER: Sure. It would depend on the totality of the evidence. I would wait to hear all the evidence.
MR. MORROGH: So would you wait to listen then to all of the evidence, both in mitigation and aggravation and then make a decision?
MR. EVINGER: Yes.
MR. MORROGH: Okay. Could you go either way, life or death, depending on the totality of the evidence?
MR. EVINGER: It's a possibility. Yes, sir.
MR. MORROGH: So when you say possibility, you could vote for a life sentence?
MR. EVINGER: Yes.
MR. MORROGH: And you could vote for a death sentence?
MR. EVINGER: Yes.
. . .
MR. MORROGH: And you'll follow the Court's instructions?
MR. EVINGER: Yes, I will.

Court's holding in *Abdul-Kabir* did not include counsel's entitlement to inquire into jurors' abilities to consider specific forms of mitigating evidence during voir dire, the Supreme Court of Virginia's decision to not extend the scope of the Supreme Court's ruling is not unreasonable or contrary to established law. "'[I]f a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.' AEDPA's carefully constructed framework 'would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.'" *White v. Woodall*, 134 S. Ct. 1697, 1706, *reh'g denied*, 134 S. Ct. 2835 (2014). The Supreme Court of Virginia' decision was not unreasonable as to the claims raised in I(A) or I(B); thus, the undersigned **RECOMMENDS DISMISSAL** of Claim I.

<u>Claim II.</u>

In Claim II, Lawlor argued that his due process rights were violated by the trial court's contradictory rulings and hostile treatment of counsel during voir dire. ECF No. 20 at 11. Lawlor further separated Claim II into two parts, Claim II(A) and Claim II(B):

Claim II(A): Lawlor argued that the trial court's "rulings hindered defense counsel's ability to conduct constitutionally adequate voir dire and gave the misimpression that counsel was behaving inappropriately." *Id.* at 11-12. The Supreme Court of Virginia rejected this claim on direct appeal. *Lawlor*, 285 Va. at 219, 738 S.E.2d at 865. Regarding the alleged contradictory rulings during voir dire, the Supreme Court of Virginia stated:

> [T]he only rulings adverse to Lawlor were those we have refused to reverse under the abuse of discretion standard, including rulings on questions to elicit the jurors' views or feelings on capital punishment, their ability to consider a sentence of life imprisonment without parole in the absence of mitigating evidence, and their willingness to consider specific types of mitigating evidence. Because those

> rulings were not error, they did not prejudice Lawlor in voir dire. To the extent
> that the adverse rulings may have been contradicted by favorable rulings at other
> places in the record, the favorable rulings could not prejudice Lawlor because
> they enabled him to propound questions that the court could properly, in its
> discretion, have excluded.

*Id.* The Supreme Court of Virginia's decision was not unreasonable. Voir dire in this case was

extensive. Questioning of potential jurors took four full days and peremptory strikes were

exercised on a fifth day. Furthermore, "[t]he method of conducting *voir dire* is within the trial

court's discretion." *Beavers*, 245 Va. at 276, 427 S.E.2d at 417-18 (citing *Fisher v.

Commonwealth*, 236 Va. 403, 410, 374 S.E.2d 46, 50 (1988), *cert. denied*, 490 U.S. 1028

(1989)); *Mu'Min*, 500 U.S. at 424 (stating that trial courts retain great latitude in deciding what

questions should be asked on voir dire). Simply because the court limited trial counsels'

questions in substance and form does not mean that the court's rulings were inconsistent or

hostile. Defense counsel clearly sought to push the envelope in form and substance, asking

questions beyond the scope of voir dire in capital cases and the court was frequently tasked with

addressing defense counsels' deviations. *See, e.g.*, JA 8434 ("THE COURT: What you asked

him I think is inappropriate. You're not asking the questions of what they can consider and that's

fine. But you're asking them what's your verdict. That is not proper."); 8438 ("THE COURT:

As soon as you asked him what would be your decision with respect to -- you crossed that

line."); 8439 ("THE COURT: You're asking this juror to tell you in advance what his verdict

would be given the proper circumstances. That's an improper question and I've sustained the

objection. I'm not going to sustain it a third time.").

   The trial court's rulings during voir dire were within the confines of the law and since

such rulings are the sound discretion of the trial court, Lawlor's argument lacks merit. *See

Goins*, 52 F. Supp. 2d at 671 ("[I]t was proper for the trial court to disallow various cumulative

questions concerning jurors' attitudes about the death penalty, when the subject had been adequately covered by other questions. In addition, the questions about jurors' community involvement, impressions of mental health professionals, and experiences with the criminal justice system were in no way constitutionally required."); *United States v. Tipton*, 90 F.3d 861, 877-78 (4th Cir. 1996) (refusing to find abuse of discretion in the district court's decision during voir dire to confine questioning to a general question by the court with opportunity provided for follow-up questioning by counsel).

Claim II(B): Lawlor also argued that the trial court repeatedly engaged in hostile and belittling treatment of defense counsel, which occurred in open court and during bench conferences. ECF No. 20 at 13. Lawlor further argued that this treatment of defense counsel prejudiced Lawlor because the court reprimanded counsel in the presence of jurors, violating Lawlor's due process rights to 'a fair trial in a fair tribunal." *Id.* at 13-15 (citing *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009)). As one ground, Lawlor pointed to an instance where the trial court threatened to terminate defense counsel's voir dire or replace counsel if he failed to follow the court's instructions. When read in context, the court's statements at the bench conference, while direct, do not express hostility:

> THE COURT: Counsel, I don't how many times I have to tell you that you cannot ask these jurors what their vote is going to be on a particular issue. There are four categories. They are whether the venire are related, has an interest in the case, expressed or formed an opinion, sensitive to any bias or prejudice or they stand indifferent to the cause. You may not continue to ask questions like if prove this would you vote that. That's improper. You're not entitled to do that. You cannot do that. I'm going to terminate your voir dire. We've now gone for three hours. Some of these questions you have asked five and six times and I have given you leeway and I have tried not to object from the bench. But I'm not going to sit idly by while you re-ask questions over and over and over of this same witness. Are we clear on that?
>
> MR. UNGVARSKY: I understand –

THE COURT: If you continue to do that, I will cut you off and I will end your voir dire or I will replace you as counsel in this case. I have the power to do that.

MR. UNGVARSKY: I hear what the Court is saying.

JA 8483-84.[3] The Supreme Court of Virginia also rejected this claim because "he did not object that the comments were prejudicial when they were made in open court or there is no indication that the jury heard the comments made during bench conferences." *Lawlor*, 285 Va. at 220, 738 S.E.2d at 865. In regards to the comments to which counsel failed to timely object, these issues are procedurally defaulted. *Weeks v. Angelone*, 176 F.3d 249, 270 (4th Cir. 1999) *aff'd*, 528 U.S. 225 (2000) (holding that Rule 5:25 is an independent and adequate state procedural bar precluding review of errors not raised at trial). Lawlor may only overcome the procedural default and obtain federal review on the merits if he can demonstrate cause and prejudice for the default or demonstrate that failure to review the claims will result in a fundamental miscarriage of justice. *See Edwards v. Johnson*, 2010 WL 5825427, at *3 (E.D. Va. Dec. 15, 2010. To

---

[3] This Court has a hard time even finding the alleged "hostile" treatment that Lawlor refers to. All instances of reprimand that Lawlor cited are nothing more than the trial court's clear exercise of its discretion both to keep order in the court and to balance counsel's zealous advocacy with respect for courtroom decorum and adherence to the court's rulings. The above warning by the court was not Mr. Ungvarsky's first warning to stay within the scope of voir dire and to not "try his case" through the questions he asked.

> THE COURT: Mr. Ungvarsky, I'm not going to tell you again. If you cannot do voir dire -- you're a guest in this Court. You are admitted pro hac vice. You are not a member of the Virginia Bar. If you cannot conduct yourself under the rules of this Court, then I'm going to ask you to step aside and I'll allow one of the other counsels to conduct this voir dire. You have continually from the very beginning of this to attempt to try your case and set forth the facts of this case and ask the potential jurors to tell you how they would vote. That's not permissible. It is objectionable to the Commonwealth. Please do not do it again.

JA 8446. On many instances the Commonwealth objected to specific questions and the court, rather than prohibiting defense counsel from questioning the potential juror, required defense counsel to rephrase or ask the questions in "proper form," *i.e.*, form consistent with case law. *See, e.g.*, JA 8424-30 (requiring defense counsel to rephrase his question about whether a juror would think that death is the only appropriate punishment because counsel initially provided a hypothetical to the potential juror and then sought to ask "what are your thoughts on the appropriateness of the death penalty for that guilty murder?"). This Court finds no hostile treatment occurred and therefore there was no need to raise any objection to the alleged conduct. In addition to the argument being unavailing, the Court notes that Lawlor presented no evidence that jurors actually heard any allegedly prejudicial comments made during bench conferences. He only referenced comments that defense counsel made to the court requesting the judge to lower his voice. ECF No. 20 at 13-14 (citing JA 8712, 8776-77, 9178-79). This Court will not make such an inference without more.

establish cause, Lawlor argued that "trial counsel unreasonably failed to sufficiently preserve this error at trial," *i.e.,* an ineffective assistance of counsel claim.   ECF No. 20 at 15.

"Ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim." *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000) (emphasis in original).   To constitute cause for a second constitutional claim, an ineffective assistance of counsel claim must be exhausted or else it, too, is procedurally defaulted. *See id.* at 453; *Murray,* 477 U.S. at 489 ("[T]he exhaustion doctrine . . . generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default."); *Justus v. Murray,* 897 F.2d 709, 714 (4th Cir. 1990) ("[B]efore an ineffective assistance of counsel claim may be raised as cause in federal habeas, it must first be exhausted in state court *and* not be procedurally defaulted.").   Lawlor did not raise this issue in his state habeas petition.[4]   Because the Supreme Court of Virginia did not have an opportunity to consider this claim, this Court is precluded from considering it as a basis for "cause" to excuse a procedural default unless Lawlor is able to demonstrate that failure to review his habeas claims will result in a fundamental miscarriage of justice.   "[I]n order to demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack, a movant must show actual innocence by clear and convincing evidence." *United States v. Mikalajunas,* 186 F.3d 490, 493 (4th Cir. 1999) (citing *Murray,* 477 U.S. at 496).   Lawlor did not raise the issue of miscarriage of justice or actual innocence at any point in his Petition; therefore this Court will not attempt to construct the

---

[4] In claim IX of Lawlor's state habeas petition, he argued that he was denied the effective assistance of counsel because defense counsel failed to move for a mistrial when jurors overheard portions of a bench conference during the guilt phase of trial. *Lawlor,* 288 Va. at 238, 764 S.E.2d at 278.   However, at no point in his state habeas petition did Lawlor assert that his trial counsel was ineffective for failing to preserve an issue of contradictory rulings or hostile treatment of counsel during voir dire.

argument for him.[5]  *Sawyer v. Whitley*, 505 U.S. 333, 362 (1992) (holding that a capital defendant has the burden to demonstrate by clear and convincing evidence that he is actually innocent"); *cf. Dretke v. Haley*, 541 U.S. 386, 393-94 (2004) (stating that before a federal court considers any allegations of actual innocence, the court "must first address all nondefaulted claims for comparable relief and other grounds for cause to excuse the procedural default").  The Supreme Court of Virginia' decision was not unreasonable as to the claims raised in II(A) or II(B); thus, the undersigned **RECOMMENDS DISMISSAL** of Claim II.


Claim III.

        In Claim III, Lawlor argued that he was convicted and sentenced by a jury assembled in a discriminatory manner and without enforcement of *Batson v. Kentucky*, in violation of the Sixth, Eighth, and Fourteenth Amendments; and that trial counsel were ineffective in failing to object to and litigate this issue.  ECF No. 20 at 15.  Lawlor argued he was prejudiced both in general by the trial court's failure "to invoke the minimum protections necessary to preclude racial discrimination in jury selection," and under the *Strickland v. Washington*, 466 U.S. 668, 687 (1984) standard because Lawlor's "death sentence was influenced by arbitrary and capricious factors."  *Id.* at 18.  The Court will consider Claim III in two parts, Claim III(A) and Claim III(B):

        Claim III(A):   With regard to Lawlor's *Batson* claim, Lawlor stated that the Commonwealth "used peremptory challenges to exclude all three Hispanic persons and the only person of Pacific Island ethnicity from serving on the jury . . . [, which] was sufficient to establish a prima facie case."  *Id.* at 16.  Respondent argued that Claim III(A) was procedurally

---

[5] Lawlor did not argue a fundamental miscarriage of justice in his Petition; thus this Court will not consider it for each claim that is procedurally defaulted.

barred as Lawlor failed to raise the claim on direct appeal. ECF No. 29 at 29. The Supreme Court of Virginia found that this claim was barred because it "could have been raised at trial and on direct appeal and, thus, [was] not cognizable in a petition for a writ of habeas corpus." *Lawlor*, 288 Va. at 229, 764 S.E.2d at 273 (citing *Slayton*, 215 Va. at 29, 205 S.E.2d at 682). The Supreme Court of Virginia's decision finding Claim III(A) procedurally barred based on *Slayton* would generally bar this Court from considering the claim. The Fourth Circuit has "held on numerous occasions that the procedural default rule set forth in *Slayton* constitutes an adequate and independent state law ground for a decision." *Mu'Min*, 125 F.3d at 196; *Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir. 1998). Therefore, Claim III(A) is procedurally defaulted. Lawlor may only overcome the procedural default and obtain federal review on the merits if he can demonstrate cause and prejudice for the default. *See Edwards*, 2010 WL 5825427, at *3. Lawlor argued that his trial counsels' ineffectiveness constituted "cause" to overcome the procedural default. ECF No. 20 at 18. This Court can consider this argument as cause here because Lawlor raised this argument in his state habeas petition, which this Court is also considering under III(B).

In Claim III(B), Lawlor argued that trial counsel were ineffective for failing to raise a meritorious *Batson* objection when a prima facie case of racial discrimination was apparent. *Id.* at 17. Respondent noted that though Lawlor presented post-trial affidavits[6] to the state court from three venire members who indicated they are Hispanic or, as to one, a Pacific Islander, he proffered no evidence indicating the prosecutor was aware of the jurors' racial identities, and cited no authority that Pacific Islanders are a "cognizable racial group" as required for *Batson*.

---

[6] The three affidavits were from Dave Lunasco, Fredericka Wall, and Gloria Alvarez. State Habeas App. 134, 486-87. Lunasco stated that he is a Pacific-Islander. App. 134. Wall stated that she was born in Arizona and is 9/16 Mexican. App. 486. Alvarez stated that she was born in Bolivia and had been living in the United States for forty years. App. 487. All three stated that they did not know why they were not selected. App. 134, 486-87.

*Id.* at 29-30.   Respondent concluded that because there was absolutely no basis for a *Batson* challenge, trial counsels' performance could not be deficient for failing to raise a meritless objection.   *Id.* at 31.   The Supreme Court of Virginia held that Lawlor failed to satisfy either the "performance" or the "prejudice" prong of the *Strickland* two-prong test.   The Supreme Court of Virginia found specifically that Lawlor "failed to establish a prima facie case of purposeful discrimination that counsel should have recognized and challenged, and that the trial court would have accepted."   *Lawlor*, 288 Va. at 230, 764 S.E.2d at 273.   Essentially, the court found that other than pointing out the racial identities of the excluded jurors, Lawlor proffered no facts and circumstances indicating the strikes were racially motivated.   *Id.* at 230-31, 764 S.E.2d at 273-74 (citing *Juniper v. Com.*, 271 Va. 362, 407, 626 S.E.2d 383, 412 (2006)).

> The Supreme Court reasoned the following in *Batson v. Kentucky*:
>
> To establish [a prima facie] case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

476 U.S. 79, 96 (1986) (internal citations omitted), *holding modified by Powers v. Ohio*, 499 U.S. 400 (1991) (holding that a criminal defendant may raise a *Batson* objection whether or not defendant and excluded jurors share the same race); *see also Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008) (summarizing the three part test: "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in

27

question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination"). Only after a party has made out a prima facie case does the burden shift, requiring the striking party to come forward with a neutral explanation. *See United States v. Legrand*, 483 F. App'x 771, 778 (4th Cir. 2012).

Though Lawlor argued that the prima facie case of racial discrimination was "apparent" to trial counsel, he failed to present evidence that supports any requirement of a *Batson* challenge other than stating that the Commonwealth used four out of five peremptory strikes to remove ethnic minorities from the venire. Essentially, Lawlor wants this Court to *presume* that Lawlor made a prima facie showing of discrimination merely because the prosecutor struck minorities from the jury. But it is not that easy; "No per se rule exists to establish a prima facie case of purposeful discrimination." *United States v. Grandison*, 885 F.2d 143, 147 (4th Cir. 1989), *subsequent mandamus proceeding sub nom. In re Grandison*, 900 F.2d 251 (4th Cir. 1990). A prima facie case of discrimination does not arise every time a prosecutor strikes a prospective juror that is of the same race as the defendant, though when the defendant and the prospective juror are of the same race, it makes it easier for the defendant to make a *prima facie* showing. *See id.* at 149 (citing *United States v. Lane*, 866 F.2d 103, 105 (4th Cir. 1989)) ("A prima facie case of discrimination does not arise 'every time a prosecutor strikes a black prospective juror.'"); *United States v. Malindez*, 962 F.2d 332, 334 (4th Cir. 1992) (citing *Powers*, 499 U.S. at 416) ("[W]hile a criminal defendant and the prospective juror whose exclusion he is challenging need not be members of the same racial group, such '[r]acial identity between the defendant and the excused person' may 'provide one of the easier cases to establish . . . a prima facie case . . . that wrongful discrimination has occurred.'"). When determining whether a prima facie showing is made, the Supreme Court advised that "the trial court should consider all

28

relevant circumstances." *Batson*, 479 U.S. at 97.   A district court can consider patterns of peremptory strikes, questions and statements made during voir dire, as well as any logical inferences drawn therefrom.   *Id.* at 97-98.   These listed examples are non-exhaustive, and the Supreme Court held that trial courts are competent to develop methods of assessing prima facie discrimination during voir dire.   *Id.* at 98; *see also Powers*, 499 U.S. at 416; *Davis v. Ayala*, 135 S. Ct. 2187, *reh'g denied,* 136 S. Ct. 14 (2015) ("A trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes.").

Lawlor, a Caucasian defendant, must do more than point to minorities that were excluded to make a prima facie showing, especially because Lawlor is not of the same race as the excluded jurors.   *See Lane*, 866 F.2d at 106 (finding that even when the defendant and the excluded juror are of the same race, the defendant must present more: "The defendant must present sufficient evidence to make a prima facie showing and cannot merely rest on the fact that a prosecutor challenged a prospective juror of his same race").   Consequently, Lawlor's argument that a prima facie case of race discrimination was "apparent" because four excluded jurors were of a racial minority is insufficient.   "[A] defendant makes out a *prima facie* case of discrimination by showing that the government peremptorily struck some members of a cognizable racial group from the *venire* under circumstances raising 'an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.'"   *United States v. Ferguson*, 4 F.3d 986 (4th Cir. 1993) (citing *Batson*, 479 U.S. at 96-97 (finding that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination," as well as "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges")); *see also Lane*, 866 F.2d at 107 (indicating that a

defendant must show "that the prosecutor's questions or conduct during voir dire or the exercise of his challenges demonstrated a discriminatory tendency"); *cf. Legrand*, 483 F. App'x at 779 (stating the incorrect legal standard would require a defendant to show a "discriminatory *pattern* of strikes," but finding no error when the district court considered "the lack of a pattern of discriminatory strikes, among other factors, in concluding that [the defendant] failed to make out a prima facie case) (emphasis in original).

Lawlor argued that the Supreme Court of Virginia "overlook[ed] the statistical disparities in the prosecutors' strikes, . . . using eighty percent of their strikes against minorities, and only twenty percent, or one, of their strikes against whites. . . ." ECF No. 20 at 19. Lawlor reasoned that this statistical disparity "raised the inference of racial discrimination." *Id.* Foremost, "[s]tatistical comparisons are 'a poor way to resolve a *Batson* challenge'; the right secured is the right to a fair selection process, not a right to proportional representation." *Ferguson*, 4 F.3d at 986 (citing *Grandison*, 885 F.2d at 148). Standing along, striking more minorities than whites does not demonstrate per se discrimination any more than demonstrating that minorities are still sitting on the jury at the conclusion of jury selection, standing alone, demonstrates an absence of discrimination. *See id.*; *United States v. Joe*, 928 F.2d 99, 103 (4th Cir. 1991) (stating that the fact that black jurors were still seated after peremptory striking took place "does not preclude a finding that defendants established a prima facie violation of *Batson*"); *Allen v. Lee*, 366 F.3d 319, 361 (4th Cir. 2004) ("[W]e have unequivocally ruled that an allegation of a *Batson* violation cannot be rebutted solely by relying on who was eventually seated on the jury."). The statistical composition of the jurors excluded and the jurors selected may be considered among a multitude of factors when the district court assesses a claim for prima facie race discrimination under *Batson*, but it in no way alone amounts to an inference of racial discrimination as Lawlor argued.

*See Joe*, 928 F.2d at 103 ("The composition of the jury may be considered as part of the total relevant circumstances upon which a determination of discrimination in jury selection is made, but it is not dispositive of that issue."). *But cf. Higgs v. United States*, 711 F. Supp. 2d 479, 503 (D. Md. Apr. 6, 2010) ("The Court is not prepared to say that statistics alone can never suffice to establish a *prima facie Batson* violation."). The exclusion of four prospective jurors of a racial minority different from that of Lawlor does not give rise to some "apparent" indicia of race discrimination for a prima facie case. *See generally Miller–El v. Dretke,* 545 U.S. 231, 239-66 (2005) (*Miller–El II*) (recognizing indicia of discrimination such as, *inter alia*, jury shuffling and scripting questions to induce different answers from racially different jurors). Thus, without a prima facie case, any objection would be meritless, and, as a result, the Supreme Court of Virginia was not unreasonable to find that counsels' failure to object at trial was not deficient performance. When a "[p]etitioner has failed to present sufficient evidence to establish a *prima facie* case of purposeful discrimination on the part of the prosecutor when he excused [a prospective juror of a particular race,] . . . he likewise has failed to show that counsel were deficient for failing to raise a *Batson* objection." *Blakeney v. Lee*, No. 3:05 CV-10-V, 2007 WL 1341456, at \*19 (W.D.N.C. May 3, 2007); *see also United States v. Lighty*, No. CIV. PJM 11-3563, 2014 WL 5509205, at \*7 (D. Md. Oct. 30, 2014) ("[B]ecause a prima facie case requires an 'inference of discrimination,' trial and appellate counsel, it appears, could have concluded that the percentage of the Government's strikes of women was insufficient to bestir them to raise the claim. As such, the failure to raise the issue would likely not give rise to an ineffective assistance of counsel claim."); *cf. Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (holding that "counsel is not required to make futile motions or objections").

Moreover, to succeed on this claim, Lawlor would not only have to demonstrate that his trial counsels' performance was deficient for failing to raise a *Batson* objection, he also "must show that, but for his trial counsel[s'] ineffectiveness in failing to make certain arguments, the result of the *Batson* challenge would have been different, i.e., the trial court would have found the prosecutor in violation of *Batson*." *Juniper v. Zook*, 117 F. Supp. 3d 780, 792 (E.D. Va. Aug. 3, 2015), *motion for relief from judgment denied,* No. 3:11-CV-00746, 2016 WL 413099 (E.D. Va. Feb. 2, 2016). Lawlor argued that there is a reasonable likelihood that "jury selection infects the most basic structure of the trial itself, and thus prejudice should be presumed." ECF No. 20 at 18.

Though this Court finds the Supreme Court of Virginia's conclusion that Lawlor's counsel were not ineffective was reasonable as addressed above, Lawlor's argument that "prejudice should be presumed" is one that the Court will entertain for purposes of argument. This issue of presumed prejudice as applied to findings of *Batson* violations on collateral review has yet to be considered by the Supreme Court and appears unsettled in the lower courts. One line of thought, which stems from the Seventh Circuit, is that *Batson* violations create "structural defects" or "structural errors" that are so deficient that prejudice is presumed automatically on both direct appeal applications and collateral review applications. *See Winston v. Boatwright*, 649 F.3d 618, 632-34 (7th Cir. 2011) (holding that prejudice is presumed for purposes of *Strickland* when counsel's performance in selecting a petit jury was found to be in an unconstitutionally discriminatory manner). The other line of thought, which stems from the Eighth Circuit, separates the prejudice analysis on direct appeal from that on collateral review, finding that, in a habeas proceeding, a petitioner is still required to demonstrate prejudice in the event he proves counsel was deficient for not objecting to a *Batson* violation by proving that the

32

chosen jury was not impartial. *See Young v. Bowersox*, 161 F.3d 1159, 1161 (8th Cir. 1998) (citing *Wright v. Nix*, 928 F.2d 270 (8th Cir. 1991)) (requiring a petitioner to demonstrate prejudice in a *Batson* violation by demonstrating that the chosen jury was not impartial); *United States v. Kehoe*, 712 F.3d 1251, 1254 (8th Cir. 2013) ("Because Kehoe is not entitled to a presumption of prejudice under our decision in *Young*, and he has not attempted to demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[,]' his claim for ineffective assistance of counsel fails.") (internal citations omitted).

While the Fourth Circuit has yet to address the issue directly, it found no abuse of discretion in a United States District Court for the Western District of North Carolina's decision adopting the Eighth Circuit's reasoning in *Young*. The North Carolina district court considered the issue of prejudice, finding the petitioner did not meet his burden:

> Nor is there any reason to believe that a jury with Robert Crawford on it would have returned a life sentence. Indeed, Petitioner does not even make this argument. He certainly has not put forth any evidence, nor does he argue, that the individual jurors who tried him were not impartial. Furthermore, the presence of Robert Crawford on the jury would not have changed the strength of the State's case against Petitioner or the nature of the evidence offered for and against him at sentencing. In short, Petitioner has failed to put forth any evidence that he was prejudiced by counsel's failure to raise a *Batson* objection at trial.

*Blakeney v. Lee*, 2007 WL 1341456, at *20, *aff'd sub nom. Blakeney v. Branker*, 314 F. App'x 572 (4th Cir. 2009). Moreover, at least two courts in the Eastern District of Virginia have adopted the Eighth Circuit's reasoning in *Young*. *See United States v. King*, 36 F. Supp. 2d 705, 711 (E.D. Va. Feb. 17, 1999) (referencing *Young*, "Other than baldly asserting that a *Batson* violation occurred in this case, King has made no attempt to demonstrate that the jurors in his case were not impartial, or that there was any adverse effect on the trial's outcome"); *Juniper*, 117 F. Supp. 3d at 792 n.7 ("[A]lthough a *Batson* violation is a structural error subject to

automatic reversal, a claim of ineffective assistance for failing to properly raise or pursue a *Batson* challenge requires the petitioner to show he was prejudiced by his lawyer's failure.").

In *Strickland*, the Supreme Court gave examples of instances when prejudice is presumed:  "Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance . . . [and] when counsel is burdened by an actual conflict of interest." *Strickland*, 466 U.S. at 692-93.  But the *Strickland* Court also appeared to limit the application of presumed prejudice, stating:

> Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice.  The government is not responsible for, and hence not able to prevent, attorney errors that will result in reversal of a conviction or sentence.  Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. They cannot be classified according to likelihood of causing prejudice.  Nor can they be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid.  Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.  Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense.

*Id.* at 693.  It is evident from the Supreme Court's reasoning in *Strickland* that the Court intended the instances of presumed prejudice to be limited and rare, requiring that in most ineffective assistance claims the defendant meet both prongs of the *Strickland* test.  Thus, when considering a petitioner's claim that trial counsel was ineffective for failing to make a *Batson* objection, the petitioner must demonstrate that counsel's performance was deficient, and that the outcome of the trial would have been different.  Lawlor did not present evidence that the jury that convicted him was anything but impartial; and because this Court will not merely presume prejudice, there is no evidence that, if there were in fact a *Batson* violation, the result of the proceeding would have been different.

34

Accordingly, the Supreme Court of Virginia was not unreasonable to find that counsels' failure to lodge a *Batson* objection at trial was not deficient performance, or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. Moreover, Lawlor's argument that counsels' alleged error constituted "cause" for his procedural default of Claim III(A) is unsupported because counsels' performance was not deficient; and the Supreme Court of Virginia's application of *Strickland* as to the portion of this claim that constitutes Claim III(B) was not unreasonable. Therefore, the undersigned **RECOMMENDS DISMISSAL** of Claim III.

Claim IV.

In Claim IV, Lawlor argued trial counsel rendered ineffective assistance of counsel under the Sixth and Fourteenth Amendments by failing to understand rudimentary law—the elements of first and second degree murder—governing the charges against Lawlor. ECF No. 20 at 20. Specifically, Lawlor argued that trial counsels' performance was deficient because they incorrectly believed that if they could show that Lawlor was too intoxicated to form the specific intent to kill, then he could not be found guilty of first degree murder, "an erroneous understanding of the applicable law," since a person can be convicted of first-degree murder without premeditation (while intoxicated) if it is in the commission of, or attempt to commit, specified felonies including, *inter alia*, rape or attempted rape (hereinafter "felony first degree murder"). *Id.* at 20-21 (stating that counsel had a duty to know the law and citing *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.")). Lawlor argued that

trial counsel began trial by arguing the theory that Lawlor was too intoxicated when he committed the crime so he should be convicted of second degree murder (*i.e.,* arguing that Lawlor was too intoxicated to premeditate the murder), but then trial counsel "realized their mistake," that pursuant to Va. Code § 18.2-32, one can be convicted of felony first degree murder without premeditation. ECF No. 20 at 20-21. After this realization, trial counsel changed their theory of the case and asked the jury to find Lawlor guilty of first degree murder, which confused the jury into likely thinking that Lawlor's trial counsel were conceding that the murder was premeditated. *Id.* at 22. Lawlor argued that this deficient performance prejudiced him because "the jurors never understood that the appropriate verdict was first degree felony murder," and not capital murder. *Id.* at 22-23.

Lawlor presented this claim to the Supreme Court of Virginia in his state habeas petition as claim VII. *See Lawlor*, 288 Va. at 237, 764 S.E.2d at 277 ("In another portion of claim (VII), Lawlor contends he was denied the effective assistance of counsel because counsel failed to realize, until the end of the guilt phase of the trial, that Lawlor could be convicted of first degree murder even if the jury found he was incapable of premeditation, if the jury found he killed Orange in the commission of rape or abduction."). The Supreme Court of Virginia found that Lawlor failed to meet the "prejudice" prong of the *Strickland* two-prong test because "Lawlor fail[ed] to identify any defense theory that counsel could have, but did not, argue because of counsel's alleged failure to recognize that Lawlor could be convicted of first degree felony murder, or to show that such a defense would have been successful." *Id.* The Supreme Court of Virginia found that despite any confusion raised by trial counsel, the instructions given to the jury "clearly delineated the distinctions between capital murder; premeditated first degree murder; first degree murder in the commission of a rape, attempted rape or abduction; and

second degree murder." *Id.* The Supreme Court of Virginia found unavailing Lawlor's contention that counsels' closing argument that the jury should find the defendant guilty of first degree murder, after stating in opening that the jury should find the defendant guilty of second degree murder, likely caused the jury to reasonably believe that counsel was conceding the evidence proved premeditation. *Id.*, 764 S.E.2d at 278. The Supreme Court of Virginia found that that the record, including the trial transcript, demonstrated that counsel argued against premeditation at length, and the jury would not have reasonably believed that counsel was conceding this point. *Id.* at 237-38, 764 S.E.2d at 278. Thus, even if counsels' performance may have been deficient, Lawlor was unable to demonstrate prejudice by showing "there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The Supreme Court of Virginia's application of *Strickland* was not unreasonable. The jury was properly instructed regarding the differences between capital murder; premeditated first degree murder; first degree murder in the commission of a rape, attempted rape or abduction; and second degree murder, and instructed on the elements required to convict Lawlor of capital murder. *Cf. Huffstetler v. Dixon*, 28 F.3d 1209 n.1 (4th Cir. 1994) (explaining that such an argument is unpersuasive if the jury was actually instructed on the elements at issue). As the Supreme Court of Virginia noted on habeas review, the jury considered the following proper instructions:

> The defendant is charged with the crime of capital murder in the commission of or subsequent to rape or attempted rape. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
>> (1) That the defendant killed Genevieve Orange; and
>> (2) That the killing was willful, deliberate, and premeditated; and

> (3) That the killing was of a person in the commission of, or subsequent to rape or attempted rape.

If you find the Commonwealth has proved beyond a reasonable doubt each of the above elements of the crime as charged, then you shall find the defendant guilty of capital murder in the commission of or subsequent to rape or attempted rape and shall not fix the punishment until your verdict has been returned and further evidence is heard by you.

If you find from the evidence that the Commonwealth has proven beyond a reasonable doubt the defendant killed Genevieve Orange and that the killing occurred in the commission of, or subsequent to rape or attempted rape, but that the killing was not willful, deliberate and premeditated, then you shall find the defendant guilty of first degree murder and shall not fix the punishment until your verdict has been returned and further evidence has been heard by you.

If you find from the evidence that the Commonwealth has not proven beyond a reasonable doubt that the killing occurred in the commission of, or subsequent to rape or attempted rape but the Commonwealth has proved beyond a reasonable doubt:

> (1) That the defendant killed Genevieve Orange; and
> (2) That the killing was willful, deliberate, and premeditated; and
> (3) That the killing was malicious,

then you shall find the defendant guilty of first degree murder and shall not fix the punishment until your verdict has been returned and further evidence has been heard by you.

If you find from the evidence that the Commonwealth has proven beyond a reasonable doubt that the defendant killed Genevieve Orange and that the killing was malicious but that the Commonwealth has not proven beyond a reasonable doubt that the killing was willful, deliberate and premeditated and was not in the commission of, or subsequent to rape or attempted rape, then you shall find the defendant guilty of second degree murder but shall not fix the punishment until your verdict has been returned and further evidence is heard by you.

If you find that the Commonwealth has failed to prove beyond a reasonable doubt any of the crimes listed above, then you shall find the defendant not guilty.

*Lawlor*, 288 Va. at 235-36, 764 S.E.2d at 276-77.  Furthermore, in Virginia, a jury is "is presumed to have followed the instructions of the trial court;" thus, any confusion created by trial counsel was remedied with proper jury instructions.   *Muhammad v. Com.*, 269 Va. 451, 619 S.E.2d 16, 58 (2005) (citing *Green v. Young,* 264 Va. 604, 611, 571 S.E.2d 135, 139 (2002)).

Counsel stressed repeatedly in closing argument that Lawlor's extreme intoxication vitiated the element of premeditation, thereby rendering unlikely the jury would have reasonably believed counsel was conceding premeditation. While arguing all of the evidence which supported the conclusion that Lawlor was heavily intoxicated on crack cocaine and alcohol, JA 10550-93, counsel repeatedly asked the jury to conclude that such intoxication meant that Lawlor could not have premeditated his killing of Genevieve Orange:

> Mark Lawlor killed Genevieve Orange. I'll tell you that. It's kind of hard for a defense attorney to say that, but that's what had happened. We've maintained that all along. However, Mark Lawlor was heavily intoxicated, extremely intoxicated. Mr. Petrovich told you that in opening. He was wasted out of his mind, bombed. I don't want to make light, but you've heard someone say to someone else, usually younger kids, what are you on, crack? Stated as funny at that time. Unfortunately, it's true today, and that's the problem.
>
> He had so much crack in him, he was unable to form the specific intent, the deliberate intent to kill Ms. Orange, but we told you he killed her.

JA 10550.

> If you've got premeditation, you're not going to go in, pot, pan, hammer, and do all these things, because he's whacked out of his mind.
>
> Dr. Morton told you rational people, you're not rational when you're doing cocaine. You're not -- you're not -- he didn't say this, because he couldn't say this. So I would submit to you you cannot be -- you're not at the level to be able to premeditate. You're not rational. You're hearing stuff outside, you're walking around, you're flipping out. You don't know.

JA 10580-81.

> But they're trying to show you that for premeditation, which is not there.

JA 10587.

> But that doesn't make sense, because you what Dr. Morton told you, when you're that stoned, you're not rational. You're not thinking. You know, you're out of your mind. You're a zombie, you're geeked, you're whacked, whatever. But right inside is a pair of scissors, and we know Mr. Lawlor was involved with a butcher knife. If he's going in there to kill her premeditatedly, he's going to kill her with a pair of scissors, or he's going to kill her with a butcher knife. He's not going to do a pot, a pan, and some kind of -- they say a hammer. Judge on that.

JA 10588.

I'll talk to you about -- we had him read this instruction again, the Defendant asserts that he was so greatly intoxicated by voluntary use of alcohol and drugs that he was incapable of forming deliberation and premeditation that is required for the guilty finding in capital.

We came in and told you we were involved in the murder. We told you he took her life. It's a hard thing to do, but that's what we did. That's where we've been. We did it in opening, and I'm telling you now, and I'm not taking it -- he didn't premeditate to kill Genevieve Orange. Counsel is going to stand up and say that premeditation could happen a second beforehand, but that's speculative unless they have evidence of that.

JA 10590-91.

Mark Lawlor is guilty of first degree murder. We don't know what happens in cases until we get in and litigate them. And boat loads of evidence, boat loads of stuff, my partner stood up and said second degree because we weren't sure what testimony would come out. I'm telling you now there's a murder. It was in the course of some kind of altercation or whatever in the apartment.

There's not premeditated, willful, deliberate, premeditated killing of Genevieve Orange, because he was so high on cocaine and so intoxicated on drugs that he could not do that. And it's demonstrated by the evidence throughout that night all the way up to that point.

JA 10592-93.

The Supreme Court of Virginia's conclusion, therefore, that the jury did not likely reasonably believe that counsel was abandoning the lack of premeditation argument, was not unreasonable. Accordingly, the undersigned **RECOMMENDS DISMISSAL** of Claim IV.


Claim V.

In Claim V, Lawlor argued that trial counsel were ineffective where they unreasonably failed to utilize and examine a psychopharmacologic expert in the guilt phase of the trial. ECF No. 20 at 24. Lawlor argued that trial counsel's primary strategy during the guilt phase was to present evidence supporting a "voluntary intoxication defense." *Id.* He further argued that in

order to support this defense, he needed an expert to testify that Lawlor's "prior drug use and addiction, in conjunction with his use on the night of the murder, had undermined his ability to premeditate and deliberate." *Id.* at 26. Counsel solicited expert assistance from Dr. Alexander Morton, Jr. ("Dr. Morton"), a psychopharmacologist. *Id.* at 25. Counsel scheduled an interview between Dr. Morton and Lawlor a week prior to trial, but a snow storm derailed the interview plans and Dr. Morton was never able to interview Lawlor, and was only able to testify to the effects of drug use generally. *Id.* In addition to trial counsels' purported failure to prepare Dr. Morton, Lawlor argued that trial counsel also failed to ask Dr. Morton whether the consumption of "the better part of a case of beer and seven grams of cocaine" would render a person incapable of deliberating or premeditating. *Id.* at 27. According to Lawlor, trial counsel did not ask this question because they incorrectly believed it was inadmissible. *Id.*

Respondent argued that trial counsels' decision not to have Dr. Morton testify specifically about Lawlor was reasonable and strategic in light of the fact that the prosecutor had already objected that the record was insufficient for Dr. Morton to testify about the specific effects of Lawlor's drug and alcohol consumption because there was unclear information in the record regarding the quantity of drugs and alcohol consumed by Lawlor that night. ECF No. 29 at 36-37. Further, Respondent contended that Lawlor was not prejudiced since Dr. Morton's testimony as a "teaching expert" provided significant mitigating evidence, and any other opinions regarding the effects of Lawlor's intoxication would have been inadmissible as unsupported by admissible evidence. *Id.* at 37-38.

Lawlor presented this claim to the Supreme Court of Virginia in his state habeas petition as claim VI. *See Lawlor*, 288 Va. at 232, 764 S.E.2d at 275 ("In another portion of claim (VI), Lawlor contends he was denied the effective assistance of counsel because counsel failed to

provide Dr. Morton with an opportunity to interview Lawlor before trial."). The Supreme Court of Virginia found that Lawlor failed to meet the "performance" or the "prejudice" prong of the *Strickland* two-prong test because "Lawlor fail[ed] to proffer any evidence Dr. Morton could have gleaned from an interview with him that would have been admissible." *Id.* at 232-33, 764 S.E.2d at 275 (reasoning that "Dr. Morton's opinion about Lawlor's susceptibility to the effects of the drugs he consumed before the murder would not have opened the door to evidence of his history of drug use and addiction. An expert may not relate hearsay evidence to the jury when providing his opinion testimony").

The Supreme Court of Virginia's decision was not unreasonable or contrary to clearly established law. The first part of Lawlor's argument—counsel was deficient for failing to prepare Dr. Morton and have him interview Lawlor—is unpersuasive. Lawlor presented no evidence to support his assertion that an interview would have resulted in admissible evidence. Evidence at trial regarding the amount of drugs and alcohol consumed by Lawlor was neither specific nor undisputed. Lawlor contended that, had Dr. Morton met with him, he would have gleaned from Lawlor both Lawlor's addiction history and the specific amount of intoxicants Lawlor claimed he consumed (the amount he argued should have been posited by his counsel to Dr. Morton). As the Supreme Court of Virginia correctly found, Dr. Morton would not have been able to relay to the jury information on this subject he might have obtained from Lawlor since an expert may not relate hearsay evidence to the jury when providing his opinion testimony. Va. Code § 8.01-401; Va. Sup. Ct. R. 2:703 ("In criminal cases, the opinion of an expert is generally admissible if it is based upon facts personally known or observed by the expert, or based upon facts in evidence."); *see also Simpson v. Commonwealth,* 227 Va. 557 (1984); *Buchanan v. Commonwealth,* 238 Va. 379, 416 (1989) ("[E]xperts in criminal cases must

testify on the basis of their own personal observations or on the basis of evidence adduced at trial."); *Holloman v. Com.*, 65 Va. App. 147, 775 S.E.2d 434 (Va. App. Ct. Aug. 11, 2015) ("The exception that allows an expert witness to give an opinion based upon hearsay applies only in civil cases; in criminal cases, the rule does not provide an exception for the admission of hearsay used by an expert in formulating an opinion."). Apart from this inadmissible hearsay, Lawler posited no other information that his counsel should or would have gleaned from interviewing Lawlor.

A defendant that argues his counsel should have investigated more or presented particular testimony also bears the burden of explaining to the Court why such steps were necessary and why counsel's failure to take those steps resulted in prejudice. *See Goins v. Warden, Perry Corr. Inst.*, 576 F. App'x 167, 173 (4th Cir. 2014) (noting that defendant's "failure to make a specific proffer to the [ ] court as to what an expert witness would have testified regarding the mental health evidence, had trial counsel properly investigated and sought to present such testimony, reduces any claim of prejudice to mere speculation and is fatal to his claim"); *Beaver v. Thompson*, 93 F.3d 1186, 1195 (4th Cir. 1996) ("[A]n allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced."); *Roundtree v. Wright*, No. L:14CV654 LMB/IDD, 2014 WL 6879925, at *4 (E.D. Va. Dec. 3, 2014) *appeal dismissed*, 600 F. App'x 188 (4th Cir. 2015) *cert. denied*, 136 S. Ct. 158 (2015) (finding that the failure to proffer affidavits was fatal under the *Strickland* analysis to show counsel's failure to introduce evidence or testimony of certain witnesses due to a lack of pretrial investigation); *Huffington v. Nuth*, 140 F.3d 572, 582 (4th Cir. 1998), *cert. denied*, 525 U.S. 981 (1998) (finding that failure to call a rebuttal witness, even if objectively unreasonable, was not prejudicial in light of the

overwhelming evidence against defendant). Inasmuch as the Supreme Court of Virginia reasonably determined that Lawlor failed to demonstrate what admissible evidence Dr. Morton would have gleamed from an interview with him, the first part of Claim V fails.[7]

The second part of Lawlor's argument—counsel was deficient for failing to ask Dr. Morton whether the consumption of the better part of a case of beer and seven grams of cocaine would render a person incapable of deliberating or premeditating—is also unpersuasive. First, as the Supreme Court of Virginia noted, according to the testimony of Michael Johnson,[8] "the evidence established that Lawlor had consumed approximately six grams of cocaine and an unknown quantity of beer." *Lawlor*, 288 Va. at 232, 764 S.E.2d at 274. Hence, the evidence did not establish that Lawlor had consumed "the better part of a case of beer and seven grams of crack cocaine" as he contended here, and thus any opinion based on this predicate would have been based on facts not in evidence, and therefore inadmissible. In light of this defect in the evidence, counsel were not ineffective for failing to ask Dr. Morton whether such consumption would render a person incapable of deliberating or premeditating. Moreover, under Virginia law, such expert testimony by Dr. Morton was in fact inadmissible because the opinion would have gone "to the 'precise or ultimate fact in issue' in the case; to have admitted the opinion would have invaded the province of the jury." *Waye v. Com.*, 219 Va. 683, 696, 251 S.E.2d 202, 210 (1979) (finding the trial court properly ruled that the expert opinion that the defendant did not

---

[7] Lawlor also argued that he was prejudiced by his counsels' failure to arrange a meeting between Dr. Morton and Lawlor before trial because the prosecution was then able to challenge Dr. Morton's credibility for failing to so meet. ECF No. 20 at 27. Lawlor cited no authority for the proposition that failing to arrange an interview under these circumstances, and thereby opening the door for the prosecution to contest a witness's credibility for not meeting with a defendant, constitutes deficient performance or prejudice under *Strickland*. Absent any authority, this argument is without merit.

[8] According to Johnson, he and Lawler acquired two "eight-balls" of crack cocaine, with each eight-ball equaling 3.5 grams of crack cocaine, and another eight-ball of powder cocaine, half of which was cooked into crack. JA 10195, 10197, 10202-03, 10211, 10215. Johnson testified he smoked one gram from each of the first two eight-balls, meaning Lawlor smoked a total of five grams. JA 10246. He also testified that Lawlor smoked about one gram of the last eight-ball of powder cocaine after half of it was cooked into crack. JA 10215. Johnson did not know how much beer Lawlor drank. JA 10190, 10197, 12055.

deliberate and premeditate at the time of the killing was inadmissible).   No deficiency in performance is found where counsel fails to introduce inadmissible evidence.   *See Hoots v. Allsbrook*, 785 F.2d 1214, 1222 (4th Cir. 1986) ("[Counsel's] decision not to attempt to introduce inadmissible evidence at the second trial did not constitute ineffective assistance of counsel."); *Juniper v. Zook*, No. 3:11-CV-00746, 2015 WL 4620102, at *19 (E.D. Va. Aug. 3, 2015) (finding that trial counsel's performance was not deficient for simply failing to present expert testimony that the Supreme Court of Virginia has consistently rejected as improper mitigation evidence); *see also Garza v. Stephens,* 738 F.3d 669, 677 (5th Cir. 2013) ("[T]he failure to make a meritless attempt at introducing evidence could not have prejudiced [the petitioner] because the evidence ultimately would not have been introduced.").   Finally, as the Supreme Court of Virginia also noted, *Lawlor*, 288 Va. at 232, 764 S.E.2d at 274, Dr. Morton was permitted to testify as a "teaching expert," and opine to the jury the general effects of consuming alcohol and cocaine, *see, e.g.,* JA 10371-73, 10380-82, 10402-03, and therefore Lawlor cannot establish prejudice.   Because the Supreme Court of Virginia's decision was not unreasonable, the undersigned **RECOMMENDS DISMISSAL** of Claim V.


Claim VI.

        In Claim VI, Lawlor argued that that the jury instructions were unconstitutional with respect to the *mens rea* for murder; and trial counsel unreasonably failed to ensure that the jury was properly instructed.   ECF No. 20 at 30.   In Claim VI(A), Lawlor stated that the jury instructions were unconstitutional because jurors were not informed of the legal meaning of "specific intent" as opposed to "general intent."   *Id.* at 31 (stating, "Jurors . . . were not accurately informed about the difference between the two, and accordingly, the Commonwealth

45

was relieved of its burden to satisfy every element of the offenses beyond a reasonable doubt"). Lawlor then stated that the jurors were erroneously instructed that they could infer Lawlor's intent from the natural and probable consequences of his acts because this instruction was not accompanied by a corresponding instruction warning jurors to confine such inferences to the consideration of "general intent." *Id.* at 32. Third, Lawlor argued that the instructions improperly used the label "first degree murder" when referring to both premeditated first-degree murder and felony first-degree murder. *Id.* at 33. Respondent argued that Lawlor procedurally defaulted Claim VI(A) because he did not raise this issue at trial or on direct appeal. ECF No. 29 at 39-40. The Supreme Court of Virginia found that this claim was barred because it "could have been raised at trial and on direct appeal and, thus, [was] not cognizable in a petition for a writ of habeas corpus." 288 Va. at 233, 764 S.E.2d at 275 (citing *Slayton,* 215 Va. at 29, 205 S.E.2d at 682).

In Claim VI(B), Lawlor argued that trial counsel were ineffective because they failed to ensure that jurors were adequately and correctly instructed. ECF No. 20 at 34. Essentially, Lawlor contended that trial counsel should have requested an instruction defining specific intent and stating how specific intent differs from general intent in order "to avoid juror confusion." *Id.* Though Lawlor conceded that counsel actually objected to the instruction regarding the natural and probable consequences of a defendant's acts, the objection was not sufficient as "it was conclusory, it contained no reasoning or analysis, and it cited no legal authority." *Id.* Respondent argued that the jury was properly instructed on the elements necessary to find capital murder and premeditated first degree murder. ECF No. 29 at 41. Further, Respondent argued that Lawlor also failed to establish *Strickland's* prejudice prong because he "offer[ed] no more than his own speculation that the jury did not faithfully apply the instructions as a whole." *Id.* at

44.  Citing *Com. v. Vaughn*, 263 Va. 31, 36, 557 S.E.2d 220, 223 (2002), Respondent stated that because "[t]he essential duty of a jury in every criminal case is to infer intent from conduct, particularly in a case resting on circumstantial evidence," Lawlor's argument is not persuasive in that he cannot demonstrate how a jury could conclude that he did not intend to kill the victim when he intended to beat her with a blunt object forty-seven times. *Id.* at 44.

The Supreme Court of Virginia held that Lawlor did not satisfy the "performance" prong of the *Strickland* two-prong test for Claim VI(B).  The Supreme Court of Virginia reasoned that the record demonstrates that the jury was instructed that to find Lawlor guilty of capital or premeditated first-degree murder, they had to find the killing was willful, deliberate, and premeditated.  288 Va. at 234, 764 S.E.2d at 275-76.  Further, the jury was instructed as to the interplay of specific intent within the meaning of willful, deliberate, and premeditated:

> [W]illful, deliberate, and premeditated means a specific intent to kill adopted at some time before the killing but which need not exist for any particular length of time. An intent to kill may be formed only a moment before the fatal act is committed, provided the accused has time to think and did intend to kill.

*Id.* at 234, 764 S.E.2d at 276.  The Supreme Court of Virginia found that because the jury was instructed on the above, any further definition of specific intent would be "redundant and potentially confusing, and counsel was not deficient for failing to make a contrary argument." *Id.*

The Supreme Court of Virginia's decision was not unreasonable or contrary to clearly established law.  Because Lawlor did not raise Claim VI(A) at trial or on direct appeal, and the Supreme Court of Virginia held the claim procedurally barred, Claim VI(A) is procedurally defaulted in this Court.  *See Mu'Min*, 125 F.3d at 196.  Therefore, Lawlor may only overcome the procedural default and obtain federal review on the merits if he can demonstrate cause and prejudice for the default.  *See Edwards*, 2010 WL 5825427, at *3.  The only cause Lawlor

asserted is counsels' ineffectiveness as alleged in Claim VI(B). However, Lawlor failed to demonstrate cause under this argument as counsels' performance was not deficient; and the Supreme Court of Virginia's application of *Strickland* on this claim was not unreasonable.

The Supreme Court of Virginia recognized that instructions on specific versus general intent are becoming disfavored, citing *United States v. Perez*, 43 F.3d 1131, 1138 (7th Cir. 1994), *United States v. Laughlin*, 26 F.3d 1523, 1527 (10th Cir. 1994), and *United States v. Jobe*, 101 F.3d 1046, 1059 (5th Cir. 1996), determining instead that juries should be instructed on the precise mental state required for the crime charged. *Lawlor*, 288 Va. at 233-34, 764 S.E.2d at 275. This conclusion was not unreasonable as the jury here was properly instructed on the mens rea required to support verdicts on either capital murder or premeditated first degree murder. Consequently, the Supreme Court of Virginia's holding that defense counsel's performance was not deficient for failing to proffer an instruction distinguishing specific from general intent was not unreasonable.

Moreover, while Lawlor indicated that an instruction defining the legal meaning of "specific intent" would have prevented any confusion to the jury, Lawlor presented no evidence indicating that the jury was confused other than his own assumption thereof, and consequently he failed to establish prejudice. An assumption alone does not indicate error; and the failure to correct what Lawlor is assuming is an error is not ineffective assistance of counsel: "We presume the jury acted according to law and applied the 'standards that govern the decision.'" *Strickler v. Murray*, 249 Va. 120, 129, 452 S.E.2d 648, 652 (1995) (citing *Strickland*, 466 U.S. at 695). Furthermore, other than Lawlor's mere assumption of juror error, Lawlor failed to demonstrate that an instruction defining specific intent (which he failed to provide as an example to the Court) would have affected the jury's decision—*i.e.*, Lawlor could never establish the

prejudice prong of *Strickland.* *See Elliott v. Warden of Sussex I State Prison*, 274 Va. 598, 620, 652 S.E.2d 465, 484 (2007) ("As the jury found petitioner guilty of [ ] capital murder, . . . petitioner cannot demonstrate that an instruction providing the jury the option of finding second-degree murder, if it did not find capital murder, would have affected the jury's decision."); *cf. Vaughn*, 263 Va. at 36, 557 S.E.2d at 223 (stating that for a defendant to prove a jury instruction on the lesser-included assault and battery offense was necessary, the defendant would have to also explain "the uncontroverted physical evidence" that the defendant clearly indicated he intended to shoot the victim in the back, an offense greater than an assault and battery); *Goins*, 52 F. Supp. 2d at 662 ("Assuming, *arguendo*, that this failure to request a limiting instruction fell below professional standards of assistance, given the overwhelming evidence against [the defendant,] there is no reasonable probability that it was this failure that led the jury to convict him of five counts of murder or sentence him to death."). Because the Supreme Court of Virginia's decision was not unreasonable, the undersigned **RECOMMENDS DISMISSAL** of Claim VI.


Claim VII.

In Claim VII, Lawlor argued that the Commonwealth violated due process by knowingly presenting false testimony from Detective John Tuller ("Detective Tuller"). ECF No. 20 at 36. Lawlor asserted this claim under *Napue v. People of State of Ill.*, 360 U.S. 264 (1959), and claimed he was prejudiced as a result. *Id.* Detective Tuller was the Commonwealth's "bloodstain pattern interpretation expert," and Lawlor contended the prosecutors knowingly proffered false information regarding Detective Tuller's qualifications and experience as an expert, both in pretrial proceedings when they proffered his resume which contained four

purported misrepresentations, and at trial when he allegedly testified falsely regarding his prior experience as a trial expert. *Id.* at 37. With respect to his resume, which the Commonwealth submitted with their expert witness disclosure, Lawlor argued that the Commonwealth violated due process in four respects: First, Detective Tuller listed six cases in which he claimed to have testified as an expert witness, when in fact in two of them, including Lawlor's preliminary hearing, he had only testified as a fact witness. Second, Detective Tuller represented that he held a current membership in the International Association of Bloodstain Pattern Analysts ("IABPA"), when he no longer held that membership. Third and fourth, Detective Tuller represented that he had attended a special crime scene investigation seminar in 2002 and a bloodstain users group seminar in 2003, even though records of the sponsoring organizations could not confirm such attendance. *Id.* at 37-38. With respect to his trial testimony, Detective Tuller testified that he had qualified as a bloodstain pattern expert in six homicide cases, all of which resulted in convictions. *Id.* In fact, Detective Tuller counted Lawlor's preliminary hearing as one of the six, and in one of the other cases the defendant was only charged with malicious wounding, not homicide. *Id.* at 38. Lawlor also argued that the Commonwealth knew Detective Tuller's testimony was false because with regard to the two aforementioned cases not resulting in homicide convictions, "the same office had prosecuted both cases." *Id.* at 39. As a result, Lawlor argued, he was prejudiced because Detective Tuller would not have been qualified as an expert by the court, and without Detective Tuller's qualified expert testimony, the Commonwealth would not have been able to prove that the bloodstain patterns at the crime scene indicated "abduction." *Id.*

Respondent argued that this claim was procedurally barred for failure to raise it at trial or on direct appeal, since the information regarding Detective Tuller's experience and qualifications

was available to Lawlor prior to trial. ECF No. 29 at 45-47. Respondent then contended that Lawlor failed to establish cause and prejudice for this failure since the errors in Detective Tuller's resume and testimony were not material, that Lawlor failed to show the prosecution knew of the errors, and that Detective Tuller's expert opinion was not critical to proof of the Commonwealth's charge of capital murder predicated on abduction. *Id.*

The Supreme Court of Virginia found this claim was procedurally barred because Detective Tuller's "curriculum vitae were known or available to Lawlor at the time of his trial;" and thus, Lawlor should have raised this issue at trial or on direct appeal. *Lawlor*, 288 Va. at 225, 764 S.E.2d at 270. The Supreme Court of Virginia's decision was not unreasonable or contrary to clearly established law. Because Lawlor did not raise this issue at trial or on direct appeal, and the Supreme Court of Virginia held the claim procedurally barred, Claim VII is procedurally defaulted in this Court. *See Mu'Min*, 125 F.3d at 196. Therefore, Lawlor may only overcome the procedural default and obtain federal review on the merits if he can demonstrate cause and prejudice for the default. *See Edwards*, 2010 WL 5825427, at *3. The only cause and prejudice Lawlor asserted was "for the same reasons that are set forth [ ] regarding the merits of the claim." ECF No. 20 at 40.

However, Lawlor's claim is without merit, and accordingly, the default is without cause or prejudice. The Fourth Circuit has reasoned that a claim under *Napue v. Illinois*, 360 U.S. 264 (1959) "requires [(i)] a showing of the falsity and materiality of testimony and [(ii)] the prosecutor's knowledge of its falsity." *Basden v. Lee*, 290 F.3d 602, 614 (4th Cir. 2002) (citing *United States v. Agurs*, 427 U.S. 97, 109-10 (1976)). This Court's review of a *Napue* claim is limited:

> "[T]he reviewing court may consider directly any adverse effect that the prosecutor's [error] might have had on the preparation or presentation of the

> defendant's case.   The reviewing court should assess the possibility that such effect might have occurred *in light of the totality of the circumstances* and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response."

*United States v. Bagley*, 473 U.S. 667 (1985); *see also Agurs*, 427 U.S. at 112 ("This means that the omission must be evaluated in the context of the entire record.").  Regarding the first part of the standard, Lawlor failed to demonstrate that the errors in Detective Tuller's testimony were materially false.  Lawlor would need to show that Detective Tuller's testimony was material by demonstrating there is "a reasonable likelihood that the false testimony could have affected the judgment of the jury."   *Basden*, 290 F.3d at 614 (citing *Agurs,* 427 U.S. at 103).  However, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."  *Agurs*, 427 U.S. at 109-10.  Lawlor only indicated a "mere possibility" by arguing that either the court would not have qualified Detective Tuller as an expert or the jury would have rejected his opinions with great skepticism.  ECF No. 20 at 39-40.

Even if Lawlor established that Detective Tuller's testimony was false in all respects, a finding of materiality requires more than falsity: "Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt.   It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."  *Agurs*, 427 U.S. at 112.  In light of the entire record, the evidence of errors in Detective Tuller's qualifications and experience Lawlor presented to support this claim would not create any reasonable doubt as to the jury's finding of guilt.  As the Supreme Court of Virginia noted,

> "Assuming, without deciding, that these inaccuracies would have precluded Tuller from testifying as an expert or, had he been permitted to testify as an

> expert, would have impeached his expertise, Lawlor cannot show a reasonable
> probability of a different outcome.   Tuller's expert testimony was not crucial to
> prove Lawlor abducted Orange. . . .   The record, including the trial transcript,
> demonstrates there was overwhelming evidence to prove Lawlor used force to
> physically detain Orange.

*Lawlor*, 288 Va. at 226-27, 764 S.E.2d at 271.[9]  Furthermore, Lawlor failed to meet the second

part of the standard in that, again, he presented no evidence the Commonwealth knew it was

presenting false testimony, other than Lawlor's inference that because the Commonwealth

prosecuted two prior cases where Detective Tuller testified, the Commonwealth should have

known Detective Tuller was presenting false testimony.  *See Daniels v. Lee*, 316 F.3d 477, 494

(4th Cir. 2003) (rejecting the defendant's inference that because the state's expert interviewed

witnesses the day before she testified, she must not have been able to base her opinions on those

interviews); *Elliott v. Kelly*, No. 1:08CV430, 2009 WL 855796, at *27 (E.D. Va. Mar. 31, 2009)

(rejecting a *Napue* claim even assuming the defendant was correct in that the officer's testimony

was false because the defendant offered "no basis for a belief that the prosecution knew of this

falsity"); *Teleguz v. Davis*, No. 7:10CV00254, 2014 WL 3548982, at *26 (W.D. Va. July 17,

2014) *aff'd sub nom. Teleguz v. Zook*, 806 F.3d 803 (4th Cir. 2015) (rejecting a petitioner's

*Napue* claim because it would require the court to make an "inferential leap" that solely because

of a "working relationship" between a case agent in Massachusetts and prosecutors in Virginia,

the Commonwealth knew of, and suppressed, information refuting murder allegations at a

recreation center).   For the above reasons, the substance of Lawlor's *Napue* claim cannot serve

as cause for his procedural default.  Because the Supreme Court of Virginia's decision was not

unreasonable, the undersigned **RECOMMENDS DISMISSAL** of Claim VII.

---

[9] The Supreme Court of Virginia reached this finding in connection with Lawlor's state habeas claim V, which alleged ineffective assistance of counsel based on counsels' failure to investigate and confront Detective Tuller regarding his qualifications and expertise.  Although Lawlor did not pursue this claim in the instant federal habeas petition, the Supreme Court of Virginia's finding is applicable in regards to the cause and prejudice issue here.

Claim VIII.

In Claim VIII, Lawlor argued that the Commonwealth violated due process by failing to disclose favorable and material impeachment evidence regarding Detective Tuller's expert credentials and testimony. ECF No. 20 at 40. In addition to Lawlor's *Napue* claim, *supra* Claim VII, Lawlor argued that the Commonwealth suppressed material evidence that was favorable to the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* at 41. Specifically, Lawlor argued that, in presenting false evidence and testimony from Detective Tuller regarding his expert qualifications and experience, the Commonwealth failed to disclose material impeachment evidence, as detailed in Claim VII,[10] which would have resulted in a reasonable probability that the jury would have disbelieved Detective Tuller's testimony, rejected the Commonwealth's theory of capital murder predicated on abduction, and arrived at a different result. *Id.* at 42. Respondent argued that this claim is procedurally barred and without merit as Lawlor failed to demonstrate prosecutorial non-disclosure, as any inconsistencies in Detective Tuller's qualifications and experience were known to or readily discoverable by Lawlor at the time of trial. ECF No. 29 at 48.

The Supreme Court of Virginia found this claim was procedurally barred because Detective Tuller's "curriculum vitae were known or available to Lawlor at the time of his trial;" and thus, Lawlor should have raised this issue at trial or on direct appeal. *Lawlor*, 288 Va. at 225, 764 S.E.2d at 270. The Supreme Court of Virginia's decision was not unreasonable or contrary to clearly established law. Because Lawlor did not raise this issue at trial or on direct appeal, and the Supreme Court of Virginia held the claim procedurally barred, Claim VIII is procedurally defaulted in this Court. *See Mu'Min*, 125 F.3d at 196. Therefore, Lawlor may only

---

[10] Specifically, Detective Tuller's disputed membership in IABPA, disputed attendance at two seminars, and disputed number of homicide trials at which he had testified as an expert witness.

overcome the procedural default and obtain federal review on the merits if he can demonstrate cause and prejudice for the default. *See Edwards*, 2010 WL 5825427, at *3. Lawlor asserted no cause or prejudice other than the argument itself stated in the substance of Claim VIII. ECF No. 20 at 42.

Again, Lawlor's claim is without merit, and accordingly, without cause or prejudice. The basis of Lawlor's argument is that the Commonwealth failed to disclose impeachment evidence favorable to Lawlor, *i.e.*, errors and inconsistencies in Detective Tuller's resume and testimony regarding his qualifications and experience. In assessing such a claim, the Court considers the standard set forth in *Brady*: "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. However, Lawlor's argument is without merit in that he presented no evidence establishing that the Commonwealth suppressed evidence. The Commonwealth provided trial counsel with Detective Tuller's curriculum vitae two months before trial as part of its expert witness disclosures on November 19, 2010. JA 1890-1902, 2730; App. 9-107. Lawlor argued that information in this *provided* curriculum vitae was false or otherwise misleading. As the Supreme Court of Virginia noted, "the alleged inconsistencies in [Detective] Tuller's representation of his qualifications were known or available to Lawlor at the time of his trial." *Lawlor*, 288 Va. at 225, 764 S.E.2d at 270. Inasmuch as Lawlor possessed this information at or before trial, he demonstrated no cause or injustice as to why he was unable to raise this claim at trial or on direct appeal, and he therefore is precluded from raising this *Brady* claim before this Court. *See Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996) (stating that when the exculpatory information is available to the defendant, the defendant is not entitled to the benefit

of the *Brady* doctrine); *Goins*, 52 F. Supp. 2d at 676 ("[T]his cannot be a constitutional violation since the information withheld was in Goins' possession."). For the above reasons, the substance of Lawlor's *Brady* claim cannot serve as cause for his procedural default. Because the Supreme Court of Virginia's decision was not unreasonable, the undersigned **RECOMMENDS DISMISSAL** of Claim VIII.


Claim IX.

In Claim IX, Lawlor argued he was denied his Sixth and Fourteenth Amendment rights to plead guilty and be sentenced by a jury. ECF No. 20 at 42. Lawlor further separated Claim I into two parts, Claim IX(A) and Claim IX(B). In Claim IX(A), Lawlor argued that Virginia's sentencing scheme is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002), and *Blakely v. Washington*, 542 U.S. 296 (2004), because Virginia requires a capital defendant to forfeit his right to have a jury determine the existence of factors necessary to impose a death sentence if he decides to exercise his Sixth Amendment right to plead guilty. ECF No. 20 at 42-43. In Claim IX(B), Lawlor argued that trial counsel rendered ineffective assistance of counsel for failing to object to Virginia's capital sentencing scheme. *Id.* at 44. Lawlor further argued that he was prejudiced because there was a reasonable probability that had counsel raised this objection, the court would have sustained his objection, thereby permitting Lawlor to plead guilty and still have a jury determine his sentence. Had that happened, Lawlor then asserted that the jury would have accepted Lawlor's remorseful plea and sentenced him to life imprisonment. *Id.* Respondent argued that this claim is procedurally defaulted. ECF No. 29 at 49.

Lawlor raised the substantive issue in Claim IX(A) in his state habeas petition. *See Lawlor*, 288 Va. at 228, 764 S.E.2d at 272 ("In claim (III)(A), Lawlor contends he was denied the right to plead guilty and to have his sentence determined by a jury."). The Supreme Court of Virginia held that it was procedurally barred from reviewing this claim as it could have been raised at trial and on direct appeal. *Id.* Because Virginia's procedural bar is an adequate and independent state ground, *see Mu'Min*, 125 F.3d at 196, this Court is prevented from reviewing the issue unless Lawlor can demonstrate cause or prejudice, *see Edwards*, 2010 WL 5825427, at *3. Lawlor did not specifically argue cause to overcome a procedural bar but did include as Claim IX(B), an ineffective assistance of counsel claim, which he presented as claim (III)(B) in his state habeas petition. *See Lawlor*, 288 Va. at 228, 764 S.E.2d at 272. Because Lawlor raised this ineffective assistance of counsel claim in his state habeas petition, and the Supreme Court of Virginia considered the claim, this Court is not barred from considering the ineffectiveness claim as "cause" for his procedural default. Furthermore, Lawlor appeared to also raise the ineffectiveness claim as well on the basis that the Supreme Court of Virginia's decision was unreasonable or contrary to clearly established federal law. Thus, the Court will analyze the ineffectiveness claim in light of *Strickland* as well as whether it suffices as "cause" to excuse the procedural default of Claim IX(A).

The Supreme Court of Virginia found that Lawlor failed to meet the "prejudice" prong of the *Strickland* two-prong test. The Supreme Court of Virginia reasoned that Lawlor failed to show that had he been permitted to plead guilty and have his sentence determined by a jury, the jury would have reached a different outcome because "even if Lawlor had been permitted to plead guilty and have his sentence determined by a jury, the sentencing jury necessarily would have had access to the evidence presented in the guilt phase of Lawlor's trial, including the

evidence adduced at trial of the brutal nature of Lawlor's crime." *Id.* at 228-29, 764 S.E.2d at 272. Essentially, the Supreme Court of Virginia determined that Lawlor's argument was flawed because he argued that he would have been able to show remorse to a jury if he were able to plead guilty (accepting responsibility) and then have a jury determine his sentence. *Id.* at 229, 764 S.E.2d at 272. The Supreme Court found that trial counsel's strategy effected the same outcome, since trial counsel conceded that Lawlor murdered Genevieve Orange, thereby admitting his conduct. *Id.* Therefore, the court concluded that Lawlor failed to demonstrate any prejudice. *Id.*

The Supreme Court of Virginia's decision was not unreasonable. First, even though the Supreme Court of Virginia did not address the performance prong of the *Strickland* test, trial counsel's performance was not deficient. Lawlor argued that trial counsel were "duty bound to understand that relevant case law established . . . [Lawlor] retained the right to have a jury determine any fact that increases the statutory maximum. ECF No. 20 at 44. However, Lawlor overstates the breadth of the clearly established law he cited, and counsels' decision not to object to Virginia's sentencing scheme was not deficient when considering the Supreme Court's rulings in *Apprendi*, *Ring*, and *Blakely*. The Supreme Court's holding in *Apprendi* was premised on the reasoning that during sentencing, if an increase in the penalty for a crime beyond that imposed by the statutory maximum is sought, then any fact that would go towards proving that increase must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 469, 490 ("The question presented is whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt."). *Blakely* also followed that notion, stating, "When a defendant pleads guilty, the State is

free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial fact-finding." *Blakely*, 542 U.S. at 310 (citing *Apprendi*, 530 U.S., at 488). In *Ring*, the Supreme Court considered an Arizona statute that required a judge who presided over a capital trial to then conduct a separate sentencing hearing to determine the existence of aggravating circumstances that would render a sentence of death. *Ring*, 536 U.S. at 592-93. The Supreme Court found this statute was unconstitutional, reasoning that the Sixth Amendment right to a trial by jury would be diminished if it did not include the right to have a jury determine the fact-finding necessary to render a death sentence. *Id.* at 609.

Virginia's statute is not contrary to the Court's holding in *Ring* and thus it was not unreasonable for trial counsel to not object. Under Virginia law, after a defendant pleads guilty to a felony offense, the judge—not a jury—is to conduct all sentencing proceedings thereafter: "Upon a plea of guilty in a felony case, tendered in person by the accused after being advised by counsel, the court shall hear and determine the case without the intervention of a jury. . . ." Va. Code § 19.2-257. Under this scheme, defendants are not denied their Sixth Amendment right to have a jury determine the aggravating circumstances during sentences. Instead, a defendant can choose to have a jury determine everything from the defendant's guilt through sentencing, or can knowingly and voluntarily waive his right to a trial by jury and have a judge serve as the factfinder both at trial and during sentencing. Furthermore, the Supreme Court of Virginia has affirmed the constitutionality of Virginia's sentencing scheme under Va. Code § 19.2-257 as it applies to capital cases. *See Powell v. Com.*, 267 Va. 107, 137-38, 590 S.E.2d 537, 555-56 (2004). Virginia courts have explained that Va. Code § 19.2-257 does not run afoul of *Ring v. Arizona* or the Sixth Amendment because a defendant always has the right to have a jury determine the aggravating factors *unless* he waives his right to a jury trial. *Jackson v. Com.*, 267

Va. 178, 189, 590 S.E.2d 520, 526 (2004) ("[B]efore the sentence of death may be imposed, the Commonwealth must prove at least one of the statutory aggravating factors beyond a reasonable doubt.  Pursuant to Code § 19.2-264.3, a jury makes that determination, unless a jury trial is waived [under Va.] Code § 19.2-257.") (internal citations omitted).  Thus, counsels' failure to make an unnecessary motion did not constitute ineffective assistance of counsel.  *See King v. Greene*, 141 F.3d 1158 (4th Cir. 1998), *cert. denied,* 524 U.S. 965 (1998) (stating that counsel clearly was not deficient in failing to raise an objection to an issue within Virginia's aggravating factors that have been previously upheld); *Goins v*, 52 F. Supp. 2d at 664 ("Counsel do not render constitutionally ineffective assistance where, as here, they refrain from challenging as unconstitutional a statute the constitutionality of which has been explicitly and repeatedly upheld."); *Juniper v. Zook*, 117 F. Supp. 3d 780, 804 (E.D. Va. Aug. 3, 2015), *motion for relief from judgment denied*, No. 3:11-CV-00746, 2016 WL 413099 (E.D. Va. Feb. 2, 2016) (finding no merit to petitioner's ineffective assistance of counsel claim that counsel should have argued Virginia law was unconstitutional "[b]ecause Virginia law has been so consistent on this issue for more than fifteen years and there is no reason to believe that a constitutional argument would sway the Supreme Court of Virginia"); *Koch*, 907 F.2d at 527 (holding that "counsel is not required to make futile motions or objections").  Furthermore, as the Supreme Court of Virginia noted regarding the lack of prejudice, counsel conceded during closing argument that Lawlor had killed Genevieve Orange, letting the jury hear Lawlor's acceptance of responsibility; thus there is no reasonable probability the outcome would have been different.  *Cf. Whelchel v. Bazzle*, 489 F. Supp. 2d 523, 533 (D.S.C. Dec. 18, 2006) (finding no prejudice where defense counsel failed to elicit damaging testimony from the state's witness about her drug use because the jury heard the

information regarding the state's witness's drug use when defense counsel cross-examined another witness).

Accordingly, because counsels' performance was not deficient, this argument is insufficient to establish cause for Lawlor's procedural default of his claim that Virginia's sentencing scheme violated his Sixth Amendment right to a trial by jury. Furthermore, the Supreme Court of Virginia's application of *Strickland* was not unreasonable as Lawlor failed to establish both deficient performance and prejudice. Because the Supreme Court of Virginia's decision was not unreasonable, the undersigned **RECOMMENDS DISMISSAL** of Claim IX.

Claim X.

In Claim X, Lawlor argued trial counsel were ineffective for failing to present available psychological testimony from an evaluating expert in the sentencing phase. ECF No. 20 at 46. Lawlor argued that trial counsel retained an expert psychologist, Dr. James Hopper ("Dr. Hopper"), who interviewed Lawlor three times prior to the trial, but then trial counsel failed to present expert testimony from Dr. Hopper at trial. *Id.* Lawlor stated three points as to the prejudice caused: First, Dr. Hopper's testimony would have contextualized and illuminated the mitigating side of double-edged testimony that counsel presented, explaining how Lawlor's criminal acts and social functioning deficits in adulthood derived from his traumatic childhood. *Id.* at 51. Second, Dr. Hopper's testimony would have supported the mitigation themes that Lawlor was an abused, neglected child who turned to drugs and alcohol at a young age, which in turn affected his actions as an adult; and that the Commonwealth would not have been able to argue during closing that evidence of Lawlor's depraved childhood was merely an excuse for his

actions. *Id.* at 52. And third, expert testimony would have explained the effects of lack of appropriate mental health treatment on Lawlor's psychological functioning as an adult. *Id.* at 53.

Lawlor presented this claim to the Supreme Court of Virginia in his state habeas petition as claim XII. *Lawlor*, 288 Va. at 243-44, 764 S.E.2d at 281-82 ("In claim (XII), Lawlor contends he was denied the effective assistance of counsel because counsel failed to present testimony from Dr. James Hopper. . . ."). The Supreme Court of Virginia found that Lawlor failed to meet the "performance" or the "prejudice" prong of the *Strickland* two-prong test. The Supreme Court of Virginia reasoned that expert psychological testimony on this subject would have been cumulative, contradicted other evidence Lawlor presented, or would have opened the door to damaging rebuttal evidence. *Id.* at 244, 764 S.E.2d at 282 (citing *Wong v. Belmontes*, 558 U.S. 15, 22 (2009)). Specifically, the court stated that there was substantial testimony presented from other witnesses that "Lawlor was an abused and neglected child who turned to drugs and alcohol," and therefore Dr. Hopper's testimony was cumulative on this point. *Id.* at 245, 764 S.E.2d at 282. Presenting Dr. Hopper's report would have also contradicted counsel's argument that "Lawlor no longer had a support network available to him" when, in fact, he still had friends from AA meetings and church who encouraged him to continue on the path to recovery. *Id.* Lastly, if Dr. Hopper's testimony were presented, the Commonwealth would have responded with damaging rebuttal testimony through their expert, Dr. Hagan. *Id.* at 245-46, 764 S.E.2d at 283.

Respondent argued that the Supreme Court of Virginia correctly found neither deficient performance nor prejudice, and pointed out that Lawlor's counsel had reasonable, strategic reasons for introducing Lawlor's mental health history records instead of calling Dr. Hopper to testify, as this prevented the prosecution from calling its rebuttal expert, Dr. Hagan. ECF No. 29

at 54-55.  Respondent also noted that Lawlor's argument that Dr. Hopper could have effectively countered Dr. Hagan's planned rebuttal was not presented to the state court, and thus could not be considered here.  *Id.* at 55.  Finally, Respondent agreed with the state court's conclusion that Lawlor failed to demonstrate "a reasonable probability the jury would have rejected a capital sentence" in light of the overwhelming evidence of Lawlor's dangerousness and of the "inherent vileness of the murder."  *Id.* at 56.

Lawlor argued that the Supreme Court of Virginia was unreasonable in its application of *Strickland* when finding the evidence cumulative because "the Supreme Court has made clear that prejudice can be established where other mitigation was presented at trial."  ECF No. 20 at 54 (citing *Sears v. Upton*, 561 U.S. 945, 951 (2010) and *Porter v. McCollum*, 558 U.S. 30, 41 (2009)).  The Supreme Court of Virginia's decision was not contrary to *Sears*.  *Sears* was a capital case in which the defendant's trial counsel presented mitigation evidence during the penalty phase that the defendant had a stable, loving childhood, and presented witness testimony to support that a sentence of death would "devastate the family."  *Sears*, 561 U.S. at 497.  However, during a state post-conviction evidentiary hearing, mitigation evidence emerged describing the defendant's childhood as "anything but tranquil," and included witnessing his parents' physically abusive relationship, personally suffering sexual abuse and verbal abuse from a family member, and struggling with learning disabilities in school.  *Id.*  On federal habeas review, the federal district court found that though trial counsel's performance was deficient for failing to proffer such evidence, no prejudice resulted, assuming trial counsel's mitigation theory was reasonable.  *Id.* at 953.  The Supreme Court disagreed, stating that a finding of "deficient performance" automatically calls into question the reasonableness of trial counsel's theory.  *Id.*  The Court further laid out a standard:  "A proper analysis of prejudice under *Strickland* would

63

have taken into account the newly uncovered evidence . . . along with the mitigation evidence introduced during [the defendant's] penalty phase trial, to assess whether there is a reasonable probability that [the defendant] would have received a different sentence after a constitutionally sufficient mitigation investigation." *Id.* at 956.  Essentially, the Supreme Court's standard requires federal habeas courts to weigh *all* mitigation evidence presented and determine whether there is a reasonable probability the outcome would have been different if this newly presented mitigation evidence were before the jury during the penalty phase. *See also Porter*, 558 U.S. at 41 (citing *Williams*, 529 U.S. at 396) ("To assess that probability, we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweigh it against the evidence in aggravation.'").

Unlike *Sears* and *Porter*, where completely new mitigation evidence was presented during state post-conviction proceedings than was presented before the trial court, new mitigation evidence was not presented here that would differ from that presented at trial.  Lawlor argued that by not presenting Dr. Hopper's evaluation to the jury, he was prejudiced; but, as the state court reasoned, the evidence Dr. Hopper would have testified to was already presented to the jury through other witnesses.  This situation is not analogous to *Sears* or *Porter*.  Here, the jury did consider the substance of the evidence; thus the Supreme Court of Virginia was not unreasonable to hold that Lawlor could not show a reasonable probability the jury would have rejected a capital sentence had counsel submitted the proffered mitigation evidence.  *See Lawlor*, 288 Va. at 246, 764 S.E.2d at 283.

Lawlor argued that the Supreme Court of Virginia unreasonably found that Dr. Hopper's testimony contradicted other evidence in the record regarding whether Lawlor had a support network available to him because the court made "an unreasonable factual determination under

64

section 2254(d)(2)." ECF No. 20 at 55. The Supreme Court of Virginia stated that Dr. Hopper's testimony would indicate that Lawlor no longer had a support network available to him, when Lawlor had already introduced evidence that he had friends from AA and church who encouraged him to seek treatment. *Lawlor*, 288 Va. at 245, 764 S.E.2d at 282-83. The Supreme Court of Virginia found that trial counsels' decision not to introduce the proffered evidence was not unreasonable given the "conflicting nature of much of the evidence." *Id.*, 764 S.E.2d at 283. However, Lawlor argued that this conclusion by the court was *factually inaccurate* because Dr. Hopper never stated in his report that Lawlor had no support network, but only that Lawlor's associates were unable to convince him to return to the recovery program. ECF No. 20 at 55. The authority Lawlor referred to, section 2254(d)(2), states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any *claim* that was adjudicated on the merits in State court proceedings unless the adjudication of the *claim* . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(2). This section refers to claims as a whole, and not specific factual distinctions in reference to those claims. The Supreme Court of Virginia was not unreasonable to infer contradictory factual connections between Dr. Hopper's report and other mitigation evidence in the record, even if Lawlor has a different interpretation. *See Lewis v. Warden of Fluvanna Corr. Ctr.*, 274 Va. 93, 116, 645 S.E.2d 492, 505-06 (2007) (reasoning that evidence concerning the defendant's prescription drug abuse was double edged in that in one respect it provided a viable excuse that she "appeared uncaring" but that in other respects it showed that she voluntarily consumed excess quantities of prescription drugs). The court's interpretation, even if incorrect, is only one part of a three-part analysis on the claim alone, not a factual determination as to the claim as a whole. The court found no prejudice resulted because the

information in Dr. Hopper's report was cumulative, contradictory, and would open the door to damaging testimony from Dr. Hagan. The court did not plainly misapprehend or misstate the record in making its findings, the misapprehension did not go to a material factual issue that is central to Lawlor's claim, and that misapprehension cannot "fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

Lastly, Lawlor argued that the Supreme Court of Virginia's decision that Dr. Hopper's testimony would open the door to damaging evidence was unreasonable because *Strickland* prejudice can still be found in areas where the mitigation evidence presented is double-edged. ECF No. 20 at 55 (citing *Williams*, 529 U.S. at 363-64). Again, the Supreme Court of Virginia held that Lawlor was unable to demonstrate that trial counsels' performance was deficient for not introducing evidence that could be used by the Commonwealth to expand their expert's testimony to further damage Lawlor. *Lawlor*, 288 Va. at 246, 764 S.E.2d at 283. Unsuccessful strategic moves of trial counsel alone do not result in a finding of deficient performance. *See Strickland*, 466 U.S. at 681 ("Those strategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based."); *Bunch v. Thompson*, 949 F.2d 1354, 1364 (4th Cir. 1991) (finding reasonable trial counsel's decision not to call psychiatrist to testify in sentencing proceeding when damaging findings could have been brought out on cross-examination and trial counsel's decision not to call certain family members because of their unreliability); *Rueda v. Clarke*, No. 1:14CV699 LMB/IDD, 2015 WL 1236226, at *8 (E.D. Va. Mar. 17, 2015) *appeal dismissed*, 607 F. App'x 306 (4th Cir. 2015) *cert. denied*, 136 S. Ct. 427 (2015) ("[I]t is well established in federal

jurisprudence that decisions concerning the calling of witnesses are matters of strategy left to the attorney and ordinarily cannot constitute ineffective assistance.").

Further, Lawlor failed to demonstrate that if counsel had presented the proffered testimony, the jury would have found otherwise given the overwhelming evidence on the other side of the double-edged sword. *Goins*, 52 F. Supp. 2d at 654 (noting that "[w]hile trial counsel's investigation of [the defendant's] mother's psychiatric history might have been more thorough, the information they obtained adequately established the effect on [the defendant] of his mother's chemical dependency and psychiatric difficulties. . . . As a result, there is no indication either that a failure to seek out this information should be characterized as objectively unreasonable or that such a failure was prejudicial"). All three of Lawlor's grounds for ineffective assistance in this claim are therefore unavailing. Because the Supreme Court of Virginia's decision was not unreasonable, the undersigned **RECOMMENDS DISMISSAL** of Claim X.

Claim XI.

In Claim XI, Lawlor argued the trial court improperly excluded testimony from Dr. Mark Cunningham of Lawlor's risk of violence in prison and his future adaptability to the prison environment. ECF No. 20 at 57. Lawlor's trial counsel called Dr. Mark Cunningham ("Dr. Cunningham"), a clinical and forensic psychologist, as an expert witness. JA 12418. Dr. Cunningham had produced a report based on his interviews with Lawlor and other witnesses such as probation officers, and on his consideration of criminal records, jail and prison records, mental health and drug and alcohol rehabilitation records, school records, and employment records. JA 12428-29. Lawlor's counsel wanted Dr. Cunningham to testify as to "whether Lawlor would commit criminal acts of violence that would constitute a continuing serious threat

to society in the future," with society being limited to a prison environment.  JA 12437-39.  In his Petition, Lawlor made two arguments with regard to why the trial court improperly excluded Dr. Cunningham's statements that Lawlor would not be a continuing threat to society *in prison*: In Claim XI(A), Lawlor argued that Dr. Cunningham's expert opinions were admissible as rebuttal, and in Claim XI(B), Lawlor argued that Dr. Cunningham's expert opinions were admissible as mitigation evidence.  ECF No. 20 at 60-62.  Respondent countered that Dr. Cunningham's opinions regarding future dangerousness in a prison environment ran afoul of the parameters of admissible evidence pursuant to Virginia Code §§ 19.2-264.2 and 19.2-264.4(C).  ECF No. 29 at 57-64.

The Court will address XI(A) first.[11]  In Claim XI(A), Lawlor argued, "Evidence that [Lawlor] would be unlikely to be violent in prison – where he would spend the rest of his life – was thus plainly relevant *to rebut* the Commonwealth's argument" regarding the aggravating factor that Lawlor would be a continuing serious threat to society.  *Id.* at 60 (emphasis added).  Lawlor sought to rebut this continuing threat evidence, demonstrating that he would not be such a threat to society, through the expert testimony of Dr. Cunningham.  *Id.* Lawlor stated that, "[f]ar from offering generalized testimony about prison security measures, Dr. Cunningham relied on [Lawlor's] specific characteristics – including evidence of 'his character, history, and background' – to assess his risk of violence in prison."  *Id.*

The Supreme Court of Virginia considered this issue on direct appeal and held, "Where the Commonwealth alleges that the future dangerousness factor applies and adduces evidence to prove it, the defendant has a due process right to rebut that evidence;" however, "evidence

---

[11] While the two issues can be quite confusing or "elusive" and "difficult to discuss," as the Supreme Court noted in *Skipper v. S. Carolina*, 476 U.S. 1, 7 (1986), the Supreme Court of Virginia provided a useful discussion of the interplay between the issues.  *See Lawlor*, 285 Va. at 246-48, 738 S.E.2d at 881-82 ("As an initial matter, we note that a defendant's evidence rebutting the risk of future dangerousness serves a purpose different from mitigating evidence.  While the same evidence may be adduced to serve both purposes, the purposes must not be conflated.").

concerning a defendant's probability of committing future violent acts, limited to the penal environment, is not relevant to consideration of the future dangerousness aggravating factor." *Lawlor*, 285 Va. at 247-249, 738 S.E.2d at 881.   The court continued, reasoning that "the relevant inquiry is not whether a defendant *could* commit criminal acts of violence in the future but whether he *would*. . . .   In other words, the issue is not whether the defendant is physically capable of committing violence, but whether he has the mental inclination to do so." *Id.* at 248, 738 S.E.2d at 882 (quoting *Morva v. Com.*, 278 Va. 329, 349, 683 S.E.2d 553, 564 (2009)).   The Supreme Court concluded,

> [T]he excluded testimony ran afoul of *Lovitt* to the extent it was offered to rebut evidence of the future dangerousness aggravating factor.   It expressed Dr. Cunningham's opinion of Lawlor's risk of future violence in prison society only, rather than society as a whole.   To be admissible as evidence rebutting the future dangerousness aggravating factor under the statutes, expert opinion testimony must not narrowly assess the defendant's continuing threat to prison society alone. The court therefore did not abuse its discretion by excluding Dr. Cunningham's testimony as rebuttal evidence on the future dangerousness aggravating factor.

*Lawlor*, 285 Va. at 250, 738 S.E.2d at 883.

In evaluating the reasonableness of the Supreme Court of Virginia's decision, this Court must consider what testimony Dr. Cunningham was and was not permitted to offer.   Dr. Cunningham testified at Lawlor's trial as an expert witness on behalf of the defense. JA 12417. Counsel for Lawlor began the substance of his direct examination with Dr. Cunningham by asking him what sort of records Dr. Cunningham reviewed before testifying.   JA 12428.   Dr. Cunningham responded that, in addition to speaking with witnesses, he reviewed "[b]road categories of criminal records, jail records, prison records, mental health records, drug and alcohol rehabilitation related records, a small amount of school records, employment records," and general correctional data regarding the field of future risk assessment in prison.   *Id.* Lawlor's counsel then asked, based on Dr. Cunningham's assessment, "whether Lawlor would

commit criminal acts of violence that would constitute a continuing serious threat to society in the future." JA 12437. The Commonwealth objected, arguing that trial counsel's question would confuse the jury as to what the definition of society is, and the trial court agreed, striking the question, reasoning that Dr. Cunningham could testify as to what his opinion is of Lawlor's risk of future dangerousness in the community, but that the community is not limited to the prison community. JA 12437-41. Trial counsel attempted to rephrase the question, asking, "And what is your opinion as to whether Mr. Lawlor would commit criminal acts of violence that would constitute a continuing serious threat to society if he were to be sentenced to life imprisonment rather than to death?" JA 12442-43. Again, the Commonwealth objected and the court sustained the objection, striking the question from the record. JA 12443-44.[12] While the court prohibited trial counsel from asking Dr. Cunningham to testify as to Lawlor's future dangerousness *in a prison society*, the court permitted Dr. Cunningham to testify in other regards. Dr. Cunningham testified as to his opinion of the Defendant's adaptability to the prison environment, stating "[t]hat there is a very low likelihood of serious violence from being in prison." JA 12448. Dr. Cunningham also testified as to the factors that led to the basis of his opinion on Lawlor's ability to adapt in a prison environment, listing factors such as "age, past patterns of behavior in confinement, education level, correctional appraisal, prior confinement in

---

[12] Trial counsel then asked the same question two more times, slightly rephrased each time, but the Commonwealth objected and the court sustained the objection. JA 12445-46. After the trial court warned counsel not to commit the same error, counsel asked Dr. Cunningham whether he had reached an opinion as to the likelihood that Lawlor would commit criminal acts of violence, and Dr. Cunningham responded, "Serious acts of violence that would constitute a continuing threat to society in prison." JA 12447. The court interjected, stating, "Doctor, that wasn't the question. I'm only going to tell you one more time." *Id.*; *see also* JA 12461 (sustaining the same objection to trial counsel's attempt to get Dr. Cunningham to talk about Lawlor's risk of violence if imprisoned for life; "THE COURT: It is stricken from the record. We've already discussed that three times at the bench. The issue is not life in prison. It's an issue of risk of violence, period."); 12511 ("THE COURT: It's very simple, Doctor. You may testify about reasonable future dangerousness, period. You may not testify about jail dangerousness. That is not the issue. The issue is not jail dangerousness. It is future dangerousness. That's all there is to it.").

prison, his convictions, and that if so sentenced on murder and capital murder charges, he would serve a life without parole sentence." JA 12453-54, 12458-59-60.

After excusing Dr. Cunningham from the courtroom for a brief discussion, trial counsel argued that Dr. Cunningham's testimony of Lawlor's future dangerousness in the prison society was relevant as merely a portion of society, conceding that the inquiry at issue is future dangerousness in society as a whole, but that a small portion of society as a whole is prison society. JA 12471-73. The court disagreed, referring defense counsel to the Supreme Court of Virginia's *holding* in *Morva* that, "[t]o be admissible, evidence relating to a prison environment must connect the specific characteristics of the particular defendant to his future adaptability in the prison environment. Conditions of prison life and the security measures utilized in a maximum security facility are not relevant to the future dangerousness inquiry unless such evidence is specific to the defendant on trial and relevant to that specific defendant's ability to adjust to prison life." 278 Va. at 350, 683 S.E.2d at 565 (internal citations omitted). The court then allowed Dr. Cunningham to return to the stand to testify as to the narrow portion of prison society testimony that *Morva* permits—evidence of specific characteristics of Lawlor regarding his ability to adapt in the prison environment. Consequently, Dr. Cunningham testified as to the lack of violent write-ups while Lawlor was incarcerated on past occasions. JA 12487.[13] Defense counsel then again attempted to narrow the inquiry to the future dangerousness in prison society by including the terms "capital sentence" or "capital defendant" in his questions, to which the court again had to remind counsel that he was trying to get Dr. Cunningham to testify to

---

[13] The court was intent on making sure that the line of questioning between trial counsel and Dr. Cunningham related only to Lawlor specifically, and related to society in general, and not prison society. *Compare* JA 12494 (sustaining an objection to defense counsel's question, "Is the best predictor of future behavior of violence in prison past behavior of violence and non-violence in prison?"), *with* 12494-95 (overruling an objection to defense counsel's question, "How good a predictor of the future behavior of violence is the lack of prior violence while incarcerated for a capitally sentenced defendant?"). The first question seeks Dr. Cunningham's opinion as to the future behavior of violence *in prison*, whereas the second question instead just asks his opinion on future behavior of violence in general.

irrelevant and inadmissible evidence. JA 12508-11 ("THE COURT: Now, I have told you over and over the issue is future dangerousness. It's not future dangerousness in prison, it's not future dangerousness -- it's future dangerousness of this individual and you keep trying to back door in the capital sentence."). Responding to the trial court's clear direction, Dr. Cunningham stated: "I'm afraid I'm going to violate my oath. My risk assessment is specific to prison. It's not prison and the open community. It is specific to prison." JA 12511. In essence, the trial court required Dr. Cunningham to testify consistent with the Supreme Court of Virginia's holding in *Morva*, and limit his opinion to future dangerousness of the individual in society as a whole, not just in prison.

The Supreme Court of Virginia, in this case, decided this issue on direct appeal, finding the trial court did not abuse its discretion in ruling on the use of Dr. Cunningham's testimony as it relates to rebuttal evidence. The Supreme Court of Virginia's decision was not unreasonable. When the Commonwealth presents evidence to prove beyond a reasonable doubt the aggravating factor that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society under Va. Code § 19.2-264.2, the defendant may rebut that evidence. *Skipper*, 476 U.S. at 5 ("[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating."). The defendant can rebut that factor with his own evidence that he does not have the metal inclination to continually commit criminal acts—but not with evidence that he would be incapable of committing future violent acts because of restraints in confinement (*i.e.,* physical incapability due to prison conditions). *Morva v. Commonwealth*, 278 Va. 329, 350, 683 S.E.2d 553, 565 (2009), *cert. denied,* 562 U.S. 849 (2010). However, dispositive of this issue and diligently considered by the trial court in this case, is the notion that the consideration of whether the defendant would

72

constitute a continuing serious threat to society refers to "society as a whole" or "society at large," and not just prison society, even if the defendant's only alternative to death is life imprisonment. *Lovitt v. Commonwealth*, 260 Va. 497, 537 S.E.2d 866 (2000), *cert. denied,* 534 U.S. 815 (2001) (defining "society" for purposes of Va. Code § 19.2-264.2 as society as a whole because "[t]he statute does not limit this consideration to "prison society" when a defendant is ineligible for parole").

Thus, the Supreme Court of Virginia's decision preventing Lawlor from rebutting the Commonwealth's argument with Dr. Cunningham's testimony that he would not constitute a continuing threat just to *prison society* was not only consistent with Virginia law but was not unreasonable or contrary to clearly established federal law. *See Morva v. Zook*, No. 15-1, 2016 WL 2587362, at *7 (4th Cir. May 5, 2016) ("The court's classification of prison-environment evidence as irrelevant and therefore inadmissible is not unreasonable under U.S. Supreme Court precedent. Nor is the court's similar determination regarding statistical evidence of similarly situated inmates and instances of prison violence"); *Skipper*, 476 U.S. at 4 ("The State does not contest that the witnesses petitioner attempted to place on the stand would have testified that petitioner had been a well-behaved and well-adjusted prisoner, nor does the State dispute that the jury could have drawn favorable inferences from this testimony regarding petitioner's character and his probable future conduct if sentenced to life in prison. Although it is true that any such inferences would not relate specifically to petitioner's culpability for the crime he committed."); *cf. United States v. Lighty*, 616 F.3d 321, 364 (4th Cir. 2010) (finding no abuse of discretion when trial judge excluded testimony regarding whether a witness believed the defendant would have a positive impact on those in jail because it was not in line with *Skipper*'s ruling to permit testimony about a defendant's adjustment to prison life); *United States v. Jackson*, 327 F.3d 273,

299 (4th Cir. 2003) ("While Jackson must be able to present any evidence of *his* character or record, or the circumstances of the offense, to urge a penalty less than death, this does not entitle him to reach more broadly to matters unrelated.").

In Claim XI(B), Lawlor argued that "Dr. Cunningham's testimony was independently admissible as mitigating evidence." ECF No. 20 at 61. As part of his proffer at trial, Lawlor's trial counsel attempted to introduce nine written questions and answers from Dr. Cunningham on the issue of mitigation.[14] JA 12674. The court rejected the proffered questions. JA 12675-76.

---

[14] The proffered questions and answers were:

1. Q: What is your expert opinion as to how Mark Lawlor's behavior pattern while in custody/incarceration, impacts his future prison adaptability?
    A: Because of Mark Lawlor's prior adaption in prison and jail, and particularly because of his lack of violent activity in these settings, Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.

2. Q: What is your expert opinion as to how Mark Lawlor's age impacts his future prison adaptability? Does that opinion take into account the fact that Mr. Lawlor committed his current crime at age 43?
    A: Because of Mark Lawlor's age of 45 years old, Mr. Lawlor represents a low likelihood of committing acts of violence while in prison. The fact that Mr. Lawlor committed his current offense at age 43 has been taken into account in forming this opinion, but it does not change my opinion about his future prison adaptability.

3. Q: What is your expert opinion as to how Mark Lawlor's education impacts his future prison adaptability? Is this risk factor predictive of violence in the free community as well?
    A: The fact that Mr. Lawlor has earned his G.E.D. is predictive of a low likelihood of committing acts of violence while in prison. This risk factor is far more predictive of violent conduct in the prison context than it is in the free community context.

4. Q: What is your expert opinion as to how Mark Lawlor's employment history impacts his future prison adaptability?
    A: Mark Lawlor's employment history in the community is predictive that Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.

5. Q: What is your expert opinion as to how Mark Lawlor's continued contact with his family and friends in the community impacts his future prison adaptability?
    A: Mark Lawlor's continued contact with these individuals while in prison, [sic] is predictive that Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.

6. Q: What is your expert opinion as to how Mark Lawlor's past correctional appraisal impacts his future prison adaptability?
    A: Mark Lawlor's past correctional appraisal is predictive that Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.

In support of his argument here, Lawlor cited Supreme Court precedent that upholds the notion that evidence of a defendant's lack of future dangerousness in prison society is relevant mitigation evidence. *Id.* The Supreme Court of Virginia agreed that "a defendant's probability of committing violence, even when confined within a penal environment, is relevant *as mitigating evidence* of his character and is constitutionally mandated under *Lockett,* provided the evidence establishing that probability arises specifically from his character and is sufficiently personalized to him." *Lawlor*, 285 Va. at 251, 738 S.E.2d at 883 (emphasis added). However, the Supreme Court of Virginia found that the specific testimony Lawlor sought to be admitted as mitigation evidence was not properly admissible as character evidence. *Id.* at 254, 738 S.E.2d at 885.

The Supreme Court of Virginia's decision was not unreasonable. Courts are of the posture that the future dangerousness of a defendant, whether inside or outside of a prison, is an inherent consideration in any sentencing analysis, and thus, it "is essential [] that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262 (1976). Consistent with this rule, the Supreme Court of Virginia stated that based on a defendant's Eighth Amendment right, a "defendant is always

---

7. Q: What is your expert opinion as to how Mark Lawlor's lack of gang affiliation impacts his future prison adaptability?
    A: Mark Lawlor's lack of gang affiliation is predictive that Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.

8. Q: Have you reached an opinion, to a reasonable degree of psychological certainty, based on all of the factors relevant to your studies of prison risk assessment, as to what Mark Lawlor's risk level is for committing acts of violence while incarcerated? And if so, what is your opinion?
    A: Yes. It is my opinion based on my analysis of all of the relevant risk factors which are specific to Mr. Lawlor's prior history and background, that Mr. Lawlor represents a very low risk for committing acts of violence while incarcerated.

9. Q: Are all of your opinions concerning the above questions and answers about Mr. Lawlor, grounded in scientific research and peer-reviewed scientific literature?
    A: Yes.

JA 3078-80.

entitled to present relevant mitigating evidence in a capital case." *Lawlor*, 285 Va. at, 247, 738 S.E.2d at 881. However, this rule, also known as the *Lockett* rule, defines mitigating evidence as "any aspect of a *defendant's character or record* and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis added). Under these circumstances, evidence of a defendants future adaptability, or "a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." *Skipper*, 476 U.S. at 7. Further, evidence of good behavior during incarceration is relevant to future dangerousness. *Id.* at 5.

In Lawlor's case, the Supreme Court of Virginia declined to extend the *Lockett* rule beyond any aspect of a *defendant's character or record* to such generalities as presented by Dr. Cunningham. Dr. Cunningham's evidence was "based on statistical models. [And w]hile each datum is extracted from Lawlor's personal history, it sheds no light on his character, why he committed his past crimes and the crime for which he stood convicted, or how would it influence or affect his behavior while incarcerated." *Lawlor*, 285 Va. at 254, 738 S.E.2d at 885. As the Supreme Court of Virginia noted, "[g]eneral conditions of prison life also are inadmissible as mitigating evidence;" *Id.* at 250, 738 S.E.2d at 883 (citing *Walker v. Commonwealth*, 258 Va. 54, 70, 515 S.E.2d 565, 574 (1999), *cert. denied*, 528 U.S. 1125 (2000)), because they are not relevant to a defendant's character, prior record, or the circumstances of his offense, *see Lockett*, 438 U.S. at 604 n.12 ("Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense."); *see also Morva v. Davis*, No. 7:13-CV-00283, 2015 WL 1710603, at *16 (W.D. Va. Apr. 15, 2015), *aff'd sub nom. Morva v. Zook*, No. 15-1, 2016 WL

2587362 (4th Cir. May 5, 2016) ("There is no United States Supreme Court decision holding that due process requires expert evidence on a capital defendant's future dangerousness while in prison based on statistical evidence.").

On May 5, 2016, the Fourth Circuit addressed the relevance of prison-risk assessment testimony when considering Virginia's standard for whether a capital defendant has a right to a state-funded non-psychiatric expert. *Morva*, 2016 WL 2587362. The court addressed the admissibility under the reasons Lawlor articulated, rebuttal evidence and mitigation evidence. The Fourth Circuit's decision affirmed the District Court for the Western District of Virginia's dismissal of petitioner William Charles Morva's ("Morva") habeas claim. *Id.* Petitioner Morva was convicted of assault and battery of a law-enforcement officer, escape of a prisoner by force or violence, three counts of capital murder, and two counts of using a firearm in the commission of a murder. *Id.* at *2. Prior to trial, Morva moved for the appointment of Dr. Mark D. Cunningham, the same prison-risk-assessment expert that testified at Lawlor's trial, to rebut the Commonwealth's claim that Morva was a future danger to society and to provide the jury with an assessment of the likelihood that Morva would commit violence if he were sentenced to life in prison. *Id.* at *3.

The Fourth Circuit noted that absent a United States Supreme Court decision on state-funded non-psychiatric experts, the Supreme Court of Virginia created its own rule—a "particularized need" standard—to address this issue, which required "an indigent defendant who seeks the appointment of an expert witness, at the Commonwealth's expense, [to] demonstrate that the subject which necessitates the assistance of the expert is 'likely to be a significant factor in his defense,' and that he will be prejudiced by the lack of expert assistance." *Id.* at * 5 (quoting *Husske v. Commonwealth,* 252 Va. 203, 476 S.E.2d 920, 925 (Va. 1996)). The Fourth

Circuit reviewed the Supreme Court of Virginia's application of the "particularized need" standard to Morva's request to present Dr. Cunningham's evidence regarding prison life, prison security, and statistics on similarly situated defendants' instances of violence in prison, which the Supreme Court of Virginia determined was irrelevant. *Id.* The Fourth Circuit held,

> the Supreme Court of Virginia did not unreasonably apply U.S. Supreme Court precedent by deeming irrelevant evidence that did not relate specifically to Morva's character, background, criminal record, or the circumstances of his offense—i.e., evidence regarding general prison life and security offered to show that Morva's "opportunities to commit criminal acts of violence in the future would be severely limited in a maximum security prison."

*Morva*, 2016 WL 2587362, at \*7 (quoting *Burns v. Commonwealth*, 261 Va. 307, 541 S.E.2d 872, 893 (Va. 2001)).  Thus, Dr. Cunningham's proposed testimony at Lawlor's trial would necessarily be deemed irrelevant.

Consistent with the foregoing law, Lawlor was able to present *relevant* evidence regarding his personal character, his record while confined and personal adaptability to prison conditions, and the circumstances of the offense.  For example, Lawlor presented evidence of his rough childhood, his personality, and his medical and substance abuse issues.  *See, e.g.*, JA 11474 (describing Lawlor's disheveled appearance as a child); 11494-96 (explaining Lawlor's unfit living conditions as a child—living in the back pantry of a pizza parlor); 11675-77 (describing, from a neighbor's perspective, that Lawlor "was always helpful" and handy around the house, "very sincere, . . . kind, considerate, . . . funny, . . . articulate, well-mannered, respectful"); 12388 (noting Lawlor's substance abuse problems, panic attacks, and anxiety symptoms).  Lawlor also presented evidence of his non-violent nature while incarcerated.  *See, e.g.*, JA 12680 ("THE COURT: You offered evidence from every single jailer you could find, every single facility.  There was no evidence of violence by Mr. Lawlor while in jail. It is cumulative, not only of the first order.  It's probably cumulative of the third order."); 12448 (Dr.

Cunningham was asked, "What opinion have you reached of the Defendant's adaptability in the prison environment?" and he responded, "[T]here is a very low likelihood of serious violence from being in prison," and stated that in conducting this risk-assessment, he took into account Lawlor's age, his past patterns of behavior in confinement and correctional appraisal, his education level, contact and relationship with community members, and his convictions for murder and capital murder, etc.); 12746 (noting that while incarcerated, Lawlor never tried to escape, never had any paraphernalia or anything illegal in his cell, and at one point was a victim when he got punched by another inmate). And, Lawlor presented evidence to mitigate the circumstances of the offense. *See, e.g.*, JA 10202-03 (presenting testimony from a fact witness that, on the night of the murder, Lawlor smoked the majority of an eight-ball of crack cocaine, and drank heavily); 10364-80 (connecting the fact witness's testimony with that of a clinical psycho-pharmacologist to present evidence that when a person consumes 3.5 grams of crack cocaine over the course of eight hours, the person may exhibit psychiatric symptoms, an inability to relate to people, paranoia, depression, suicidal ideations, extreme irritability, delusional thinking, and engage in either a fight or flight type of phenomena).

In conclusion, the evidence that Lawlor presented, and the evidence from Dr. Cunningham that he could not present, was consistent with Virginia law both in terms of rebuttal and mitigation evidence. The Supreme Court of Virginia's decision not to extend the *Lockett* rule was not unreasonable or contrary to clearly established federal law. The Supreme Court of Virginia's decision finding certain of Dr. Cunningham's proposed testimony as irrelevant was also not unreasonable or contrary to federal law. Accordingly, the undersigned **RECOMMENDS DISMISSAL** of Claim XI.

Claim XII.

In Claim XII, Lawlor argued that the trial court's exclusion of relevant mitigation evidence regarding his sexual abuse history and "good character evidence from family and friends"[15] deprived the jury of critical sentencing evidence in violation of his right to due process and a reliable sentencing determination under the Eighth and Fourteenth Amendments. ECF No. 20 at 64. Lawlor broke this claim down into three parts:

Claim XII(A). In part A, Lawlor stated that the trial court wrongly "adopted a categorical position that hearsay was inadmissible for any reason during the penalty phase," which excluded relevant mitigating evidence that contextualized the sexual component of the murder. ECF No. 20 at 65. Specifically, trial counsel wanted to get statements into evidence that Lawlor made to two probation officers, Mark Crosby ("Crosby") and Kathy Coburn ("Coburn"),[16] by putting them on the stand and having them testify as to what Lawlor told them. *Id.* at 66; *see, e.g.,* JA11471-74 (Crosby attempting to state on the record what Lawlor said to him that made Crosby remember Lawlor); 11479 (Crosby attempting to state on the record what the atmosphere in Lawlor's house was like when he was living with his father); 11495-97 (trial counsel attempting to get Crosby to testify as to the "reputation" of Sal's Pizza Place); 11500-04 (trial counsel and the court discussing at a bench conference the hearsay exception that it is not admitted to prove the truth of the matter asserted but rather the effect on the listener); 115007-27 (discussing generally with trial counsel the differences between Lawlor's statements and those in *Green*, as

---

[15] The "good character evidence from family and friends" that Lawlor sought to introduce was testimony of those individuals regarding "the value of [Lawlor's] life" to them, the positive relationships they had with him, and the effect his execution would have on them. ECF No. 20 at 68.

[16] Trial counsel never called Coburn to the stand, JA 11579-86 (discussing – and disagreeing – with the court that the substance of Coburn's testimony would be hearsay and therefore deciding not to call her as a witness), and instead called a few other witnesses who could testify as to Lawlor's character. *See, e.g.,* JA 11557 (Testimony of Don Lawlor, a distant cousin); 11587 (Testimony of Kevin Lawlor, Don Lawlor's brother); 11596 (Testimony of Kimberly Schlottman, the mother of Lawlor's child); 11670 (Testimony of Suzanne Freeze, Lawlor's neighbor).

well as discussing the rules of evidence while still considering mitigation evidence in capital cases). In effect, counsel argued to the trial judge that these statements were either admissible as an exception to the hearsay rule based on their reliability under the circumstances and *Green v. Georgia*, 442 U.S. 95, 97 (1979), or as non-hearsay not offered for the truth of the matter but instead offered to show the basis for Crosby's recollection of Lawlor and as explanation for the actions he took as Lawlor's probation officer. JA 11471-527.

In the instant Petition, Lawlor abandoned the argument that the statements were non-hearsay not offered for the truth of the matter, and instead focused on why the trial court should have allowed the out of court statements into the record based on their reliability. ECF No. 20 at 65. Specifically, Lawlor wanted: (1) Crosby to testify about the statements Lawlor made to him regarding sexual abuse by the Sal's Pizza Place owner; (2) Coburn to testify that Lawlor was the victim of sexual abuse and needed psychological treatment; and (3) Woody Couts of Alcohol and Drug Services ("Couts") to testify about Lawlor's history of sexual abuse through letters that he wrote to a circuit court judge in 2006. *Id.* at 66. Lawlor argued that the trial court's ruling barring this evidence as hearsay violated the Supreme Court's ruling in *Green*, "because the evidence was 'highly relevant to a critical issue in the punishment phase of trial' and ' substantial reasons existed to assumes its reliability.'" *Id.* (quoting *Green*, 442 U.S. at 97).

In *Green*, the petitioner, Roosevelt Green ("Green"), was indicted with a co-defendant, Carzell Moore ("Moore"), for rape and murder of a female in Monroe County, Georgia. *Id.* at 95. Moore and Green were tried separately, both were convicted, and both received a capital sentence. *Id.* At Green's trial, he sought to introduce the testimony of Thomas Pasby ("Pasby") because, "[a]ccording to Pasby, Moore had confided to him that he[, Moore] had killed Allen, shooting her twice after ordering [Green] to run an errand." *Id.* at 96. The trial court refused to

allow Green to introduce Pasby's testimony, ruling that Pasby's testimony constituted hearsay under Georgia law due to the fact that it included statements that Moore made to Pasby, and Moore would not be testifying. *Id.* The Supreme Court held in favor of Green, reasoning, "[r]egardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment. The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, . . . and substantial reasons existed to assume its reliability." *Id.* at 97 (internal citations omitted). The Supreme Court's reasons as to the reliability of the hearsay were as follows: (1) Moore made his statement spontaneously to a close friend; (2) The evidence corroborating the confession was ample; (3) The statement was against interest, and there was no reason to believe that Moore had any ulterior motive in making it; and(4) the State considered the testimony sufficiently reliable to use it against Moore, and to base a sentence of death upon it. *Id.* The Supreme Court then emphasized that this was a unique circumstance in which "the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).

The Supreme Court of Virginia considered this claim on direct appeal. *Lawlor*, 285 Va. at 239-42, 738 S.E.2d at 877-79. On direct appeal, the Supreme Court of Virginia noted that Lawlor conceded that the excluded statements were hearsay but argued they were still admissible under *Green* because "they are reliable because they were made years before to probation officers in the context of supervisory relationships." *Id.* at 242, 738 S.E.2d at 878. However, the Supreme Court of Virginia rejected Lawlor's *Green* argument,[17] stating, "By its own terms,

---

[17] The trial court rejected trial counsels' argument that the statements Lawlor made to Crosby constituted admissible evidence under *Green* because the statement in *Green* was a third-party confession, and the statements Lawlor made to probation were only about his circumstances while a teenager in probation. JA 11483-86.

*Green* does not stand for the proposition that evidence may not be excluded on hearsay grounds simply because it is offered as mitigation in the penalty phase of a capital murder trial. . . . [W]hen hearsay evidence does not bear the indicia of reliability present in *Green* and *Chambers,* it may properly be excluded even when offered in mitigation." *Id.* at 240-41, 738 S.E.2d at 877-78. In applying the *Green* reasoning, the court found that the statements Lawlor made to his probation officers must be "clothed with any indicia of reliability" in order to come into evidence. *Id.*, 738 S.E.2d at 879. The court held that because the statements "were not made against Lawlor's penal interest, they were not made spontaneously to a close friend, and they were not independently corroborated by other evidence, . . . the court did not abuse its discretion by excluding them." *Id.*

Respondent argued that The Supreme Court of Virginia's decision to not let hearsay—that does not qualify under a hearsay exception—into evidence during the penalty phase was not unreasonable because it was consistent with both Virginia law and the precedent set forth in the Supreme Court's *Green v. Georgia* decision. ECF No. 29 at 64-65, 68.

The Supreme Court of Virginia's decision was not unreasonable, and, in any event, any error in excluding the specific proffered testimony was harmless because Lawlor was able to introduce other evidence of his sexual abuse history, and this issue was strenuously argued to the jury without objection. The Court first notes that there is no precedent establishing that the rules of evidence, specifically hearsay, are suspended or otherwise modified when presenting mitigation evidence. *See Davis v. Branker*, 305 F. App'x 926, 937 (4th Cir. 2009) ("[N]either *Lockett* and its progeny nor *Green* compel the conclusion that a state court is required to present a capital jury with *any* evidence the defendant proffers as mitigating, no matter how irrelevant, unreliable, or cumulative, or that a state's normal evidentiary rules must always yield to allow the

introduction of such evidence."). Further, *Green* was the rare case involving a third-party confession for the crime in which Green was facing. Lawlor's statements to Crosby, Coburn, and Couts concerned his living situation over twenty years before Lawlor murdered Genevieve Orange. Thus, the content of Lawlor's statements "do[] not rise to the level of the critical relevancy of the accomplice's confession in *Green,* nor bear upon its 'inherent reliability.'" *Id.* at 938 (finding letters of remorse that the petitioner wrote while awaiting trial to not surmount the hearsay rule through *Green* because they were cumulative to other evidence and the content was self-serving); *see also Buchanan v. Angelone*, 103 F.3d 344, 349 (4th Cir. 1996), *aff'd,* 522 U.S. 269 (1998) (noting the hearsay statements in *Green* fall under a "narrow exception": "In *Green,* the excluded statement strongly tended to show that the defendant was innocent. In this case, the statements were offered only for the purpose of providing additional support for Dr. Brown's conclusion that Buchanan acted under extreme emotional stress."). Because of the stark differences between the type of statement in *Green* and the statements here, it cannot be said the Supreme Court of Virginia was unreasonable for not extending the application of *Green.*

Regardless, even if the Court broadly interprets the premise that "reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule," *Sears*, 561 U.S. at 949 n.6, and assumes that "substantial reasons existed to assume its reliability," *Green,* 442 U.S. at 97, Lawlor was not prejudiced by the exclusion of this specific evidence. This is so because the very same evidence of Lawlor's teenage sexual abuse was admitted through the testimony and records of other witnesses. *See, e.g.,* JA 14947 (Rafala Professional Counseling Services records, Def. Ex. 82); 12655-56 (testimony of Samuel Dworkin reading the Rafala Professional Counseling Services record entry pertaining to Lawlor's presenting problem: "[G]rew up with mom until 13, then dad till 16, then

left home. Dad emotionally unavailable. Mom tried. I abused myself with drugs and alcohol since age 13, sexually abused by 40-year-old man that I stayed with when I was 16. I'd run away from home. He abused me for six months."); 10982-83 (testimony of Elizabeth Cox describing Sal of Sal's Pizza as a known child molester); 12377-84, 12399 (testimony of psychiatric nurse practitioner Mary Fisher and Snowden Hospital medical records, Def. Ex. 76, describing Lawlor's history of sexual abuse); 14932-33 (Initial Mental Health Evaluation of Lawlor, Def. Ex. 77, identifying instances of physical and sexual abuse).

Lawlor's evidence of his sexual abuse history was not only fairly presented to the jury, it was argued at some length by his attorney as a mitigating factor during closing arguments:

> What did happen to Mark? Where was Mark to go? Where was Mark to go? We know where he went. We know exactly where he ended up. At one point he ends up with Sal at Sal's Pizza in the pantry, in the back where he get molested by Sal, serially molested by Sal. He got to stay in the pantry. Mark had nowhere to go, and that's where he ended up having to go.
>
> How do you know about Sal? You know all about Sal. You know about Sal because you know about it from Mark Crosby -- we'll talk a little bit more about that -- and you know about Sal because you know that after Mark Crosby it took Mark years to be able to tell anyone about the sexual abuse that he endured when he was young, years.
>
> It wasn't until he met Mary Fisher in 2005 that he was able to talk about that sexual abuse, and then you know from the records from Snowden Hospital, 2005, when Tucker, a 40 year old he was staying with back in New Jersey when he was 16 who molested him, and you know from Cynthia Rafala's notes that were read by Mr. Dwarkin (ph.) from I think it was February 2006 -- he was just starting to open up, just starting to open up about what was going on with him when he was young, about the man who molested him when he was a teenager.
>
> And you know from Mark Crosby, because Mark Crosby knew the reputation of Sal and didn't want Mark to stay there. Now, what's going on with Mark at this time? I want to step back a bit because you heard from Bob Blistan, I want to just make clear, Bob Blistan – Mark was 15-years-old, he was in ninth grade, it was the spring time -- by the time we're talking about, the shotgun, by the time we're talking about Sal and all that, three months in Bob Blistan's class have passed.
>
> Mark's not in school. He was living with his dad, but he wasn't in school. He was last in school -- Bob Blistan when he was 15, and think about the school that he was in. Three-person class for emotionally disturbed kids, separated out from the rest of the student body. Now, Mr. Blistan is doing the best he can with

what he was given by his school and by his school district, but did they really give up much for these kids?  Were these the kids they were really trying to pay attention to or the kids they're trying to keep away from the good kids, the other kids.

This boy, he's got nothing at home.  He's got nothing at school.  By the time he's living at Sal's, he doesn't have school, he doesn't have parents, he doesn't know where his sister is.  Grandma's far away.  The rest of the cousins, they all get together, but not with Richard and Fran's kids and their family, so (unintelligible) part of his life.  He's got nothing but Sal.

Fortunately for the moment at least, he meets Mark Crosby, the probation officer.  Now, Mark's drinking and using drugs, Crosby sees that, Crosby sees he's getting into little  unintelligible); he's staying at Sal's, can't stay there; sleeping in cars, that's no good, a 15 year old sleeping in cars for his life, and so when Mark gets another little petty little thing, Crosby comes up with a plan.

Now, Mark Crosby's a practical man.  He's not bringing Mark into his home, he's not embracing him, he's not treating Mark as his own son, but he recognizes this boy has nowhere to go, can't go to dad's, not going to live in that house, can't go to Sal's.  So what does Crosby do?  Crosby's got about 150 probationers, right, Mark's one of them.  Practical man.  I'm going to get him a bus ticket and get him out of here.  Get him out of here.  Let's just get him out.  Anything, anything had to be better than what was going on right then and there.

According to the practiced eye of Mark Crosby, it was put him on the bus and send him away.  But the pain and abuse and the damage of those years before Mark left New Jersey, a bus ticket, while it's a Hail Mary act of desperation by the probation officer, a bus ticket cannot fix all that pain.

JA 12841-44.  Moreover, counsel returned to this argument later in his closing:

And Mary Fisher tells you, look, I don't go diving right in, right now tell me everything, tell me the whole ocean of the trauma you've experienced in your life.  She lets the person tell her what they're comfortable telling because that way they won't shut down, so she hears about what happened to Mark's sister; right?  And she hears about the rape and the sexual molestation of that and Mark walking in, and she hears about sexual abuse that Mark had endured, and she testifying to the memory, exactly what it is she doesn't recall, and they're making progress, they're making progress.

JA 12864.

Consequently, to the extent that the state trial court wrongly excluded relevant testimony from Crosby, Coburn and Couts, any error in excluding the testimony was harmless.  Even if a federal court finds error on behalf of the trial court upon habeas review, relief is not automatic.  A trial court error is harmless unless it had a "substantial and injurious" effect on the jury's

verdict. *Fry v. Pliler*, 551 U.S. 112, 116 (2007); *United States v. Dyess*, 730 F.3d 354, 366 (4th Cir. 2013) (quoting *United States v. Rodriguez*, 433 F.3d 411, 416 (4th Cir. 2006)) ("Under the harmless error standard, a defendant is 'entitled to relief if the error has affected his substantial rights.'"). Moreover, the burden rests with the petitioner to demonstrate the injurious effect. *Hill v. Clarke*, No. 3:12CV174, 2014 WL 6388431, at *5 (E.D. Va. Nov. 14, 2014), *appeal dismissed* (Mar. 23, 2015) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) ("An error is harmless unless the *petitioner* demonstrates that the error resulted in 'actual prejudice.'") (emphasis in original). In assessing the gravity of the error's effect, this Court must consider the trial court's error "in light of the record as a whole." *Brecht*, 507 U.S. at 638. Given that the record as a whole includes significant evidence of Lawlor's childhood sexual abuse, and counsel argued that evidence vigorously to the jury, Lawlor suffered no prejudice in the trial court's exclusion of the proffered testimony.

Thus, the trial court's application of Virginia's hearsay rule did not rise to the level of a constitutional violation as Lawlor claimed, and the Supreme Court of Virginia was not unreasonable in upholding the trial court's exclusion of the statements.

Claim XII(B). In part B, Lawlor stated that the trial court violated Lawlor's Fifth Amendment right not to testify by referring to Lawlor's failure to testify when the court limited trial counsel's witnesses from testifying about Lawlor's sexual abuse history. ECF No. 20 at 67. Lawlor referred to the following statements by the trial court:

> THE COURT: I'm not going to let him testify for Mr. Lawlor of what Mr. Lawlor told him was going on at the house, et cetera. If you want to do that, put Mr. Lawlor on the stand.

JA 11482.

THE COURT:  Why isn't that absolute hearsay?  If it is absolute hearsay, which I'm sure you'll say it is, how is -- where is that exception?  Mr. Lawlor could surely take the stand and testify to those things if he chooses to.

JA 11582.

MR. UNGVARSKY:  Well, Your Honor, I would like to set forth other grounds for why we think these statements are admissible and what these statements are.

THE COURT:  Tell me what they are.

MR. UNGVARSKY:  Okay.  The statements include what Mr. Lawlor told --

THE COURT:  You admit they're all hearsay statements?

MR. UNGVARSKY:  Well --

THE COURT:  They have to be.  You want this witness to speak the words of Mr. Lawlor, through his mouth –

MR. UNGVARSKY:  Right, I –

THE COURT:  Instead of putting Mr. Lawlor on the stand.  You want this witness to talk for Mr. Lawlor.  I understand that.  But it's hearsay nonetheless, isn't it?

JA 12116.

THE COURT:  Isn't what you're trying to do isn't what you're trying to do, you're trying to get statements that Mr. Lawlor could make into evidence without putting Mr. Lawlor on the stand?  All of these are statements that he could make and they would not be objectionable, but you're choosing to try to put all this evidence in without Mr. Lawlor.

MR. UNGVARSKY:  I'm not sure that Mr. Lawlor -- you're correct that we are seeking to put this in without Mr. Lawlor, and I think we are allowed to.  We don't have to only rely upon the Defendant.  And that's what the Jones case was; that they didn't rely upon the defendant, they put it in through his relative. I'm not sure under the hearsay rule as articulated to the Court that even Mr. Lawlor would be allowed to testify that "Thirty years ago I told somebody 'X'".  That might also be struck as hearsay.

THE COURT:  How can the Commonwealth cross examine this witness to ascertain the truth, which is what cross examination is all about?  How can they cross examine when all they're getting is a secondhand recitation?

JA 12140.

Lawlor stated that "[i]n each of these instances, by effectively penalizing [Lawlor's] decision not to testify, the court committed error." ECF No. 20 at 67. Respondent argued that the Supreme Court of Virginia's decision was not unreasonable in that it concluded that the trial court did not err for stating to trial counsel, outside the presence of the jury, that the information Lawlor sought to come into evidence would only be admissible through Lawlor's testimony himself and that the mere fact that Lawlor had to decide whether to testify does not violate his Fifth Amendment right. ECF No. 29 at 68.

The Supreme Court of Virginia considered this claim on direct appeal. *Lawlor*, 285 Va. at 246, 738 S.E.2d at 880 ("Lawlor asserts that the court erred by ruling that he would have to testify to present his mitigating evidence to the jury."). The court reasoned and concluded:

> Each of the identified statements was made as the court ruled on an objection by the Commonwealth. Contrary to Lawlor's assertion, the court did not base its rulings on his exercise of his right against self-incrimination. Rather, it based these rulings on its determination that the evidence Lawlor was attempting to present was inadmissible hearsay. The court noted that while the witnesses would not be allowed to present hearsay evidence by testifying to statements Lawlor made to them, the evidence would be admissible if Lawlor testified himself: then, by definition, it would not be hearsay. A court does not err by observing outside the presence of the jury that inadmissible hearsay evidence would be admissible if the declarant testified directly—even if the declarant is the defendant.

*Id.* at 246, 738 S.E.2d at 881. The Supreme Court of Virginia's decision was not unreasonable or contrary to clearly established federal law. First, as the Supreme Court of Virginia noted, "A court does not err by observing outside the presence of the jury that inadmissible hearsay evidence would be admissible if the declarant testified directly." *Id.* All of the instances that Lawlor referred to were statements the trial court made outside the presence of the jury either during a bench conference or before the jury was brought into the courtroom. *See* JA 11480 (noting the discussion at JA 11482 occurred during a bench conference); JA 11576 (noting the jury had not been brought in yet for the statement made at JA 11582); JA 12118 (noting the

discussions at JA 12116 occurred between the court and counsel outside the presence of the jury: "THE COURT: Let's bring the jury in"); JA 12133 (noting the back-and-forth between the court and Mr. Ungvarsky at JA 12140 occurred in a bench conference). Second, the court's statements indicating that Lawlor would have to testify in order to render admissible his out of court statements are in direct response to the Commonwealth's hearsay objections, and are consistent with Virginia's rules of evidence. *See* Va. Rules Evid. 2:801-03.

Further, Lawlor claimed that the trial court was "penalizing" him for not testifying. ECF No. 20 at 67. Lawlor cited *Estelle v. Smith*, 451 U.S. 454, 455 (1981), which, as Respondent noted, provides that the state cannot compel a defendant to testify against his will. *See* ECF No. 29 at 68-69. Lawlor presented no evidence other than the court's statements themselves to establish that the court made such statements in an attempt to force Lawlor to testify. The record clearly shows that the trial court did not *compel* Lawlor to testify. The court explained to trial counsel that if they wanted to get into evidence certain out of court statements that did not qualify for any hearsay exceptions, they could only do so through the declarant, *i.e.,* Lawlor. The trial court repeatedly reiterated the notion that the rules of evidence still apply during the mitigation phase. *See, e.g.,* JA 11490 ("THE COURT: This is a court of law and we're going to try this case according to the rules of law, according to the evidence and according to the evidence in the case."); JA 11510 ("So to cite *Sears v. Upton* for the proposition that the hearsay rule doesn't apply in this proceeding is absolutely wrong."); JA 11517-18 ("THE COURT: You get broad latitude in offering mitigation, but you don't get to offer unsubstantiated, unverified, second- and third-rate hearsay, nor do you get to put your mitigation evidence on in the guise of someone else testifying to it. This isn't Mr. Lawlor on the stand. This is someone who has, by your own admission, no foundation for that."). In fact, the court explained that this same hearsay

rule would apply to any witness, not just Lawlor, who happened to be the declarant at issue. *See* JA 11482 ("THE COURT: But at this juncture he cannot sit on the stand and parrot hearsay testimony from Mr. Lawlor *or any other witness*. So to the extent that that's where you' re going with this, I sustain the objection.") (emphasis added); *see also* JA 11504 ("THE COURT: We're at the mitigation stage and this witness cannot sit up on the stand and merely recite his opinions any more than any other witness can."). Consequently, the Supreme Court of Virginia's ruling on this claim was not unreasonable.

Claim XII(C). In part C, Lawlor argued that the trial court improperly excluded testimony from Lawlor's family and friends as to the effect that Lawlor's execution would have on them and the value of their positive and loving relationships with him. *Id.* at 68. Specifically, Lawlor argued that the trial court erred by denying a motion that would have admitted this "execution impact" evidence by reasoning that it would be testimony of a witness's future emotions, and that the impact on a third party was not relevant. *Id.* Lawlor cited *Lockett*, *Tennard*, and *Eddings*, to support his proposition that the trial court improperly refused to permit testimony from Joann Cox ("J. Cox"), Richard Poorman ("Poorman"), and Elizabeth Cox ("E. Cox") as to the "value of their relationships" with Lawlor. *Id.* Such execution impact evidence, Lawlor argued, was probative of his "character and the value of his life, and was therefore relevant." *Id.* at 69.

The Supreme Court of Virginia considered this claim on direct appeal. *Lawlor*, 285 Va. at 244, 738 S.E.2d at 880 ("In assignments of error 14 and 120, Lawlor asserts that the court erred by denying his motion to allow evidence of the effect his execution would have on his family and friends."). The court discussed the scope of relevant evidence, first citing *Andrews v. Com.*, which reasoned that "[a] defendant in a capital case has the constitutional right to present

virtually unlimited relevant evidence in mitigation." 280 Va. 231, 301, 699 S.E.2d 237, 277 (2010). The court next examined the standard enunciated by the Supreme Court in *Tennard v. Dretke*:

> [T]he meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard—any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence—applies. . . . Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.

542 U.S. 274, 284 (2004) (citations and internal quotation marks omitted). The court then reconciled that standard with the standard set forth in *Coppola v. Com.*, which held in part that "the effect of [a defendant's] incarceration upon relatives is not a mitigating circumstance for the jury to consider." 220 Va. 243, 254, 257 S.E.2d 797, 804 (1979), *cert. denied,* 444 U.S. 1103 (1980)). The Supreme Court of Virginia held that, based on these principles, the trial court did not abuse its discretion by excluding this evidence. *Lawlor*, 285 Va. at 245, 738 S.E.2d at 880. Respondent argued that the Supreme Court of Virginia correctly decided that the information Lawlor sought to introduce did not meet the relevance standard and, even if it did, Lawlor was not prejudiced because he got this information into evidence through the testimony of his sister at sentencing. ECF No. 29 at 70-71.

Before considering whether the Supreme Court of Virginia's decision was not unreasonable or contrary to clearly established federal law, the Court will review the specifics of the testimony at trial, summarizing it below:

Joann Cox:
    J. Cox testified that she was a friend of Lawlor who "looked upon him as a son." JA 11897. J. Cox helped Lawlor out by providing him a place to stay on weekends, driving him to AA meetings, and helping him out financially at times. JA 11899-900. In return, Lawlor would help her out around the house, doing chores: "He was the most helping individual I know; always wanting to help

somebody." JA 11901. J. Cox also brought Lawlor to her church, where he became an active and engaged member. JA 11908-09.

J. Cox stated that since his arrest for the murder of Orange, she had stayed in touch with him through telephone and letter correspondence, stating that she even received a Mother's Day Card from him while he was incarcerated. JA 11925-26. She felt like she was "talking to the old [Lawlor]," not the Lawlor that is currently on trial. JA 11926. From the time of his arrest until she testified at trial, she only visited once. *Id.* She attempted to testify that the reason for not visiting more often was because it was "very difficult for [her] to have a loved one on the other side of that glass when [she] can't touch him." JA 11926-27. The Commonwealth objected on the basis of *Copolla* and the court held a bench conference, informing defense counsel that the witness could not testify as to "any of the effects of punishment" on a witness because it was irrelevant. JA11927-28. The court allowed J. Cox to testify as to Lawlor's facial expressions, body language, and overall demeanor, letting her conclude that Lawlor was glad to see her when she visited. JA 11930. J. Cox stated that at the time of trial, she talked with Lawlor about three to four times per week. JA 11932-33. In these phone conversations, J. Cox stated that they discussed the house or people at church, and they laughed and told jokes. JA 11934. J. Cox further indicated that she loved Lawlor and would keep talking and writing to him but would only "possibly" visit him if he were moved to a distant location because she would not feel comfortable making an overnight trip and staying in a strange area. JA 11934-35. J. Cox also attempted to respond to counsel's question, "have you in the past, and do you, value the love that he has shown you?" but the Commonwealth objected and the court sustained it. JA 11947-48.

Richard Poorman:

Poorman testified that he was Cox's next-door neighbor, but that he and Lawlor were friends and were both recovering alcoholics. JA 12020-21. He testified that since they were both recovering alcoholics, they supported each other similar to how a sponsor would support his mentee in the AA program. JA 12022-23. Poorman also stated that Lawlor was very helpful, working around the house and the yard. JA 12025-26. Poorman attempted to respond to counsel's question, "Do you miss seeing him around?" but the Commonwealth objected and the court sustained the objection. JA 12028-29. Counsel also asked Poorman whether he would consider visiting Lawlor while he was incarcerated, but the Commonwealth objected and the court again emphasized that the effect on a third party was not relevant and that it called for speculation. JA 12029-30. The court further stated that trial counsel could ask Poorman about the strength of his relationship with Lawlor, but not whether Poorman plans to visit. JA 12031.

Elizabeth Cox:

E. Cox testified that her children really took to her brother, Lawlor, and loved to laugh and play with him. JA 12559-60. She stated that she lives in Kentucky, but visited Lawlor one time with her husband and daughter while he awaited trial. JA 12561. She stated that the visit was important to her and that

she "wanted to see [her] brother. [She] wanted to talk to him, tell him [she] love[d] him, see how he was doing." JA 12561. She also stated that she will visit him again, and will write to him "all the time." *Id.* In response to a question about the strength of her relationship with Lawlor, E. Cox stated,

> This situation, trial, whatever you want to call it, has opened up a lot of things that we haven't been able to talk about. It's kind of a healing thing, overall thing that in the future that it could be a healing for us, things that we haven't been able to discuss and maybe help each other get through some things, but I definitely feel like it's stronger and could be even stronger still.

JA 12562. However, when trial counsel asked, "What, if anything do you feel you would get out of your relationship with your brother?," the Commonwealth objected and the court sustained the objection, explaining to trial counsel that what E. Cox gets out of her relationship with her brother is irrelevant as it is essentially asking what is the effect on her of their current relationship while he is incarcerated. JA 12562-63. E. Cox did testify, though, that she contributed "understanding, compassion, [and] comfort" toward her relationship with Lawlor, and that she will continue interacting with him in that regard. JA 12564. She concluded her testimony by stating that her relationship with Lawlor is important to her. JA 12565.

The Supreme Court of Virginia's decision was not unreasonable or contrary to clearly established federal law. *Eddings* merely established that a Defendant has the right to offer relevant mitigating evidence to rebut aggravating factor evidence, 455 U.S. at 117, and *Lockett* defined the scope of relevant mitigating evidence as "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," 438 U.S. at 604. In *Tennard*, the Supreme Court rejected the Fifth Circuit's test for screening relevant evidence related to a capital defendant's IQ. *Tennard*, 542. U.S. at 284. The Court described the test for relevance—"[r]elevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value"—as a "low threshold." *Id.* at 284-85 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)). The Court found that the Fifth Circuit's test was inconsistent with the general principles of relevance because it screened out

94

any positive aspect of a defendant's character, such as his good behavior in jail while awaiting trial. *Tennard*, 541 U.S. at 285-86.

It is difficult to make an argument that the effect of a defendant's execution on a friend is relevant mitigating evidence that relates to the defendant's character. As it reads, the effect is on the friend, and thus would likely relate to the friend's character, not the defendant's, which would be outside the scope of *Lockett*. The Fourth Circuit recently considered this question in *U.S. v. Hager*, holding that "to allow evidence about the impact the execution will have upon a third party goes beyond testimony about the defendant's character, prior record, or the circumstances of the crime." 721 F.3d 167, 195 (4th Cir. 2013). The court continued, "To allow testimony of the impact on third parties, however, does nothing to inform the jury on any of these matters and upsets the balance set forth in *Payne*." *Id.* The court noted that some federal courts have allowed execution impact testimony, citing *United States v. Wilson*, 493 F.Supp.2d 491 (E.D.N.Y. Jan. 9, 2007); *United States v. Fell*, No. 2:01crl2–01, 2005 WL 1634067 (D. Vt. July 5, 2005), but emphasized that there are no federal cases "*requiring* admission of 'execution impact' testimony because there are no such cases. *Lockett* does not stand for that principle." *Id.* (quoting *Stenson v. Lambert,* 504 F.3d 873, 892 (9th Cir. 2007)) (emphasis added).

A year later the Fourth Circuit affirmed its decision. *United States v. Umaña*, 750 F.3d 320, 355 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 2856, 192 L. Ed. 2d 894 (2015) ("Umaña argues that he should have been allowed to submit evidence regarding the impact that his execution would have on his wife and child. This argument, however, is squarely foreclosed by our decision in *Hager*, 721 F.3d at 194."). The majority of federal courts reasoned similarly. *See, e.g., Stenson v. Lambert,* 504 F.3d 873, 891-92 (9th Cir. 2007); *United States v. Snarr*, 704 F.3d 368, 401 (5th Cir. 2013) (excluding execution impact evidence and explaining that "victim

impact evidence fundamentally differs from execution impact evidence, which in no way reflects on the defendant's culpability"); *United States v. Williams*, 18 F. Supp. 3d 1065, 1072 (D. Haw. May 7, 2014) ("Even if a witness testifies that he or she does not want to see Defendant executed, it would not be relevant as a mitigating factor to understand what specific impact his execution would have on that witness."). Accordingly, the Supreme Court of Virginia's decision upholding the trial court's exclusion of testimony regarding the effect that Lawlor's execution would have on his family and friends was not unreasonable or contrary to federal law.

The Fifth Circuit in *Jackson v. Drake* also addressed this issue, holding, "Evidence of impact on friends and family does not reflect on Jackson's background or character or the circumstances of his crime." 450 F.3d 614, 618 (5th Cir. 2006). In a dissenting opinion, Judge Dennis, sitting for the Fifth Circuit, disagreed, reasoning,

> Testimony that a defendant is beloved and valued by family and friends outside of prison is directly relevant to the question of whether he can lead a "useful life" if sentenced to life imprisonment because it tends to show that other people consider the defendant valuable as a human being and would benefit from the defendant's survival.

*Id.* at 620 (Dennis, J., dissenting). The majority's opinion and Judge Dennis's dissent do not necessarily conflict. While the majority reasoned that evidence of an execution's impact is inadmissible, Judge Dennis believed that evidence of the value of a defendant's relationship with his family and friends is admissible because it would tend to show the defendant's survival would benefit others. This "relationship value" evidence is also at issue here. In addition to his argument that the trial court improperly excluded execution impact evidence, Lawlor argued that "the court refused to permit testimony from Joann Cox, Richard Poorman, and Elizabeth Cox as to the value of their relationships with [Lawlor]." ECF No. 20 at 68.

Unlike Judge Dennis's dissent in *Jackson*, the Fourth Circuit took a different view in *Hagar*, holding,

96

> Whether Hager's daughters loved him sheds no light on Hager's character, his prior record, or the circumstances of the offense. And we are unable to say that Tonia's and Anika's love for their father is conditioned on whether he had good character traits. As such, we are unable to say that Hager's daughters' love for him constitutes relevant mitigating evidence. . . . [H]ow Hager's daughters feel about their father is not relevant mitigating evidence. . . . And the fact that they love him or that it is important to them "to talk with him, see him, and have him in their lives" provides no insight, either.

721 F.3d at 195-97. The Fourth Circuit based its reasoning on *Coleman v. Saffle*, 869 F.2d 1377, 1393 (10th Cir. 1989) (reasoning that were the court to allow testimony from a defendant's family members that they love him, "[t]he only way they could be considered to bear on [the defendant's] character is to assume that a [family member] would not love him unless he had some good character traits"). Other courts have concluded differently. *See, e.g., Stenson*, 504 F.3d at 891-92 (excluding execution impact statements but noting no abuse of discretion to allow "extensive testimony from [a defendant's] family members and friends about their relationships with [the defendant] and whether they would continue those relationship while [the defendant] was in prison"); *Williams*, 18 F. Supp. 3d at 1071-72 ("To make the parameters clear, Defense witnesses may also, if desired, testify that Defendant's life has value to them, and in that sense, his death could impact them."). Even though there is some disagreement between the federal courts about the admissibility of relationship value evidence during a capital sentencing, the Supreme Court of Virginia's decision was not unreasonable or contrary to clearly established federal law, as the federal law has yet to be clearly established on this subject.

Nonetheless, even if testimony from family and friends about how much they love a defendant and how much they value their relationship with the defendant were admissible mitigation evidence, Lawlor was not prejudiced. The trial court actually gave trial counsel great leeway on this subject. The trial court allowed J. Cox to testify that she loved Lawlor and would continue to correspond with him. JA 11934-35. The trial court instructed trial counsel that it

97

could ask Poorman about the "strength" of his relationship with Lawlor.  JA 12031.  And most influentially, the trial court allowed E. Cox to testify that she also loved Lawlor and will continue to visit and write to him.  JA 12561.  E. Cox further testified to the strength of her relationship with Lawlor, explaining that since his confinement they have been able to talk more openly and "heal" in a way.  JA 12562.  She emphasized that her relationship with Lawlor is important to her, and stated, "I definitely feel like it's stronger and could be even stronger still."  JA 12562, 12565.

In sum, Lawlor's rights were not violated when the trial court refused to allow statements about what Lawlor said to others as unreliable hearsay.  Lawlor was not prejudiced by the trial court's explanations regarding the hearsay violation and at no point did the trial court compel Lawlor to testify.  Further, the trial court did not err by excluding testimony from Lawlor's friends and family about the effect that Lawlor's execution would have on him.  Thus, because the Supreme Court's decision was not unreasonable or contrary to clearly established federal law, the undersigned **RECOMMENDS DISMISSAL** of Claim XII.

Claim XIII.

In Claim XIII, Lawlor argued that trial counsel was ineffective for unreasonably opening the door to damaging testimony from Amanda Godlove during cross-examination at the sentencing phase.  ECF No. 20 at 71.  Amanda Godlove ("Godlove") was Lawlor's ex-fiancée whom he was convicted of abducting in 1998.  *Id.* at 72.  The Commonwealth called Godlove as a witness to testify about the abduction incident, JA 10680-701, to which defense counsel then cross-examined her, JA 10702-14.  Lawlor asserted that "on cross-examination, defense counsel elicited testimony that [Lawlor] generally had anger control issues, that Godlove had only agreed

to marry [Lawlor] because she was scared to refuse his proposal, and that Godlove had ended the relationship because she was afraid of [Lawlor]." ECF No. 20 at 72. Specifically, he argued that defense counsels' questioning "opened the door" for the Commonwealth to inquire about the tenor of Lawlor's entire relationship with Godlove and specific prior acts relating to her. *Id.* Lawlor pin-pointed testimony that he argued would not have been admissible but for trial counsels' deficient performance:

> Godlove: I was afraid that if I made him mad what some of the consequences could be as far as violence or being physically hurt. . . . Saying or doing something that Mr. Lawlor wouldn't agree or be happy with would make him angry, and I don't like that level of anger. . . . [h]e gets physical. Just out of control, hitting things, grabbing me, and I don't know—things getting broken, smashed. . . . There have been multiple incidents where Mr. Lawlor for a lack of a better word lost his temper and had broken things. . . . He got into the same kind of rage that caused—I just call it a white, hot rage. . . . We were at where he was staying and he threw a trash can. He threw a heavy ashtray at me. At one point I believe he hit me and I got a split lip, and he choked me into unconsciousness twice. . . . He said you're leaving here my girl or you're leaving here in a body bag."

*Id.* (citing excerpts from JA 10714-19).

Respondent contended that trial counsels' performance was not deficient, but rather a reasonable pursuit of a strategy intended to demonstrate that Lawlor's bad acts only occurred when under the influence of drugs. ECF No. 29 at 74. Respondent also asserted that Lawlor was not prejudiced because of the other overwhelming evidence of dangerousness, *id.* at 72-73, the fact that the prosecution could have recalled Godlove to rebut Lawlor's mitigation evidence later in the case, *id.* at 72, and the fact that the jury based its death sentences on both aggravating factors—future dangerousness and vileness, *id.* at 74.

Lawlor presented this claim to the Supreme Court of Virginia in his state habeas petition as claim X. *See Lawlor*, 288 Va. at 240, 764 S.E.2d at 279 ("In claim (X), Lawlor contends he was denied the effective assistance of counsel because, during the sentencing phase, counsel

opened the door to the admission of evidence of Lawlor's abuse of his former fiancee, Amanda Godlove."). The Supreme Court of Virginia found that Lawlor failed to meet the "prejudice" prong of the *Strickland* two-prong test because Lawlor failed to demonstrate that but for counsel's alleged errors, the result of the proceeding would have been different. *Lawlor*, 288 Va. at 242, 764 S.E.2d at 280. The Supreme Court of Virginia reviewed the transcript and found that the Commonwealth had elicited the following testimony *before* defense counsels' cross-examination even began:

> Godlove had already testified that prior to the abduction, but after she and Lawlor had ended their relationship, Lawlor called her at work and approached her office, and as a result of Lawlor's behavior she felt the need to have two men escort her to her car every night when she left work "for [her] safety." Godlove testified she and her mother had established a routine whereby she would phone her mother every night when she left work, and her mother knew how long it would then take Godlove to get home. Godlove would again call her mother as she approached the house, and upon arriving home Godlove would pull into the garage but stay in her car, with the windows rolled up, the doors locked, and her hand on the remote control for the garage door until the door had fully closed before getting out of her car. These measures were to ensure Godlove's safety. Godlove testified that on the evening of the abduction she had followed this routine, but when she got near her house she noticed a car which was not normally there and which matched the description she had of Lawlor's car. Godlove then called her mother and asked her to meet her at the door. Then she drove past her home to see if the car followed her. When it did not, she turned around and went home. She pulled into her garage and waited in her car, doors locked, windows rolled up, hand on the garage door opener, watching the door in the rear view mirror. Before the door closed, Lawlor rolled under it and approached the car, demanding to talk with Godlove. When she told him to leave, he got very angry and started banging on the car. Godlove's mother saw what was happening and told Lawlor she was going to call the police. According to Godlove's testimony "normally, that would be enough of a deterrent" but on this night Lawlor said he did not care. Godlove's mother opened the garage door and motioned to Godlove to drive away. When Godlove attempted to do so, Lawlor climbed onto the hood of the car and began hitting and kicking the windshield until he managed to put a hole in it. Lawlor reached through the windshield, turned off the car, opened the door, dragged Godlove out, threw her into his car, and drove away. Eventually, Lawlor's rage dissipated and he freed Godlove after she feigned a severe asthma attack.

*Lawlor*, 288 Va. at 241-42, 764 S.E.2d at 280 (quotations in original) (summarizing Godlove's testimony at trial, *see* JA 10682-700).  The Supreme Court of Virginia concluded that "based upon this testimony, the jury knew Godlove was afraid of Lawlor long before he abducted her," and that Lawlor failed to demonstrate the result of the proceeding would have been otherwise. *Id.* at 242, 764 S.E.2d at 280.

The Supreme Court of Virginia's application of *Strickland* was not unreasonable.  The jury heard or could at least deduce from Godlove's testimony on direct examination that Lawlor would lose his temper and that he tended to break things.  It is clear from Godlove's testimony on direct that she feared Lawlor to the point where she had men escort her to her car from work, had a tedious routine with her mother to ensure she was able to safely enter the home, and that she was used to his rages to the point she could contemplate a successful manner in which to feign a severe asthma attack and escape.  Even if defense counsels' performance was deficient, there is no indication that without Godlove's additional testimony on redirect, the outcome would have been different. *See Goins*, 52 F. Supp. 2d at 661 ("The decision whether to call Scott as a witness necessitated the weighing of risks and returns that is an intrinsic part of defense counsel's choice of strategy.  Such weighing should not be labeled ineffective assistance merely because the choice of strategy has been unsuccessful.").  Thus, the Supreme Court of Virginia's ruling that Lawlor failed to demonstrate prejudice is not unreasonable.  Consequently, the Supreme Court of Virginia did not unreasonably apply *Strickland* to Claim XIII, the undersigned **RECOMMENDS DISMISSAL** of Claim XIII.

Claim XIV.

In Claim XIV, Lawlor argued that the Commonwealth misled the sentencing jury by wrongly asserting, during thepenalty phase, that petitioner raped Orange; and trial counsel was ineffective for failing to object. ECF No. 20 at 78. First, Lawlor asserted in Claim XIV(A) that he was not convicted of raping Orange but was instead convicted of capital murder while in the commission of, or subsequent to, a rape or attempted rape. *Id.* However, during sentencing the Commonwealth emphasized to the jury that Lawlor had in fact raped Orange. *Id.* Lawlor further asserted that this misrepresentation prejudiced him because the jury considered the Commonwealth's statements as true in making their sentencing recommendation as well as during their determination as to whether Lawlor's conduct satisfied the vileness aggravating factor. *Id.* Second, Lawlor argued, as Claim XIV(B), that trial counsel's performance was deficient for failing to object to the Commonwealth's statements during sentencing, and that this deficient performance prejudiced Lawlor because "jurors who followed the court's instructions were reasonably likely to interpret defense counsel's failure to object as a concession that [Lawlor] had indeed raped [Orange]." *Id.* at 78-79.

Respondent argued that Claim XIV(A) was procedurally defaulted, and that the Supreme Court of Virginia's decision regarding Claim XIV(B) was not unreasonable as counsel's performance was not deficient because "[o]bjecting to the use of the word 'rape' would only have risked irritating the jury while simultaneously affording the prosecutor repeated opportunities to justify his theory of the case." ECF No. 29 at 78. Further, Respondent argued that the prosecution fairly pursued its theory of the case from start to finish that Lawlor raped and murdered Orange, and that the jury itself knew whether it convicted Lawlor of murder in the commission of a rape or attempted rape, and thus would not have been confused. *Id.* at 77-78.

Lawlor raised both XIV(A) and XIV(B) in his state habeas petition. *Lawlor*, 288 Va. at 246-47, 764 S.E.2d at 283-84. The Supreme Court of Virginia found that the issue in Claim XIV(A) was barred because it "could have been raised at trial and on direct appeal and, thus, [was] not cognizable in a petition for a writ of habeas corpus." *Lawlor*, 288 Va. at 247, 764 S.E.2d at 283 (citing *Slayton,* 215 Va. at 29, 205 S.E.2d at 682). Therefore, Claim XIV(A) is procedurally defaulted. Lawlor may only overcome the procedural default and obtain federal review on the merits if he can demonstrate cause and prejudice for the default. *See Edwards*, 2010 WL 5825427, at *3. Lawlor argued that his trial counsels' ineffectiveness constituted "cause" to overcome the procedural default. ECF No. 20 at 18. This Court can consider this argument as cause here because Lawlor raised this argument in his state habeas petition, which this Court is also considering under XIV(B). Thus, the Court will analyze the ineffectiveness claim in light of *Strickland* as well as whether it suffices as "cause" to excuse the procedural default of Claim XIV(A).

As to whether defense counsel was ineffective, the Supreme Court of Virginia found that Lawlor failed to meet the "prejudice" prong of the *Strickland* two-prong test. The Supreme Court of Virginia reasoned that Lawlor failed to show the result of the proceeding would have been different because "[t]he sentencing phase jury was composed of the same jurors who convicted Lawlor during the guilt phase of trial." *Lawlor*, 288 Va. at 247, 764 S.E.2d at 284. Essentially, the jurors had already ruled on Lawlor's guilt, convicting him of capital murder committed in the commission of or subsequent to either rape or attempted rape. *See* Va. Code § 18.2-31(5). Therefore, the jurors, being the same factfinders during the sentencing phase as those during the guilt phase of the trial, would not have been misled by the Commonwealth's

statements because they were well aware of the conviction they found and the circumstances surrounding that conviction.

The Supreme Court of Virginia's decision was not unreasonable as the question of whether Lawlor had in fact raped or attempted to rape Orange remained unresolved even after the jury's conviction, and thus did not preclude the Commonwealth from maintaining its theory that Lawlor raped Orange. The Commonwealth's statements were consistent with its theory of the evidence and were supported by evidence in the record at that time. Though not addressed by the Supreme Court of Virginia, Lawlor failed to demonstrate that counsels' performance was deficient for failing to object during the Commonwealth's closing argument. *See Elliott*, 274 Va. at 618, 652 S.E.2d at 483 (finding trial counsel's performance was not deficient for failing to object to the Commonwealth's closing argument that the petitioner had sex with the victim while she was unconscious because that statement was consistent with the prosecutor's evidence as a "circumstance surrounding the offense" of murder); *Teleguz v. Warden of Sussex I State Prison*, 279 Va. 1, 13, 688 S.E.2d 865, 875-76 (2010) (finding counsel's performance was not deficient for failing to object to an inflammatory statement by the prosecutor that was supported by evidence already in the record and was not factually inaccurate).

Furthermore, the Supreme Court's determination that Lawlor failed to demonstrate prejudice is also not unreasonable. Lawlor presented no evidence other than his own inference or assumption that the jury was in fact misled by the Commonwealth's statements. This Court will not make such an inferential leap as jurors are presumed to follow jury instructions unless there is evidence otherwise. *Francis v. Franklin*, 471 U.S. 307, 324 (1985) ("Absent such extraordinary situations, however, we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions."). Finally, because

104

Lawlor's ineffectiveness of counsel claim fails, the claim is insufficient as "cause" for his underlying claim that the Commonwealth misled the sentencing jury by wrongly asserting during penalty phase that Lawlor had raped Orange.  Because the Supreme Court of Virginia's decision was not unreasonable, the undersigned **RECOMMENDS DISMISSAL** of Claim XIV.


Claim XV.

In Claim XV, Lawlor argued that the vileness aggravating factor violated the Fifth, Sixth, Eighth, and Fourteenth Amendments.  ECF No. 20 at 81.  Virginia Code § 19.2-264.4(C) provides two alternative factors for which the Commonwealth must prove beyond a reasonable doubt in order to support a death sentence:

> The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused [1] that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or [2] that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim.

Va. Code § 19.2-264.4(C).  These two aggravating factors are commonly referred to as the "future dangerousness" and "vileness" factors.  *See Juniper*, 2015 WL 4620102, at *14 ("In Virginia, death may be imposed only if a jury finds at least one of two aggravating factors, commonly referred to as 'future dangerousness' and 'vileness.'").  In response to the evidence and argument the Commonwealth presents to prove these factors, the defendant has a right to offer relevant mitigating evidence to rebut any evidence of aggravating factors.  *Id.* (citing *Eddings*, 455 U.S. at 114; *see also Lockett*, 438 U.S. at 604 (creating what is known as the *Lockett* rule, which states: "[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating*

*factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death"). Lawlor argued in Claim XV(A) that the application of the vileness aggravating factor violated *Ring v. Arizona*, 536 U.S. 584 (2002) because Virginia courts have permitted vileness to be found even where a jury has not unanimously agreed on an element of the factor under Va. Code § 19.2-264.4(C). ECF No. 20 at 81. Lawlor argued in Claim XV(B), "The vileness factor is unconstitutionally vague and invites arbitrary and capricious death sentences." ECF No. 20 at 81. Lawlor argued "[m]urder is intrinsically vile, and nothing in Virginia's definition of the vileness aggravating factor provides the 'specific and detailed guidance' necessary to channel the sentencer's discretion under the Eighth Amendment." *Id.* at 82. Respondent argued that both Virginia courts and the Fourth Circuit have upheld the constitutionality of Virginia's vileness factor. ECF No. 29 at 79-80.

The Supreme Court of Virginia rejected these arguments on direct appeal, stating, "We have previously considered and rejected these arguments." *Lawlor*, 285 Va. at 255-56, 738 S.E.2d at 886 (listing cases upholding the notion that the vileness aggravating factor is not unconstitutionally vague). The Supreme Court also responded to Lawlor's argument that "the composite sub-factors to the vileness aggravating factor must be individually proven beyond a reasonable doubt and agreed upon unanimously by the jury." *Id.* at 256, 738 S.E.2d at 886. The Supreme Court of Virginia again rejected this argument, citing *Prieto v. Com.*, 283 Va. 149, 721 S.E.2d 484 (2012) (*Prieto II*), which had not been decided at the time of Lawlor's trial but served as controlling precedent at the time of Lawlor's direct appeal. In *Prieto II*, a capital defendant argued that the elements that formed the basis for the aggravated vileness factor were torture, depravity of mind, or aggravated battery, and that a capital jury considering the vileness

106

aggravating factors would have to unanimously agree upon which elements of vileness form the basis of its finding of vileness. *Prieto II*, 283 Va. at 179, 721 S.E.2d at 502. The Supreme Court of Virginia rejected this contention, stating, "Depravity of mind, aggravated battery, and torture are not discrete elements of vileness that would require separate proof but rather are several possible sets of underlying facts [that] make up [the] particular element. *Id.* at 180, 721 S.E.2d at 503 (citing *Jackson v. Commonwealth*, 266 Va. 423, 434-35, 587 S.E.2d 532, 541 (2003), *cert. denied,* 543 U.S. 842 (2004)). This conclusion was not unreasonable as Lawlor has pointed to no authority which holds that the underlying facts that make up the element of "vileness" are actually separate elements that must be proven and agreed upon unanimously by the jury.

Furthermore, the Fourth Circuit affirmed the constitutionality of the "vileness" and "future dangerousness" aggravating factors multiple times. *See, e.g., Bennett v. Angelone*, 92 F.3d 1336, 1344 (4th Cir. 1996); *Spencer v. Murray*, 5 F.3d 758, 764-65 (4th Cir. 1993); *Cardwell v. Netherland*, 971 F. Supp. 997, 1021 (E.D. Va. Aug. 1, 1997) *aff'd sub nom. Cardwell v. Greene*, 152 F.3d 331 (4th Cir. 1998) ("The Fourth Circuit has consistently sustained the validity of the "vileness" factor in Virginia against vagueness challenges."). The Supreme Court of Virginia's decision was consistent with both Virginia and Fourth Circuit precedent; thus, it was not contrary to, nor an unreasonable application of, clearly established law. *See Barnes v. Jabe*, 71 F.3d 495, 496 (4th Cir. 1995) ("Thus, even if, as a panel, we possessed the authority to hold the Commonwealth's vileness factor unconstitutionally vague, we would not do so."). Because the Supreme Court of Virginia's decision was not unreasonable, the undersigned **RECOMMENDS DISMISSAL** of Claim XV.

Claim XVI.

In Claim XVI, Lawlor argued that the jury instructions during sentencing unconstitutionally biased jurors toward a sentence of death; and appellate counsel was ineffective for failing to properly present this claim on direct appeal. ECF No. 20 at 83. In the first part of this claim, Lawlor argued that the jury instructions "erroneously told the jurors that a death sentence was *presumed correct* after an aggravating factor was proven," rather than making the death sentence available for consideration only after an aggravating factor was proven. *Id.* (emphasis in original). Respondent argued that Claim XVI is procedurally barred as it was not considered by the state supreme court. ECF No. 29. Lawlor presented this claim on direct appeal but the state denied review, stating that the argument was not within the scope of his assignments of error: "Neither this nor any other assignment of error challenges the Commonwealth's proposed instructions on the basis that they misled the jurors into believing they could not impose a sentence of life imprisonment. We consider only arguments within the scope of the assignment of error." *Lawlor*, 285 Va. at 258, 738 S.E.2d at 888 (citing Va. Sup. Ct. R. 5:27); *see also* Va. Sup. Ct. R. 5:17(c). Respondent also argued that the trial court did not abuse its discretion in using the proffered instruction rather than Lawlor's preferred instruction since the pattern instruction has been approved by both the Supreme Court of Virginia and the United States Supreme Court. ECF No. 29 at 81-82.

The Fourth Circuit has held that the Supreme Court of Virginia's rule denying review when assignments of error are improper, lacking, or limited in scope, is an adequate and independent state law ground to constitute a finding of procedural default. *See Mueller v. Angelone*, 181 F.3d 557, 584 (4th Cir. 1999) (finding that the petitioner's procedural default under Rule 5:17(c) for failure to brief issues that were designated as assignments of error was an

adequate state ground to foreclose review of the federal claim); *Hedrick v. True*, 443 F.3d 342, 360 (4th Cir. 2006) ("Rule 5:17(c) is nevertheless 'firmly established' in its general requirement that briefs must include all assignments of error."). The Supreme Court of Virginia's decision not to consider this claim based on a procedural rule is an independent and adequate ground for dismissal of this claim unless Lawlor can overcome procedural default and obtain federal review on the merits by demonstrating cause and prejudice for the default. *Edwards*, 2010 WL 5825427, at *3 (citing *Coleman*, 501 U.S. at 750; *Savino v. Murray*, 82 F.3d 593, 602 (4th Cir. 1996)).

Because the Supreme Court of Virginia never considered the merits of Claim XVI, this Court must determine whether Lawlor is able to overcome the procedural default. Lawlor argued that he can establish cause and prejudice for any default based on appellate counsels' ineffectiveness. ECF No. 20 at 85. Specifically, he argued that "[h]ad appellate counsel properly preserved this claim for review, there is a reasonable probability that the state court would have granted relief based on the merits of the claim. . . ." *Id.* "[I]n order for ineffective assistance of counsel to serve as cause and prejudice to exclude a defaulted claim, the petitioner must not have procedurally defaulted his underlying ineffective assistance claim." *Salyers v. Johnson*, No. 7:07cv403, 2007 WL 3339312, at *2 n.1 (W.D. Va. Nov. 9, 2007) (citing *Carpenter*, 529 U.S. at 453-54; *Murray v. Carrier*, 477 U.S. 478, 486 (1986) ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."). Because Lawlor did not raise this issue in his state habeas petition, the Supreme Court of Virginia never had the opportunity to consider the merits of the claim, and thus, it cannot be presented now. *Cf. Wilson v. Lee*, No. CIV.A. 3:02CV551, 2003 WL 23961848, at *2 (E.D. Va. Apr. 4, 2003) *aff'd in part,*

*appeal dismissed in part,* 102 F. App'x 830 (4th Cir. 2004) (explaining that all of the petitioner's claims are barred from review because they were never properly presented in his first habeas petition, in which case they would be barred by Va. Code. § 8.01–654(B)(2) or because he defaulted the claim on collateral appeal when he failed to list the claim as an assignment of error as required by Va. Sup. Ct. R. 5:17); *Harden v. Johnson,* No. 2:08CV444, 2009 WL 1172869, at *5 (E.D. Va. Apr. 29, 2009).  Lawlor cannot demonstrate his appellate counsel was deficient for failing to properly preserve the claim for review where there is no reasonable probability the Supreme Court of Virginia would even consider the merits as it was procedurally defaulted under Va. Sup. Ct. R. 5:17(c).  *See Strebe v. Johnson,* No. 1:10CV704 TSE/TRJ, 2011 WL 476436, at *5 (E.D. Va. Feb. 3, 2011) ("To the extent that these claims are without merit, appellate counsel cannot be said to have acted unreasonably in failing to pursue them on direct appeal.  Strebe can thus not demonstrate the necessary deficient performance under *Strickland.*").  Thus, Lawlor failed to establish cause for his procedural default.  Furthermore, absent a showing of cause, a prejudice analysis is unnecessary. *See Kornahrens v. Evatt,* 66 F.3d 1350, 1359 (4th Cir. 1995) (noting that courts should not consider the issue of prejudice absent cause to avoid the risk of reaching an alternative holding).  In any event, Lawlor could not establish prejudice because, as Respondent noted, the objected to instruction has been found to "sufficiently and properly state[] the statutory framework" by the Supreme Court of Virginia, *Gray v. Commonwealth,* 233 Va. 313, 351, 356 S.E.2d 157, 178 (Apr. 24, 1987), *cert. denied,* 484 U.S. 873 (1987), and to "not violate . . . constitutional principles" by the United States Supreme Court, *Buchanan v. Angeleone,* 522 U.S. 269, 277 & n.4 (1998).  Accordingly, the undersigned **RECOMMENDS** that Claim XVI be **DISMISSED** as procedurally defaulted.

110

Claim XVII.

In Claim XVII, Lawlor argued that the trial court violated his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel during the sentencing proceeding. ECF No. 20 at 85. Specifically, Lawlor stated that the trial court's reference to Lawlor's pre-trial silence and defense strategy not to have him testify was improper in that it held Lawlor's silence against him when it refused to set aside his death sentence, inferring that Lawlor lacked remorse for his actions. *Id.* at 86. Respondent argued that the trial court properly considered Lawlor's lack of remorse even if it improperly commented on Lawlor's defense strategy. ECF No. 29 at 84. And, Respondent argued that the Supreme Court of Virginia was not unreasonable to find that the trial court did not give significant weight to the mention of defense strategy in considering his sentence because, as a whole, the court considered many other factors. *Id.*

The Supreme Court of Virginia considered this issue on direct appeal. *Lawlor*, 285 Va. at 263, 738 S.E.2d at 890 ("Lawlor argues that the court erred by considering the defense strategy and representations in pre-trial motions, finding that Lawlor had not expressed remorse, and noting that Lawlor did not testify on his own behalf in the penalty phase."). The Supreme Court of Virginia was tasked with reviewing the trial court's decision on sentencing for abuse of discretion. *Id.*, 738 S.E.2d at 890-91 (citing *Yarbrough v. Commonwealth*, 262 Va. 388, 398, 551 S.E.2d 306, 312 (2001)). This review consists of three ways in which a trial court could abuse its discretion: (1) when a relevant factor that should have been given significant weight is not considered by the trial court; (2) when an irrelevant or improper factor is considered and given significant weight; and (3) when all proper factors are considered but the court commits clear error of judgment in weighing those factors. *Id.*, 738 S.E.2d at 891 (citing *Landrum v.*

*Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352, 717 S.E.2d 134, 137 (2011)). The Supreme Court of Virginia reviewed the entirety of the trial court's sentencing statements and reasoned:

> While it is proper for a court to consider a defendant's *present tense* refusal to accept responsibility, or show remorse, it may not be linked to his prior claim of innocence or not guilty plea or exercise of his right to remain silent. Lawlor's defense strategy in the 22 months preceding trial, including his assertion that Delgado may have committed the murder and the concomitant denial of responsibility it implied, was not an appropriate factor to consider in weighing Lawlor's sense of remorse at the time of sentencing. Simply put, a defendant must not be penalized at sentencing for having mounted a legal defense to the charge against him.

*Id.* at 266, 738 S.E.2d at 892 (emphasis in original) (internal citations omitted). However, in considering the impact of this error by the trial court, the Supreme Court of Virginia noted that the trial court gave the greatest weight to other factors at sentencing, including the sentencing report, mitigating evidence, and the evidence adduced at trial; and thus, the court concluded: "While Lawlor's defense strategy was not a proper factor, the court did not give it significant weight in relation to the many other factors stated from the bench when it determined that Lawlor had not shown good cause to set aside the jury's sentences. Accordingly, the court did not abuse its discretion." *Id.* at 267, 738 S.E.2d at 892.

The Supreme Court of Virginia's decision was not unreasonable or contrary to clearly established federal law. Lawlor cited two Supreme Court cases and a Fourth Circuit case to support his argument: *Mitchell v. United States*, 526 U.S. 314 (1999), *Estelle*, 451 U.S. at 454, and *United States v. Caro*, 597 F.3d 608 (4th Cir. 2010). ECF No. 20 at 87. The Court in *Mitchell* held that the Fifth Amendment privilege against self-incrimination does not end upon a determination of guilt but is instead maintained through sentencing. 526 U.S. at 327. In *Estelle*, the Court also held that the Fifth Amendment applies during sentencing and precluded the

112

Government from using statements that the defendant made during a court-ordered mental competency evaluation with a state psychiatrist to prove the future dangerousness aggravating factor. 451 U.S. at 468. The Court reasoned that the defendant's Fifth Amendment rights were violated because the defendant was court-ordered and "did not voluntarily consent to the pretrial psychiatric examination." *Id.* In *Caro*, the Fourth Circuit stated that the Fifth Amendment prohibits considering a defendant's silence regarding the non-statutory aggravating factor of lack of remorse. 597 F.3d at 630. The Supreme Court of Virginia's holding was not contrary to these holdings, and, in fact, the Supreme Court of Virginia even recognized in its opinion a defendant's Fifth Amendment right during sentencing. *Lawlor*, 285 Va. at 266, 738 S.E.2d at 892 ("While it is proper for a court to consider a defendant's *present tense* refusal to accept responsibility, or show remorse . . . prior claim of innocence or not guilty plea or exercise of his right to remain silent.") (citations omitted) (emphasis in original).

While the Supreme Court of Virginia did find the trial judge erred by referencing Lawlor's defense strategy, the court considered any error by the trial court under the standard of abuse of discretion, concluding that the trial court gave significantly greater weight to those aspects of evidence proper for the court's determination. *Id.* at 267, 738 S.E.2d at 892-93. And, contrary to Lawlor's assertion, the Supreme Court of Virginia fully considered the law, including Lawlor's constitutional rights. This Court finds the decision was thoroughly reviewed and reasonable in light of the trial court's statements. Because the Supreme Court of Virginia's decision was not unreasonable, the undersigned **RECOMMENDS DISMISSAL** of Claim XVII.

113

Claim XVIII.

In Claim XVIII, Lawlor argued that the cumulative impact of the constitutional errors in this case requires that his convictions and death sentence be vacated. ECF No. 20 at 88. Essentially, Lawlor argued that even if no individual error merits relief, the totality of all the errors, considered together, merits relief. *Id.* (citing cases addressing the "cumulative error" on habeas review). Respondent argued that the cumulative error standard is not applicable in the present matter because he did not have more than one claim with merit. ECF No. 29 at 86. Lawlor raised this issue in two separate claims in his state habeas petition, challenging the cumulative effect of counsel's deficient performance in claim XIV and a portion of XV, and then challenging the cumulative effect of the trial errors in the remaining portion of claim XV. *Lawlor*, 288 Va. at 247-48, 764 S.E.2d at 284.

The Supreme Court of Virginia held that Lawlor's challenge to the cumulative effect of trial counsel's deficient performance was without merit because each of Lawlor's individual ineffective assistance of counsel claims were rejected. *Id.* at 248, 764 S.E.2d at 284 (citing *Lenz v. Warden of the Sussex I State Prison,* 267 Va. 318, 340, 593 S.E.2d 292, 305, *cert. denied,* 542 U.S. 953 (2004)). The Supreme Court of Virginia's decision was not unreasonable. The cumulative error doctrine states: Two or more errors, though individually harmless, may cumulatively prejudice a defendant to the same extent a single reversible error would. *See United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009); *United States v. Martinez,* 277 F.3d 517, 532 (4th Cir. 2002). The remedy of reversal under the cumulative error doctrine is rare and should not be employed when none of a defendant's claims have merit. *Basham*, 561 F.3d at 330. A petitioner must demonstrate that there is more than one error, and that those errors "so fatally infect the trial that they violated the trial's fundamental fairness." *United States v. Bell,*

114

367 F.3d 452, 471 (5th Cir. 2004).  Because the Supreme Court of Virginia did not find more

than one harmless error, "[i]t necessarily follows that the cumulative error doctrine finds no

foothold in this appeal." *United States v. Sampson*, 486 F.3d 13, 51 (1st Cir. 2007).

As to Lawlor's challenge that the cumulative effect of the trial court's errors deprived

him of his constitutional right to due process, the Supreme Court of Virginia found the issue

barred under *Slayton* because Lawlor could have raised the issue at trial or on direct appeal.

*Lawlor*, 288 Va. at 248, 764 S.E.2d at 284.  The Supreme Court of Virginia's decision was not

unreasonable or contrary to clearly established law.  Because Lawlor did not raise this issue at

trial or on direct appeal, and the Supreme Court of Virginia held the claim procedurally barred,

Claim XVIII is procedurally defaulted in this Court.  *See Mu'Min*, 125 F.3d at 196.  Therefore,

Lawlor may only overcome the procedural default and obtain federal review on the merits if he

can demonstrate cause and prejudice for the default.  *See Edwards*, 2010 WL 5825427, at *3.

Lawlor argued that he can demonstrate cause and prejudice for this default because both trial

counsel and appellate counsel "unreasonably failed to raise this claim during trial and on appeal,

respectively."  ECF No. 20 at 8.  To constitute cause for a second constitutional claim, an

ineffective assistance of counsel claim must be exhausted or else it too is procedurally defaulted.

*Murray*, 477 U.S. at 489.  Lawlor did not raise in his state habeas petition that his trial and

appellate counsel were ineffective for failing to raise the issue that the cumulative effect of the

trial court's errors deprived him of his constitutional right to due process.  *Oken v. Corcoran*,

220 F.3d 259, 265 (4th Cir. 2000) (denying an ineffective assistance of appellate counsel claim

as cause where petitioner failed to raise it in his state habeas).  Thus, Lawlor's ineffective

assistance of counsel claim is also procedurally defaulted and cannot now serve as cause for the

procedural default on the substance of the claim.  *See Carpenter*, 529 U.S. at 453-54; *Murray*,

477 U.S. at 486.  Because the Supreme Court of Virginia's decision was not unreasonable, the undersigned **RECOMMENDS DISMISSAL** of Claim XVIII.


## IV. RECOMMENDATION AND CONCLUSION

For these reasons, the undersigned **RECOMMENDS** that Respondent's Motion to Dismiss, ECF No. 28, be **GRANTED**, and Lawlor's Petition, ECF No. 20, be **DENIED** and **DISMISSED WITH PREJUDICE.**

Lawlor's Motion to Supplement the Record, ECF No. 38, is **DENIED** and **DISMISSED WITH PREJUDICE**.


## V. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, Faulcon is notified that:

1. Any party may serve on the other party and file with the Clerk of this Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d).  A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made.  The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S.

140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to all counsel of record.

/s/

Lawrence R. Leonard
United States Magistrate Judge

LAWRENCE R. LEONARD
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
August 26, 2016